IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| LARRY KLAYMAN | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Civil Action No. 08-1005 (Bates) |
| | : |
| DAVID BARMAK, individually, and | : |
| MINTZ, LEVIN, COHN, FERRIS, | : |
| GLOVSKY and POPEO, P.C., a professional | : |
| corporation | : |
| | : |
| Defendants. | : |
| | : |

## NOTICE OF RELATED CASE

Defendants David Barmak and Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.

("Mintz Levin") (collectively, "Defendants"), through undersigned counsel and pursuant to

Local Rule 40.5 hereby file this Notice of Related Case requesting that the present case (the

"Action") be designated as "related" to a case presently pending in this District, *Larry Klayman,*

*et al. v. Judicial Watch, Inc., et al.*, (the "Judicial Watch Action") (Civil Docket No. 1:06-cv-

00670-CKK-AK).  Because, as set forth below, the Action and the Judicial Watch Action are

related cases with common facts and witnesses, Defendants request that the Action be assigned

to the same Judge and Magistrate (Judge Kollar-Kotelly and Magistrate Judge Kay) who are

assigned to the Judicial Watch Action and who are already familiar with many of the facts and

issues that are present in both the Action and the Judicial Watch Action.  Defendants do not seek,

and would oppose, consolidation of the two cases, as the present Action has just commenced,

while discovery in the Judicial Watch Action is closed.

In support of this Notice, Defendants state as follows:

I.     **BACKGROUND**

1.     On or about November 1, 2007, Plaintiff Larry Klayman filed the Action against the Defendants in the Circuit Court in the State of Florida.  Mr. Klayman had previously filed the Judicial Watch Action in this Court on April 12, 2006.

2.     Defendants timely removed the Action to the United States District Court for the Southern District of Florida on December 3, 2007.

3.     Defendants thereafter filed a Motion to Dismiss for Lack of Personal Jurisdiction, Improper Venue and Forum Nonconveniens on December 20, 2007.

4.     While Defendants' Motion to Dismiss was still pending, Plaintiff Larry Klayman filed his Amended Complaint on January 31, 2008.  In response, on February 19, 2008, Defendants filed their Renewed Motion to Dismiss for Lack of Personal Jurisdiction, Improper Venue and Forum Nonconveniens.

5.     Defendants' Renewed Motion to Dismiss was heard on May 30, 2008.  At that hearing, Judge Alan S. Gold of the United States District Court for the Southern District of Florida in Miami entered an Order granting Defendants' Motion to Dismiss insofar as it sought the transfer of the Action to this Court pursuant to 28 U.S.C. § 1404(a).  This Order was entered on the docket on June 3, 2008.  Defendants' Motion to Dismiss for Lack of Personal Jurisdiction was otherwise denied as moot.

6.     The present Action appeared on this Court's docket on June 16, 2008.

II.     **STATEMENT OF POINTS AND AUTHORITIES**

7.     The relief sought herein is permitted by Local R. Civ. P. 40.5.

8.     Pursuant to their obligations under Local Rule 40.5, and so that this Court may take appropriate measures to manage its docket, Defendants submit this Notice to inform the Court that the Action is "related" to the Judicial Watch Action.

9.     The Action and the Judicial Watch Action are both civil cases and meet the definition of "related" pursuant to Local Rule 40.5.  The Judicial Watch Action, which was filed in 2006, is the "earliest" of the two cases and is still pending on its merits in this Court and the cases "involve common issues of fact" and "grow out of the same event or transaction."  *See*, Local Rule 40.5(a)(3)(ii)-(iii).[1/]

10.     The Amended Complaint in the Action and the Second Amended Complaint in the Judicial Watch Action are attached as Exhibits A and B, respectively.  A review of these complaints reveals that the Action and the Judicial Watch Action should be treated as related cases.  Mr. Klayman alleges that the Defendants in the Judicial Watch Action took (or failed to take) certain actions which caused him harm.  In the later-filed Action, Mr. Klayman alleged that the Defendants (the law firm and an individual attorney who represented Judicial Watch) advised or counseled Judicial Watch to take those actions.  The cases are unquestionably based on the same set of alleged facts, grow out of the same events and, pursuant to Local Rule 40.5, should be treated as "related" cases.

11.     The "related" nature of these actions is further evidenced by a decision of this Court (Kollar-Kotelly, J.), granting Judicial Watch, Inc. and Thomas J. Fitton's Motion for Leave to Amend Counterclaim in the Judicial Watch Action.  In that decision, Judge Kollar-Kotelly addressed Mr. Klayman's request for sanctions based on the argument that certain disclosures made in the Amended Counterclaim violated the attorney-client privilege. *See*

---

[1/]     In his decision to transfer the Action, read from the bench, Judge Gold expressly noted that these two cases were likely to involve the same witnesses and evidence.

Memorandum Opinion in Judicial Watch Action, dated December 3, 2007, attached as Exhibit C. The complained-of "disclosures" were set forth in ¶¶ 10-20 of the Amended Counterclaims of Judicial Watch, Inc. and Thomas J. Fitton and related to allegations made by Mr. Klayman's then-wife, in the midst of their divorce proceedings, that Mr. Klayman had physically assaulted her and engaged in an "inappropriate relationship with a Judicial Watch employee." *See* Amended Counterclaim of Judicial Watch, Inc. and Thomas J. Fitton, ¶¶ 10-20, attached as Exhibit D.  Mr. Klayman argued that the disclosures contain information provided "in confidence, as attorney-client communications" to Mr. Barmak.  Ex. C, pp. 14-15.  In rejecting Mr. Klayman's request for sanctions, Judge Kollar-Kotelly found that the "attorney-client privilege and attorney duty of confidentiality" were not applicable given the circumstances of Mr. Klayman's disclosure of this information.  *Id.*  That decision is not only directly relevant to the present Action, but establishes the "related" nature of these cases.  In the present Action, Mr. Klayman brings claims of breach of contract and breach of fiduciary duty against Mr. Barmak and Mintz Levin for disclosing this very same information regarding the allegations by Mr. Klayman's then-wife.  Ex. A, ¶¶ 9-21.  This overlap of issues confirms that these two cases are "related" and should be assigned to the same Judge and Magistrate Judge.

**III.**        **CONCLUSION**

12.      For the foregoing reasons, and for any other reasons that the Court deems just and

proper, Defendants respectfully request that the Court find that the Action and the Judicial Watch

Action are "related" and assign the Action accordingly.

June 17, 2008

                         Respectfully submitted,


                         */s/Helen Gerostathos Guyton*
                         Helen Gerostathos Guyton (Bar No: 499203)
                         MINTZ, LEVIN, COHN, FERRIS,
                         GLOVSKY AND POPEO, P.C.
                         701 Pennsylvania Ave., N.W.
                         Suite 900
                         Washington, D.C.  20004-2608
                         (202) 434-7300

                         *Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

      I, Helen Gerostathos Guyton, hereby certify that a true copy of this document was served on all counsel of record by either electronic or first class mail, postage prepaid on June 17, 2008.


                              */s/ Helen Gerostathos Guyton*
                              Helen Gerostathos Guyton

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

### Civil Action No.  07-23135-CIV-Gold/Brown

**LARRY KLAYMAN**

      **Plaintiff,**

v.

**DAVID BARMAK, individually, and
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY and POPEO, P.C. a
professional corporation**

      **Defendants.**

_____/

### AMENDED COMPLAINT

The Plaintiff Larry Klayman (hereinafter referred to as "Plaintiff") sues the Defendant David Barmak (hereinafter referred to as "Barmak") and the Defendant, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. (hereinafter referred to as "Mintz Levin") (Barmak and Mintz Levin collectively hereinafter referred to as "Defendants") and in support of this action states:

1.    This is an action for breach of contract and breach of a fiduciary duty arising out of the Defendants' improper actions in disclosing confidential and attorney client privileged and proprietary information learned as counsel for the Plaintiff, as well as after improper and illegal acts, in order to benefit other clients at the expense of the Plaintiff, who was at all material times also a client or former client.

### PARTIES

2.    The Plaintiff, Larry Klayman is an individual who resides in Miami-Dade County, Florida.

3.    The Defendant, David Barmak is an attorney admitted to practice law in the District of Columbia, and resides in Maryland.

4.    The Defendant, Mintz Levin is a law firm which practices law in the District of Columbia, but also does business in Florida.

## STATEMENT OF FACTS

5.    In 1994, the Plaintiff founded a public interest non-profit group, Judicial Watch, and served as the Chairman, General Counsel, and Treasurer of Judicial Watch until September 23, 2003.    At that time, the Plaintiff stepped down in order to seek the Republican nomination for Senate in Florida.

6.    On or about May 2003, the Defendants had been representing the Plaintiff personally in a number of matters and were also representing Judicial Watch as outside General Counsel.

7.    Around that time, the Plaintiff had commenced discussions with Judicial Watch, which ultimately led to the execution of a Severance Agreement between the Plaintiff and Judicial Watch.

8.    Since Judicial Watch wished to consult with the Defendants about negotiations over the terms of that severance and the Plaintiff was agreeable, since he had retained other counsel to represent him in that regard, Judicial Watch and the Plaintiff executed a waiver agreement in which Judicial Watch acknowledged that the Defendants were the

Plaintiff's personal counsel and the Plaintiff permitted the organization to consult with the Defendants for the limited purpose of negotiating the Severance Agreement.

9.      Prior to that time, the Plaintiff had disclosed to the Defendants in the context of the attorney-client representation that the Plaintiff's then-wife had made certain defamatory and false allegations against the Plaintiff for tactical reasons in a divorce proceeding then pending in the Fairfax County Virginia Circuit Court.

10.     The Plaintiff spoke to the Defendants in their capacity as the Plaintiff's personal attorney, and the Defendants understood and expressly agreed that the Plaintiff's disclosures to the Defendants were protected attorney-client communications.   The Plaintiff disclosed in confidence that the allegations were untrue, and were a contrivance of divorce litigation drafted by his then-wife's lawyer for strategic advantage.   The Plaintiff disclosed the allegation to avoid surprise or embarrassment to the Defendants, because the Defendants concurrently represented Judicial Watch then and continue to represent them now.    In fact, Defendants admitted that the allegations were, in Defendant Barmack's own words, "B.S."

11.     Subsequently, the Plaintiff's ex-wife recanted the untrue allegations in her complaint, and the record of the divorce was placed under seal by Order of the Circuit Court of Fairfax County upon a joint motion by both divorcing parties.

12. The effect of that Order was that the divorce action record "shall only be opened to the parties, their respective attorneys, and to such other persons as the judge of such court at his discretion decides have a proper interest therein." Va. Code Ann. § 20-124.

13. The Defendants had access to the record of the Plaintiff's divorce proceedings as the Plaintiff's attorney and as concurrent counsel to Judicial Watch, which the Plaintiff then headed. Defendants had no right to publish its contents, use it, consult with or work with others to use it against the Plaintiff at any later time.

14. After leaving Judicial Watch in September 2003, disputes arose between the Plaintiff and Judicial Watch, and the Plaintiff filed suit against Judicial Watch in the United States District Court for the District of Columbia in 2006, which case remains pending under the caption *Larry Klayman v. Judicial Watch, et. al.,* Civil Acton No. 06-670 (CKK) (the "Litigation").

15. The Defendants continued to represent Judicial Watch as outside General Counsel after the Plaintiff left Judicial Watch, and in effect represented the directors and officers of Judicial Watch, improperly, in the professional and personal capacities. That representation has included, without limitation, advising Judicial Watch and the current directors and officers in connection with the Litigation and otherwise against the interests of Plaintiff.

16. As part of their legal advice to Judicial Watch and the current directors and officers in the Litigation and otherwise, the Defendants further

consulted, advised and caused or participated in causing Judicial Watch to

publish in Florida or elsewhere the scurrilous, false, recanted and sealed

allegations made by the Plaintiff's ex-wife in the divorce action, which the

Plaintiff had revealed and discussed in confidence to the Defendants as his

attorneys. Defendants have significant contact with Florida and Miami-

Dade County in particular since Plaintiff left Judicial Watch, through mail,

telephone and email communications, concerning relevant matters

involving Judicial Watch, the current directors and officers, and Plaintiff.

17.    The Defendants never asked for and the Plaintiff never consented to the

Defendants' disclosure of these confidences.

18.    The Defendants' purpose in reciting recanted allegations of the Plaintiff's

former wife in a sealed divorce action was to embarrass and harass the

Plaintiff, his wife, his ex-wife (who jointly moved the Fairfax County

court to seal the divorce record, as the Order shows), his children, and to

violate the privacy of third parties who are innocent of the misconduct

initially alleged in the divorce action.

19.    The Defendants published the allegations nationwide and specifically in

Miami Dade County, Florida and in such other media outlets as the Legal

Times and the internet.

20.    At the time that the Plaintiff made his confidential disclosures to the

Defendants, Defendants acknowledged that they *did not* believe that the

Plaintiff had committed any improprieties, and both the Plaintiff and

Judicial Watch agreed that the allegations in the sealed divorce complaint

had no bearing on the Plaintiff's resignation. In this regard, the Severance Agreement provides and represents unequivocally that Plaintiff's voluntary resignation was to allow him to pursue other endeavors, such as running as a candidate for the U.S. Senate.

21.    The Defendants conceived of, directed, coordinated and allowed Judicial Watch and the current directors and officers of Judicial Watch and their agents and representatives, to publish the sealed divorce allegations to embarrass and harm the Plaintiff and his family without concern for the privacy of the Plaintiff or innocent third parties. Furthermore, the Defendants published the sealed divorce records for strategic advantage in the litigation by the Plaintiff against Judicial Watch and its current directors and officers.

22.    The Defendants also violated their fiduciary duties and duty to maintain client confidences in other ways which included but are not limited to:

A.    Counseling and assisting Judicial Watch and its individual current directors, in their professional and personal capacities, in asserting false and contrived claims for alleged reimbursable expenses allegedly due and owing by Larry Klayman and assisting in the creation of false and misleading invoices and tax returns in this regard, threatening Plaintiff with adverse publicity if he did not pay and, when Plaintiff would not acquiesce or cave in to these threats, then publishing this misleading and false information on Judicial

Watch and other websites, with mutual donors, supporters and others, and elsewhere. In effect, Defendants have been representing the alleged interests of not just Judicial Watch but its current individual directors and officers, such as the current president, Tom Fitton, against the interests of Plaintiff, also a client;

B. Threatening Plaintiff with litigation and other retaliatory actions if he ever represented or referred to himself as the founder and former Chairman and General Counsel of Judicial Watch, all of which is true and which comprises Plaintiff's professional background.

C. Counseling and assisting Judicial Watch and its current individual directors and officers, both in their professional and personal capacities, on ways to interfere with Plaintiff's relationships with the media, for which he depends for his livelihood;

D. Counseling and suggesting to Judicial Watch and its current directors and officers, in both their personal and individual capacities, to publish statements that Plaintiff was only an employee of Judicial Watch and not its founder and Chairman, in order to diminish, disparage and harm Plaintiff's reputation and standing in the community;

E.  Counseling and suggesting to Judicial Watch and its current directors and officers, both in their personal and individual capacities, that they need not adhere to and in fact could violate and interfere with the implementation of the terms of the Severance Agreement and Plaintiff's legal rights in general, such as by not removing in good faith Plaintiff as guarantor of the organization's multi-million dollar building lease, and not paying for Plaintiff's children's health insurance under Cobra and for a period terminating Plaintiff's family coverage in its entirely when he was ill; opening Plaintiff's mail; not providing forwarding information concerning Plaintiff; stating false and misleading reasons for Plaintiff's leaving Judicial Watch, not paying Plaintiff's expenditures on behalf of Judicial Watch, disparaging Plaintiff with Judicial Watch employees; telling employees not to talk to Plaintiff; and misusing of Plaintiff's name and identity in mailings into Florida and elsewhere.

F.  Falsifying and providing misleading information to Judicial Watch's accountant, Raffa and Associates, P.C. as demonstrated by a hold harmless agreement Raffa demanded from Judicial Watch to prepare and sign the false and misleading tax returns.

G. Such other actions as will be uncovered during discovery in this case.

## COUNT I
## BREACH OF CONTRACT

23. The Plaintiff incorporates the allegations in paragraphs 1 through 22 above as is set forth in full.

24. As required by the professional rules of conduct and common law, as well as Defendants' representation agreement with the Plaintiff, Defendants were to keep information disclosed to them confidential and not to benefit another client at the expense of the Plaintiff.

25. The Plaintiff is not in possession of a written agreement between the Plaintiff and the Defendants, however, the agreement was drafted by the Defendants and upon information and belief the contract is in the possession of the Defendants. The Defendants will not be prejudiced by the Plaintiff's failure to attach a copy of the contract to this complaint. The agreement was confirmed orally, by a course of dealing and legal representation with Plaintiff.

26. As set forth above, the Defendants breached that agreement by misusing confidential information for the benefit of Judicial Watch to the detriment of the Plaintiff in the Litigation and taking other improper actions, as set forth herein.

27. The Defendants' breach of the agreement has injured the Plaintiff in an amount in excess of $2,000,000.00.

WHEREFORE, for the above stated reasons, the Plaintiff requests this Court to enter a judgment in his favor for damages in the amount of $2,000,000.00 against the Defendants, together with pre-judgment interest, attorneys fees, court costs, and any other relief this Court deems just, necessary, and proper.

## COUNT II
## BREACH OF FIDUCIARY DUTY

28.    The Plaintiff incorporates the allegations in paragraphs 1 through 27 above as is set forth in full.

29.    As counsel for the Plaintiff, the Defendants owed the Plaintiff a fiduciary duty, which included; *inter alia*, the obligation to refrain from disparaging, and harming the Plaintiff based on information obtained as a result of his representation of the Plaintiff.

30.    The Defendants, as counsel for the Plaintiff held a position of trust and confidence with Plaintiff.

31.    The Defendants in providing legal services to the Plaintiff, utilized their position as counsel to the Plaintiff to befriend the Plaintiff and obtain a position of trust and confidence with the Plaintiff.

32.    As set forth above, the Defendants violated their duty by misusing confidential information that the Defendants obtained through the use of their position of trust for the benefit of Judicial Watch to the detriment of the Plaintiff in the Litigation, as well as taking the other improper actions, as set forth herein.

33.    Defendant, Barmak and his law firm so acted because his law firm, the Defendant, Mintz and Levin was among Judicial Watch's highest-paid

outside professional service providers, and he wanted to preserve and advance that status, even at the expense of another client.

34.    There was no justification or excuse for the Defendants' actions, many more of which are likely to be disclosed though discovery.\

35.    The Defendants' breach of fiduciary duty has injured the Plaintiff in an amount in excess of $2,000,000.00.

36.    The Defendants' actions were intentional, malicious, willful, wanton, and so far beyond conduct acceptable to a person with a fiduciary duty to another so as to entitle the Plaintiff to an award of punitive damages in an amount in excess of $20,000,000.00.

WHEREFORE, for the above stated reasons, the Plaintiff requests this Court to enter a judgment in his favor for damages in the amount of $2,000,000.00 against the Defendants, together with pre-judgment interest, court costs, punitive damages in excess of $20,000,000.00 and any other relief this Court deems just, necessary, and proper.

**PLAINTIFF HEREBY DEMANDS TRIAL BY JURY.**

Dated: <u>January 31, 2008</u>

Respectfully submitted,

Larry Klayman, Esq.
Fla. Bar No.: 0246220
THE KLAYMAN LAW FIRM, P.A.
Attorneys for Plaintiffs
3415 SW 24th Street
Miami, FL 33145
Tel: 305.447.1091
Fax: 305.447.1548

By: <u>s/Larry Klayman</u>
Larry Klayman, Esquire

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 31st day of JANUARY, 2008, I electronically filed

the foregoing document with the Clerk of Court using CM/ECF.  I also certify that the

foregoing document is being served this day to Ana T. Barnett, Esq., Stearns Weaver

Miller Weissler Alhadeff & Sitterson, P.A. Attorneys for Defendants, South First Manor,

LLC, Museum Tower, Suite 2200, 150 West Flagler Street, Miami, FL 33130.


Respectfully submitted,

Larry Klayman, Esq.
Fla. Bar No.:  0246220
THE KLAYMAN LAW FIRM, P.A.
Attorneys for Plaintiffs
3415 SW 24th Street
Miami, FL 33145
Tel: 305.447.1091
Fax: 305.447.1548

By: s/Larry Klayman
Larry Klayman, Esquire

# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Larry Klayman,<br>540 Brickell Key Drive<br>Miami, FL 33131; | : | |
| | : | |
| Louise Benson,<br>5779 Rolling Road<br>Woodland Hills, CA 91367 | : | |
| | : | |
| *Plaintiffs,* | : | Civil Action No. 1:06-CV-00670 |
| | : | |
| v. | : | Honorable Colleen Kollar-Kotelly |
| | : | |
| Judicial Watch, Inc.<br>501 School Street, S.W.<br>Suite 500<br>Washington, D.C. 20024; | : | |
| | : | |
| Thomas J. Fitton<br>5245 42nd Street N.W.<br>Washington, D.C. 20015; | : | **Jury Trial Demanded.** |
| | : | |
| Paul Orfanedes<br>1050 North Stuart Street<br>Unit 515<br>Arlington, VA 22201; and | : | |
| | : | |
| Christopher Farrell<br>501 School Street, S.W.<br>Suite 500<br>Washington, D.C. 20024<br>*Defendants.* | : | |
| | : | |

## SECOND AMENDED COMPLAINT

Plaintiffs, Larry Klayman ("Klayman"), and Louise Benson ("Benson"), complain against

the Defendants as follows:

## Introduction

1.     This is an action by the founder and former Chairman of Judicial Watch, and a high value donor and volunteer to Judicial Watch to remedy defendants' breach of various agreements and laws, and to ultimately restore ethics and honesty to Judicial Watch.  Since Klayman left Judicial Watch to run for the United States Senate, Judicial Watch has failed to honor its commitments to Klayman, Benson and other donors.  Moreover, Judicial Watch, at the direction of its President, Thomas J. Fitton, has failed to respect its severance agreement with Klayman by engaging in a pattern of fraud, disparagement, defamation, false advertising and other egregious acts against Klayman.  Regrettably, this complaint was filed because the Defendants failed to correct their conduct and remedy the damage, despite repeated demands.

2.     In 1994, Klayman conceived of, incorporated and founded Judicial Watch to restore and promote ethics in the government and in the legal profession and he was the first to use the trademark "Judicial Watch" in commerce. The mark has a double meaning, as Judicial Watch was not only intended to help ensure that the court system acts ethically and correctly, but also to use the judiciary to oversee and police the executive and legislative branches of government.

3.     Klayman conceived of Judicial Watch to serve as a private Justice Department for the people, in effect a "True Independent Counsel," free from the influences of politics he had seen as a trial attorney at the U.S. Justice Department. It was a novel concept to form an innovative group to advocate on behalf of its members and the public through concrete and forceful legal actions and educational endeavors, including but not limited to the use of the courts and the media.

4.     During the approximately ten (10) years since Klayman founded and lead Judicial Watch, the organization grew from one office with a volunteer staff to, by the year 2000, a $28

271748-1                                    2

million dollar plus, per annum, foundation with headquarters in Washington, D.C. and regional offices in Los Angeles, California; Chicago, Illinois; Dallas, Texas; Miami, Florida; and Norfolk, Virginia. By the year 2003, Judicial Watch had about 50 employees with plans to expand not only domestically, but also internationally. It also had nationally syndicated radio and television shows called "The Judicial Watch Report," expanding the group's prestige and influence. Moreover, under Klayman's leadership, Judicial Watch achieved many notable successful verdicts or findings in courts throughout the United States.

5. In 2003, a seat in the United States Senate (the "Senate") opened in Klayman's home state of Florida. After representing many Florida citizens in legal matters, Klayman decided that he could be even more effective in his fight against corruption by being elected to the Senate.

6. Though Judicial Watch had become a substantial organization, Klayman believed that the most effective way to effectuate a non-partisan "clean-up" of government was to transition Judicial Watch to a suitable successor while he was elected to the Senate. Klayman intended to take his "Judicial Watch" style of advocacy inside the government, while Judicial Watch continued its work as an independent non-profit organization.

7. Accordingly, Klayman decided to enter into severance negotiations with Thomas J. Fitton, then President of Judicial Watch ("Fitton") and the Judicial Watch board members, including Paul Orfanedes ("Orfanedes") and Christopher Farrell ("Farrell"), to begin the transition of leadership. Ultimately, Klayman entered into a detailed severance agreement (the "Severance Agreement").

8. Shortly before Klayman left Judicial Watch, he discovered that, contrary to Fitton's representations he made when Klayman hired him, Fitton had not obtained his undergraduate

271748-1                                    3

degree. Klayman pressed, and Fitton agreed (a) to obtain his college degree, and (b) to continue the

process to find a qualified individual with a legal background to lead Judicial Watch, particularly

in light of Fitton's lack of qualifications.

9.    Before departing Klayman discussed the position with and interviewed highly

respected and qualified candidates to become Chairman of Judicial Watch.

10.    As a condition to his signing the Severance Agreement and stepping down from

Judicial Watch, Klayman insisted, and Fitton agreed, to have Judicial Watch hire a qualified

person to become Chairman.  Klayman discussed with Fitton possible candidates that were suitable

to lead Judicial Watch.

11.    Instead of taking the steps he promised to find a distinguished and qualified

Chairman to run Judicial Watch, Fitton has solely acted to entrench himself as head of Judicial

Watch.

12.    Even today there is no Chairman, and Fitton controls Judicial Watch.

13.    Fitton mislead Klayman and others to promote his personal agenda, interests, and

political ideology to the detriment of Judicial Watch, Klayman, and Judicial Watch's donors and

supporters.

14.    Fitton viewed Klayman's departure as an opportunity to take complete control of the

organization to the detriment of Judicial Watch's donors, and employees, including many attorneys

and staff that were hired by Klayman.  Since Klayman's departure, Fitton has mismanaged Judicial

Watch and closed regional offices or eliminated the staff of the regional offices to the point that the

remaining offices are shells that perform virtually no service.  On information and belief, many of

the employees were wrongfully terminated by Fitton, for reasons that include age, sex and national

origin discrimination.

15.     Moreover, upon information and belief, since Fitton took control of Judicial Watch, Fitton purchased two resort properties in Belize by using numbered accounts and limiting disclosure of his name on the sale documents to hide the fact that Fitton was involved in the purchases (the "Belize Properties"). Fitton's attempt to "hide" his purchase of the Belize Properties raises an inference that he has committed similar acts at Judicial Watch, secreting his potentially improper or questionable conduct that is detrimental to donors, supporters, Klayman and others.

16.     From the time Klayman stepped down from his posts at Judicial Watch, Fitton, Orfanedes and Farrell, directly and through other agents of Judicial Watch defamed, disparaged and cast Klayman in a false light to denigrate Klayman, and in an effort to undermine Klayman's ability to return to the helm of Judicial Watch or compete with Judicial Watch in the future.

17.     As plead more fully below, Judicial Watch, through Fitton, Orfanedes and Farrell and other agents and representatives breached the Severance Agreement and have mislead donors, including but not limited to Louise Benson, the media, and the public with their false advertisements, and other publicity, and solicitations and their continued defamation and disparagement of Klayman.

### Parties

18.     Larry Klayman ("Klayman") is an individual citizen and resident of the State of Florida. Klayman practices law and bases his legal practice in Florida.

19.     Louise Benson ("Benson") is an individual citizen of California and was at all times material to the allegations made in the complaint a supporter and donor to Judicial Watch.

20.    Judicial Watch, Inc. ("Judicial Watch") is a 501(c) (3) organization formed under laws of the District of Columbia with its headquarters in the District of Columbia.  Klayman founded Judicial Watch in 1994 as a public interest government watchdog to investigate and prosecute government corruption and abuse.  He not only conceived of and was the first to use the trademark, "Judicial Watch" in commerce, but Klayman also gave Judicial Watch the motto "Because No One is Above the Law!"

21.    Thomas J. Fitton ("Fitton") is President of Judicial Watch.  At all times material to the allegations made in this complaint, Judicial Watch was controlled by Fitton.

22.    Paul J. Orfanedes ("Orfanedes") is the Secretary and a Director of Judicial Watch. At all times material to the allegations made in this complaint, Orfanedes was the Secretary of Judicial Watch, a director, and the attorney managing cases at Judicial Watch.

23.    Christopher J. Farrell ("Farrell") is a Director of Judicial Watch.  At all times material to the allegations made in this complaint, Farrell was a director of Judicial Watch and acted as its lead investigator.

### Jurisdiction And Venue

24.    The court has jurisdiction under 42 U.S.C. § 1332 because the matter is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  Jurisdiction is also proper pursuant to 15 U.S.C. §§ 1125(a), *et. seq.* and 18 U.S.C. §§ 1962, *et. seq.*  This court has supplemental jurisdiction over the claims in this complaint that arise under state law, because the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from the same operative facts.

25.    Venue is proper pursuant to 28 U.S.C. § 1391.  The actions occurred in whole or in

part in this jurisdiction, and Klayman and Judicial Watch have agreed venue is appropriate in this

jurisdiction.

## Statement of Facts

26.    Klayman is an honors graduate of Duke University, and Emory University School of

Law, former U.S. Justice Department prosecutor and civil trial attorney.  Klayman was the founder

and former Chairman and General Counsel of Judicial Watch and in 2004 he was a candidate for

the Senate from Florida.

27.    Judicial Watch has acted in a variety of matters ranging from challenges to the

President and Mrs. Clinton's Legal Defense Fund, he is credited with uncovering "Chinagate" or

campaign finance scandal with John Huang, a suspected Chinese agent; lawsuits over the theft of

nuclear codes at Los Alamos Nuclear Laboratories;  political misuse of the Internal Revenue

Service; fraud and/or corruption at the United Nations, the pre- and post September 11 cover-up of

incompetence and other misconduct at the Federal Bureau of Investigation and a number of

government agencies; the resignation of House Speaker Newt Gingrich when he admitted to

having brought disgrace on the House of Representatives; various ethics complaints; a lawsuit to

open Vice-President Cheney's Energy Task Force – a suit that was ultimately heard by the United

States Supreme Court; and complaints against former House Majority Leader Tom Delay and other

Republican Congressmen and Senators for selling access to government.  The prestigious

"National Journal" has called Klayman a "major force in Washington" and "the major public

interest litigator at this time." National Journal, June 24, 2002.

A.    Klayman's Departure from Judicial Watch and the Severance Agreement

28.    In 2003, Klayman decided to step down from Judicial Watch and run for the Senate

from Florida as long as a suitable replacement could be found for him as Chairman of Judicial

Watch. Accordingly, Klayman decided to enter into severance negotiations with Fitton and the

Judicial Watch board members to begin the transition of leadership. Ultimately, Klayman entered

into a detailed severance agreement (the "Severance Agreement").

29.    During the severance negotiations, Klayman discovered that Fitton had not obtained

his undergraduate degree. Shocked that Fitton had misrepresented his educational background to

Klayman when he was hired years earlier, Klayman pressed and Fitton agreed (a) to obtain his

college degree, and (b) to continue the process to find a qualified individual, with a legal

background to lead Judicial Watch, particularly in light of Fitton's lack of qualifications.

30.    Fitton also deliberately misrepresented that he would find a suitable successor for

Klayman as Chairman. Instead of taking steps that he promised, to find a successor to run Judicial

Watch, Fitton has acted to entrench himself in control of Judicial Watch and run it as his own

partisan operation for his own personal gain.

31.    During the negotiation of the severance agreement, Fitton and two other directors of

Judicial Watch, Orfanedes and Farrell, acted in secret to remove persons loyal to Klayman from

Judicial Watch in order to take over and completely change the nature of Judicial Watch after his

departure.

32.    The Severance Agreement was signed on September 19, 2003. The Severance

Agreement provides, in pertinent part, as follows:

A.    Judicial Watch would pay Klayman, *inter alia*: (i) all compensation due to

him through his last day of work, (ii) a severance payment, (iii) compensation for agreeing not to

compete with Judicial Watch for two (2) years; (iv) health insurance benefits for himself and his

family, for one (1) year; and (v) the monies Klayman had expended for or on behalf of Judicial

Watch.

      B.    Klayman would have continued access to Judicial Watch documents and

information in the event that he ever needed it to defend himself against accusations or legal

actions;

      C.    Judicial Watch would advise and permit Klayman to comment in advance

concerning any information about him that Judicial Watch intended to submit to the Internal

Revenue Service.

      D.    Judicial Watch would return Klayman's personal property and assets to him,

including those belonging to Klayman and Associates, his law firm;

      E.    Judicial Watch would work in good faith to remove Klayman as a personal

guarantor of the multi-million dollar lease of the headquarters space at 501 School Street, S.W.,

Washington D.C.;

      F.    Judicial Watch and its officers and directors would not, in any way,

disparage, denigrate or defame Klayman;

      G.    On or before September 27, 2003, Judicial Watch was to issue a press

release announcing Klayman's departure that was to state as follows:

> Judicial Watch announced today that Larry Klayman has
> stepped down as Chairman and General Counsel of Judicial
> Watch, to pursue other endeavors. Tom Fitton, who is
> President of Judicial Watch, said:
>
> Larry conceived, founded and helped build Judicial Watch to
> the organization it is today, and we will miss his day to day
> involvement. Judicial Watch now has a very strong presence
> and has become the leading non-partisan, public interest
> watchdog seeking to promote and ensure ethics in
> government, and Larry leaves us well positioned to continue

our important work."

H.    Judicial Watch agreed that Klayman shall be permitted to use, publish and

otherwise disseminate to third parties the following additional statement of Judicial Watch:

> Larry was the creator and founder of Judicial Watch, and
> helped build it to be a stable, successful and widely respected
> organization. We thank him for his service.

I.    Judicial Watch agreed that Klayman would be permitted to comment on

Judicial Watch activities after the separation date;

J.    Judicial Watch and Klayman agreed to limit any statements to third parties

regarding Klayman's leaving Judicial Watch to be consistent with the Press Release and

statements set forth above in subparagraphs G and H.

B.    <u>Breach of the Severance Agreement – The Disparagement and Portrayal of
Klayman in a False Light</u>

33.    Commencing almost immediately upon Klayman's departure, Fitton caused Judicial

Watch to breach the Severance Agreement, to further Fitton's efforts to entrench himself in power

at Judicial Watch to pursue his own personal interests, as well as to take Judicial Watch in a

direction wholly inconsistent with Judicial Watch's non-partisan mission -- and to harm Klayman.

34.    Fitton breached the Severance Agreement to promote his personal agenda and

political ideology.

35.    After Klayman announced his candidacy for the Senate from Florida on September

19, 2003, Fitton, in concert with two other directors of Judicial Watch, orchestrated a campaign to

disparage, defame and cast a false light on Klayman.

36.    Among other things, in breach of the Severance Agreement, Fitton and Judicial

Watch employees and agents concealed from and misrepresented Klayman's location from people that called asking for Klayman.

37.    Furthermore, they affirmatively told callers they could not discuss the "reasons" why Klayman left Judicial Watch, contrary to the express provisions in the Severance Agreement, in order to create the erroneous impression that Klayman was forced to leave Judicial Watch. Moreover, they told callers that they did not know where Klayman could be contacted. This course of conduct has continued up to the present.

38.    Fitton ordered employees in Judicial Watch's headquarters and regional offices not to speak with or contact Klayman.

39.    Shortly after Klayman's announcement that he was a candidate for the Senate, Fitton, in conjunction with Judicial Watch's outside counsel, David Barmak, Esquire, made a frivolous demand on Klayman, purporting to prohibit Klayman from ever mentioning that he was the founder of Judicial Watch and threatening to take legal action against Klayman if he failed to comply with the demand.

40.    Fitton and others caused Judicial Watch to orchestrate an effort to cause media outlets, including radio and television stations and broadcast and cable networks, to shun Klayman and persuade them not to discuss matters of public concern with Klayman.

41.    On information and belief, Fitton, Orfanedes, Farrell and others on behalf of Judicial Watch represented, *inter alia*, that Judicial Watch could and would take legal action against the media outlets if they permitted Klayman to appear and truthfully state he was the founder and former Chairman of Judicial Watch. Such threats, however unfounded, were sufficient to cause the media to shun Klayman and refrain from inviting him to appear or comment to them.

42.     Throughout his tenure at Judicial Watch, Klayman had established a strong relationship with the media.  Klayman, already a well-known lawyer, became a regular guest on many television network, cable and radio programs.  Klayman was so well known and widely recognized that a semi-fictional character, based on Klayman, was created for the television show "West Wing."  Klayman enjoyed celebrity status within the non-profit legal/political community.  In fact, by working under Klayman, Fitton learned that the most powerful tool for finding clients and raising his stature in the legal community was through the media outlets.  During his years at Judicial Watch, Klayman was regularly called to comment on legal or political affairs as Judicial Watch's founder and Chairman.

43.     While at Judicial Watch Klayman was synonymous with Judicial Watch, and his media presence resulted in numerous clients contacting Judicial Watch for legal counsel.

44.     By threatening the media, and directing media outlets that they could no longer refer to Klayman as Judicial Watch's founder and former Chairman, or ever discuss anything that concerned or related to Judicial Watch, Fitton and others breached the Severance Agreement and disparaged, defamed and portrayed Klayman in a false light.

45.     The actions of Fitton Orfanedes, Farrell and other Judicial Watch employees and agents had the desired effect of chilling the media.  Without the ability to freely refer to Klayman as Judicial Watch's founder and former Chairman, or to comment on Judicial Watch's activities, the media would not be able to identify Klayman to its viewers. Instead of calling on Klayman to comment on political and legal affairs -- and have to confront Judicial Watch's threats of retaliation in doing so -- the media sought to avoid injecting themselves into any disputes between Judicial Watch and Klayman by ignoring Klayman and seeking other commentators.

46.     Fitton and Judicial Watch engaged in this pattern of disparagement and portrayal of Klayman in a false light to ensure that Klayman could never compete with Judicial Watch or Fitton himself.

47.     Fitton's improper acts were done to further his own agenda to marginalize Klayman and promote Fitton's status within the media and elsewhere.

C.     Breach of the Severance Agreement – Fraudulent Mailings, Misrepresentation False Advertising and Portrayal of Klayman in a False Light

48.     Over one month after Klayman stepped down as Chairman and General Counsel of Judicial Watch, Fitton caused Judicial Watch to send fund raising letter solicitations through the U.S. Mail that falsely represented that Klayman was Chairman and General Counsel of Judicial Watch. This mailing used Klayman's name and image without permission. A sample copy of this fraudulent direct mail piece is attached hereto as Exhibit "A."

49.     This fraudulent fundraising practice created confusion among donors, and they mistakenly sent donations to Judicial Watch believing that Klayman was still there running the organization and using their donations for proper purposes.

D.     Fraud on Louise Benson and the other Building Fund Donors

50.     In November 2002, while Klayman was Chairman and General Counsel of Judicial Watch, Judicial Watch began a campaign to raise funds from the supporters of Judicial Watch to purchase the building that housed their headquarters office space at 501 School Street, S.W., in Washington, D.C (the "Building"). Judicial Watch sent appeals to potential donors, including but not limited to Benson, seeking funds solely for the purpose of purchasing the Building and no other reason. A copy of the solicitation sent to Benson is attached hereto as Exhibit "B."

51.     Benson relied on the representations made by Judicial Watch in the solicitation in

271748-1                                            13

making a pledge for $50,000. She would not have made the pledge, and paid $15,000 up front to purchase Fitton's office space at Judicial Watch, but for the representation in Judicial Watch's solicitation that the money would be used to purchase the Building and provide her with naming rights.

52.    Benson made her pledge solely on the condition that Judicial Watch was and would continue to actively pursue the purchase of the Building, as Judicial Watch represented in its solicitation.

53.    After Klayman's departure from Judicial Watch, Fitton caused Judicial Watch to cease actively pursuing the purchase of the Building, but concealed that fact from Benson and other similarly situated donors and supporters of Judicial Watch.

54.    Fitton and Judicial Watch never contacted the landlord, Robert Wolpe, and owner of the headquarters building to negotiate the purchase of the Building.

55.    Fitton caused Judicial Watch to publish a newsletter in February 2005 which concealed the truth and led Benson and other donors to believe Judicial Watch was actively pursuing the sale, and had been consistently maintaining donations from Benson and 3,686 others in a segregated, interest bearing account. A copy of the newsletter is attached as Exhibit "C."

56.    On information and belief, the truth was, however, that Fitton caused Judicial Watch to commingle with Judicial Watch's operating funds, or misuse in other ways, the approximately $1.4 million raised from Benson and others. This misuse of funds further demonstrates Fitton's agenda to takeover Judicial Watch for his own personal gain.

57.    Fitton caused Judicial Watch to continue to mislead Benson and other donors in a newsletter dated September 2005, which falsely states:

This fund has been one of the most comprehensive

fundraising efforts in Judicial Watch history. The
long term goal of the fund is to provide financial
stability for Judicial Watch through the ownership of
an office building.

A copy of the newsletter is attached as Exhibit "D."

58.    The truth is that after Fitton took control when Klayman left, he caused Judicial

Watch to take little or no action to increase the fund, failed to communicate with donors at all

about the Building until Klayman pressed more and threatened to go to appropriate government

authorities and the donors themselves.

59.    At all material times Judicial Watch had sufficient resources to purchase the

Building. Fitton however, chose to deceive donors by failing to even communicate with the owner

of the Building.

60.    Moreover, when Benson questioned Judicial Watch about the status of her donation

and the attempts to purchase the Building, Gregg Mills, Judicial Watch fundraiser, deliberately

misrepresented that Judicial Watch was actively attempting to purchase the Building.

61.    Robert G. Mills, a/k/a, Gregg Mills, is the high-dollar fundraiser for Judicial Watch.

He deliberately mislead Benson to believe that Judicial Watch was engaged in efforts to purchase

the Building.

62.    Fitton continued to employ Mills on behalf of Judicial Watch even though he knew

or should have known that Mills' prior actions exposed Judicial Watch's reputation for

non-partisan integrity to injury. For example Fitton knew, and or should have known that:

(a)    Mills had been president of U.S. Family Network, found by the Federal

Election Commission to have funneled corporate money into attack advertisements against

Democrats;

271748-1                                    15

   (b) Mills led a nonprofit group that received millions of dollars from clients of former lobbyist Jack Abramoff;

   (c) Prosecutors recently subpoenaed Mills in connection with the investigation into Congressman Tom DeLay's alleged money laundering and campaign finance scandal case in Texas; and

   (d) Mills' refusal to take a polygraph exam in 2003 after allegations surfaced that he allegedly stole funds from another organization, which he admittedly repaid.

  63. Benson detrimentally relied on Mills', Fitton's, and Judicial Watch's fraudulent misrepresentations.

  E. <u>Defamation, Disparagement of Klayman and Misrepresentation</u>

  64. During the period of Fitton's leadership, Judicial Watch's assets have been reduced almost fifty-percent (50%) percent, based on Judicial Watch's annual submissions to the IRS. On information and belief, Judicial Watch's assets now are between $8 and 9 million dollars - down from almost about $16 million in actual booked assets as of September 19, 2003, when Klayman left. And, if inheritances and prospective attorneys' fees awards had been booked at that time, Judicial Watch's assets would have been in the $20 million dollar range.

  65. Fitton has caused Judicial Watch to disparage, and defame Klayman in violation of the Severance Agreement by putting false statements on its website in which references in press quotations originally made about Klayman are doctored to refer to Judicial Watch instead. The effect is to denigrate Klayman by rewriting history, a la the novel <u>1984,</u> by George Orwell. Some examples of the "rewrites" Fitton caused Judicial Watch to make are as follows:

   <u>compare</u>

   **Fitton's Judicial Watch Quote:** "Judicial Watch appears to be the main

public interest litigator at this time, no small feat." *National Journal*, June 24, 2002.

with

**Real Quote:** "He (Klayman) appears to be the major public litigator at this time." *National Journal*, June 24, 2002

compare

**Fitton's Judicial Watch Quote:** "Thanks, in part, to its aggressive litigation, Judicial Watch was recently named one of the top ten most effective government watchdog organizations by *The Hill* newspaper and a force in Washington by the *National Journal*."

with

**Real Quote:** "...through his challenge of secrecy rules, Klayman has become a major force in Washington." *National Journal*, June 24, 2002.

A copy of the Judicial Watch's website, with the false quotations, as well as the reprints from published articles containing the correct quotations attributing Judicial Watch success to Klayman are attached hereto collectively as Exhibit "E."

66.    Fitton also caused Judicial Watch to harm and damage Klayman, in order that they could continue to control and misuse the organization. To further their means and ends, assisted by Barmak, they engaged in the following additional conduct in breach of the Severance Agreement:

A.    Judicial Watch illegally and systematically opened mail sent to Klayman at Judicial Watch and tortiously interfered with another entity funded by Klayman, Freedom Watch, Inc., which is a 501 (c) (3) founded to promote freedom domestically and around the world;

B.    Judicial Watch made false statements on IRS Form 990s, and then published them on Judicial Watch's website, claiming that Klayman owned certain monies to Judicial Watch. Fitton signed the 2003 and 2004 Judicial Watch tax returns and made these false

statements under oath, in violation of 18 U.S.C. §1001. These fraudulent statements were

intended to harm and defame Klayman. Despite Klayman's repeated requests for corrections and

retraction, Judicial Watch refused and continued to publish these falsehoods throughout

November and December, 2005 and continuing until at least August 2005 and beyond;

  C. Judicial Watch failed to pay Klayman and his family for health care

insurance.

  D. Judicial Watch failed to pay Klayman his last paycheck while employed by

Judicial Watch;

  E. Judicial Watch converted Klayman's personal property and assets, as well

as those of Klayman's law firm Klayman & Associates;

  F. Judicial Watch failed to make a good faith effort to remove Klayman as a

personal guarantor from the lease for Judicial Watch's headquarters at 501 School Street, S.W.,

Washington D.C.;

  G. Judicial Watch filed false and frivolous legal pleadings to attempt to have

Klayman removed as counsel for Sandra Cobas in the Miami Elian Gonzalez litigation concerning

the alleged use of excessive force during the Easter, 2000 raid on his uncle's house, fraudulently

representing to the court that Klayman was legally barred from representing her;

  H. Fitton and Judicial Watch failed to forward telephone messages and mail to

Klayman, and opened mail that was not addressed to or did not pertain to Judicial Watch;

  J. On information and belief, Judicial Watch interfered with Klayman's

relationships with Klayman's former clients who had offered to help Klayman in his Senate

campaign, by disparaging, defaming, holding in a false light and providing false and misleading

271748-1

information to them to cause them to sever their relationships with Klayman; and

I.    Fitton and Judicial Watch defamed Klayman among the media outlets and the general public.

67.    Defendants' deliberate wrongful conduct is part of a pattern of abuse that is intended to mislead the public and harm Klayman, Judicial Watch and its donors.

## COUNT ONE – FRAUDULENT MISREPRESENTATION

### Louise Benson v. Judicial Watch and Thomas Fitton

68.    Plaintiffs incorporate by reference the allegations of paragraphs 1 through 67 as if fully set forth herein:

69.    As alleged above Benson contributed funds to Judicial Watch in reliance on the specific representations made by Judicial Watch that it intended to use them to purchase the Building located at 501 School Street, S.W., Washington, D.C. (the "Building").

70.    Since Benson pledged her money, and made her $15,000 payment, Fitton and Judicial Watch have continued to misrepresent that it intends to use her money, and those of other similarly situated donors, to purchase the Building or another property.

71.    Upon information and belief, since Fitton has taken over Judicial Watch, Fitton and Judicial Watch have not intended to, taken no steps to and is not, now, because of the dissipation of Judicial Watch assets, in a position to purchase the Building.

72.    Greg Mills, fundraiser for Judicial Watch, deliberately mislead Benson by fraudulently representing that the funds were being used to purchase the Building.

73.    Benson justifiably relied to her detriment on the misrepresentations of Fitton, Mills and Judicial Watch.

271748-1

19

74.     These misrepresentations were calculated to placate Benson and stop her and other similarly situated donors from filing suit and/or seeking a return of the donations.

75.     Defendants' representations since October 2003 are false and fraudulent, and Fitton and others who caused those representations to be made in, inter alia, Judicial Watch newsletters sent to Benson and others in February and September 2005, knew they were false at the time they were made.

76.     Judicial Watch, Fitton, and Mills made those misrepresentations to induce Benson and the other 3,864 donors who gave money to buy the Building to refrain from demanding a refund of their donations so Judicial Watch could retain the benefit of their donations.

77.     The fraud and deceit of Judicial Watch, Fitton, and Mills was knowing and intentional and has damaged Benson.

78.     The actions of Judicial Watch in retaining Benson's money under false pretense is so outrageous as to shock the conscience, thereby entitling Benson to an award of punitive damages.

## COUNT TWO – BREACH OF CONTRACT

### Louise Benson v. Judicial Watch

79.     Plaintiffs incorporate by reference the allegations of paragraphs 1 through 78 as if fully set forth herein.

80.     As alleged above Benson contributed funds to Judicial Watch in response to a direct solicitation and in reliance on the specific representations made by Judicial Watch that it intended to use her contribution to purchase the Building located at 501 School Street, S.W., Washington, D.C. (the "Building").

81.     Benson entered into a contract with Judicial Watch to obtain the naming rights to a

271748-1                                  20

particular space in the Building, specifically the office of Fitton.

82.    Specifically, Benson was induced to pledge $50,000 and pay $15,000 in return for the naming rights of the either Chairman's Office, the President's Office, Guest Reception Area, or the Lounge and Key Witness Room.

83.    As consideration for her $50,000 pledge, and $15,000, payment Judicial Watch agreed to name the President's (Fitton's) Office after Louise Benson.  Judicial Watch agreed that after purchasing the Building it would recognize her generous pledge by placing a plaque on the President's Office.

84.    Since Benson pledged her money, Judicial Watch has continued to misrepresent that it intends to use her money, and those of other similarly situated donors, to purchase the Building or another property.

85.    Since Fitton has taken over Judicial Watch, Judicial Watch has not intended to, taken no steps to, and is not now, due to the dissipation of Judicial Watch assets, in a position to purchase the Building.

86.    Greg Mills, fundraiser for Judicial Watch, deliberately mislead Benson by fraudulently representing that the funds were being used to purchase the Building.

87.    Benson relied to her detriment on the misrepresentations of Fitton, Mills and Judicial Watch.

88.    Judicial Watch has not purchased the Building and is in breach of the agreement that offered Benson the naming rights to the President's Office in consideration for her pledge and contribution.

271748-1                                    21

## COUNT THREE – UNJUST ENRICHMENT

<u>Louise Benson v. Judicial Watch</u>

89.    Plaintiffs incorporate by reference the allegations of paragraphs 1 through 88 as if fully set forth herein:

90.    As alleged above Benson contributed funds to Judicial Watch in response to a direct solicitation and in reliance on the specific representations made by Judicial Watch that it intended to use her contribution to purchase the Building located at 501 School Street, S.W., Washington, D.C. (the "Building").

91.    As set forth herein, the Judicial Watch accepted, used and enjoyed the benefits of Benson's $15,000 payment made in the belief that Judicial Watch would purchase the Building and provide her naming rights.

92.    As set forth herein, Benson conferred a valuable benefit upon Judicial Watch by pledging $50,000 and making payment of $15,000 in consideration of Judicial Watch's promise to purchase the Building and provide Benson naming rights for the President's Office.

93.    Judicial Watch has not purchased the Building and is misusing Benson's payment.

94.    As set forth herein, because of the relationship between the parties, Benson is entitled to receive the reasonable value of the benefits conferred upon Judicial Watch, which is $15,000 plus interest.

95.    In addition, Benson conferred a substantial benefit upon Judicial Watch in an amount in excess of $65,000 through the services that she provided by working at Judicial Watch's San Marino, CA office, and through the services she provided to Judicial Watch's "Judicial Monitoring Project," with the expectation that Fitton and others would act honestly and ethically toward her

271748-1                                22

and to the public generally.

96.    Because Fitton and Judicial Watch have not acted properly by deliberately misleading donors and improperly converting Judicial Watch into a partisan organization, Benson is entitled to receive the value of the services she provided.

## COUNT FOUR – Violation of Section 43(a) of the Lanham Act

Klayman v. Judicial Watch and Thomas Fitton, Paul Orfanedes, and Christopher Farrell

97.    Plaintiffs Klayman incorporates by reference paragraphs the allegations of paragraphs 1 to 96 as if fully stated herein.

98.    By placing in the U.S. mails and on the Internet letters, newsletters and other solicitations that misrepresented that Klayman was the Chairman and General Counsel of Judicial Watch, and using these published misrepresentations to raise money for Judicial Watch, Judicial Watch engaged in false designation of origin, false and misleading descriptions, false and misleading representations, false and misleading advertising and other illegal acts of unfair competition which are likely and did cause confusion, mistake, and/or deception and misrepresented the nature, characteristics and qualities of plaintiffs' products, services, and activities in violation of 15 U.S.C. §1125(a)(1)(A) and (B). These illegal acts were perpetrated and occurred both nationally and internationally.

99.    Defendants deliberately misrepresented and falsely advertised that Klayman was Chairman and General Counsel of Judicial Watch after he left Judicial Watch to run for the Senate.

100.    The misuse of Klayman's name and likeness were calculated to confuse donors into believing that Klayman was soliciting their donations and that he was still running Judicial Watch.

101.    Klayman is a celebrity within the non-profit legal/political community.  Klayman is

271748-1                                23

widely recognized, both nationally and internationally, as the leading figure in the world of government and judicial oversight and pubic "watchdog" groups.

102. Fitton and Judicial Watch knew that donors that received the misleading fundraising publications would be confused by the publication and use of Klayman's name and likeness.

103. Fitton Orfanedes, Farrell and Judicial Watch deliberately used Klayman's image and name to confuse donors into thinking that Klayman was still affiliated with Judicial Watch.

104. Fitton's Orfanedes', Farrell's and Judicial Watch's false portrayal of Klayman was used to misrepresent the status of Judicial Watch to entice donors to continue giving donations to Judicial Watch.

105. As a result of the foregoing, plaintiff has been damaged in an amount that will be ascertained at trial. In addition to plaintiff's actual damages, he is entitled to receive Defendants' profits pursuant to 15 U.S.C. § 1117(a). These damages and profits should be enhanced to achieve justice pursuant to 15 U.S.C. § 1117(a) and/or trebled pursuant to 15 U.S.C. § 1117(b) because defendants conduct was willful.

106. The activities of defendants have caused and will cause irreparable harm to Plaintiff's personal and business relationships and good will for which he has no adequate remedy at law.

## COUNT FIVE

### Violation of Florida Statute 540.08 – Unauthorized Publication of Name or Likeness
### Klayman v. Judicial Watch Thomas Fitton, Paul Orfanedes, and Christopher Farrell

107. Plaintiff Klayman incorporates by reference paragraphs the allegations of paragraphs 1 to 106 as if fully stated herein.

108. By placing in the U.S. mails and on the Internet letters, newsletters and other

solicitations that used his image and name, and misrepresented that Klayman was the Chairman and General Counsel of Judicial Watch, where such published misrepresentations sought to raise money for Judicial Watch, Judicial Watch engaged in unauthorized use of the name, portrait, photograph, other likeness of Klayman without the express written or oral consent of Klayman to such use of his name or likeness. These illegal acts were perpetrated and occurred both nationally and internationally and were in violation of Florida Statute 540.08.

109.   Defendants deliberately misrepresented and falsely advertised that Klayman was Chairman and General Counsel of Judicial Watch after he left Judicial Watch to run for the Senate.

110.   The misuse of Klayman's name and likeness were calculated to confuse donors into believing that Klayman was soliciting their donations.

111.   Fitton Orfanedes, Farrell and Judicial Watch knew that donors that received the misleading fundraising publications would be confused by the publication and use of Klayman's name and likeness.

112.   As a result of the foregoing, Klayman has been damaged in an amount that will be ascertained at trial. In addition to Klayman's actual damages, he is entitled to recover damages for an amount which would have been a reasonable royalty, and punitive or exemplary damages.

113.   Plaintiff is entitled to punitive damages because defendants conduct was willful.

114.   The activities of defendants have caused and will cause irreparable harm to Plaintiff's personal and business relationships and good will for which it has no adequate remedy at law.

## COUNT SIX – Breach of Contract – Rescission

### Klayman v. Judicial Watch

115.   Klayman incorporates by reference the allegations of paragraphs 1 through 114 as if

fully stated herein.

116.  As alleged above, Judicial Watch breached the Severance Agreement as set forth in above in Paragraph 66.

117.  Fitton's deliberate and calculating steps to breach the Severance Agreement were egregious and were taken to further his personal gain to the detriment of Klayman, Judicial Watch and the public.

118.  By disparaging, defaming, and casting Klayman in a false light to the public and media, Fitton and Judicial Watch breached the Severance Agreement with the malicious intent to eliminate Klayman as a competitive force.

119.  By disparaging, defaming and casting Klayman in a false light to the public and media, Fitton breached the Severance Agreement to ensure that Judicial Watch would no longer be a non-partisan organization and instead become an organization that promoted Fitton's own interests and agenda without regard for the public interest at large.

120.  By filing false statements on its Form 990s, and then posting them on the Judicial Watch website, Fitton and Judicial Watch defamed Klayman—a direct breach of the Severance Agreement.

121.  The false statements on Judicial Watch's IRS Form 990s were intended to and had the effect of suggesting that Klayman defrauded Judicial Watch or improperly withheld certain monies from Judicial Watch.

122.  By actively misrepresenting the reasons for Klayman's departure from Judicial Watch, Fitton and Judicial Watch disparaged Klayman by creating the false impression that Klayman was forced to leave Judicial Watch. This pattern of disparagement is a direct violation of the terms of

271748-1                                    26

the Severance Agreement.

123. Judicial Watch, through Fitton and other agents and representatives, contrary the expressly negotiated terms of the Severance Agreement, falsely stated that they could not discuss the reasons that Klayman left Judicial Watch.

124. Judicial Watch, through Fitton and other agents and representatives, falsely instructed the television, cable and the written media that Klayman could not speak on the air about Judicial Watch cases or public events.

125. On information and belief, Judicial Watch, through Fitton, Orfanedes, Farrell and other agents and representatives, falsely instructed the television, cable, and the written media that Klayman could not be referred to as the "Founder and former Chairman of Judicial Watch."

126. By failing to pay Klayman the full amount due under the Severance Agreement, and in failing to return all of Klayman's property, Fitton and Judicial Watch breached the Severance Agreement.

127. By failing to take affirmative steps to purchase the Building and remove Klayman as a guarantor for the Judicial Watch lease, Fitton and Judicial Watch have breached the Severance Agreement.

128. After Klayman discovered that Fitton had not obtained a college degree, Klayman insisted that Fitton obtain a college degree, and that he find a suitable candidate, one who was distinguished and qualified, to fill the position of Chairman of Judicial Watch.

129. Fitton assured Klayman that the Chairman position would be filled.

130. In fact, just prior to Klayman's departure, Klayman had been discussing and consulting with highly qualified and distinguished candidates to lead Judicial Watch.

271748-1                                          27

131. Fitton deliberately misrepresented that he would take steps to find a suitable successor for Klayman as Chairman to induce Klayman to enter into the Severance Agreement. Fitton persuaded Klayman that Fitton would actively work to find a legal/public figure to succeed Klayman and run Judicial Watch.

132. Fitton never intended to find a suitable successor for Klayman, and instead always intended to take over Judicial Watch for his own personal gain. Without a law degree, let alone a college degree, Fitton was not equipped to run a non-profit legal organization.

133. Fitton's deliberate misrepresentations materially induced Klayman to enter into the Severance Agreement.

134. Klayman relied on Fitton's fraudulent misrepresentations to his detriment and the detriment of Judicial Watch.

135. Fitton's and Judicial Watch's breaches of the Severance Agreement are so pervasive and widespread that monetary damages would be inadequate. The Severance Agreement must be rescinded, and the parties must be returned to the status quo anta. Klayman should be restored to his position as Chairman of Judicial Watch.

136. Without rescission of the Severance Agreement, Klayman and Judicial Watch will continue to be harmed.

137. If this Court rescinds the Severance Agreement, Klayman will be restored to his position as Chairman and General Counsel of Judicial Watch.

### COUNT SEVEN – Breach of Contract – Damages

Klayman v. Judicial Watch

138. Klayman incorporates by reference the allegations of paragraphs 1 through 137 as if

fully stated herein.

139.  As alleged above, Judicial Watch breached the Severance Agreement as set forth in above in Paragraph 66.

140.  Fitton's deliberate and calculating steps to breach the Severance Agreement were egregious and were taken to further his personal gain to the detriment of Klayman, Judicial Watch and the public.

## COUNT EIGHT -  Breach of Contract – Specific Performance

### Klayman v. Judicial Watch

141.  Klayman incorporates by reference the allegations of paragraphs 1 through 140 as if fully stated herein.

142.  Judicial Watch has failed to pay Klayman and owes him amounts due Klayman under the Severance Agreement.

143.  Judicial Watch has failed to return Klayman's personal items property, and artwork, and Klayman & Associates, P.C., property as required by the Severance Agreement.

144.  Judicial Watch has failed to remove Klayman as a guarantor for all credit card accounts as required by the Severance Agreement.

145.  Judicial Watch has failed to remove Klayman as a guarantor for the Building as required by the Severance Agreement.

146.  Judicial Watch has failed to provide Klayman access to documents as required under the Severance Agreement.

147.  Despite repeated demands to adhere to and honor the terms of the Severance Agreement, Judicial Watch remains in breach of the agreement and it must be ordered to

271748-1

29

specifically perform its obligations.

## COUNT NINE - Defamation

### Klayman v. Judicial Watch, Thomas Fitton, Paul Orfanedes, and Christopher Farrell

148.   Klayman incorporates by reference the allegations of paragraphs 1 through 147 as if fully stated herein.

149.   Judicial Watch, through Fitton, Orfanedes, Farrell and other agents and representatives, including but not limited to Barmak, have defamed Klayman, by publishing false statements to various persons and entities as alleged above.

150.   Judicial Watch, through Fitton, Orfanedes, Farrell and other agents and representatives, published false and misleading statements in Judicial Watch's 2003 and 2004 Form 990 IRS Returns.  These false statements were prominently published on Judicial Watch's website and falsely stated unequivocally that Klayman owed a certain amount of monies to Judicial Watch.

151.   The false and defamatory publications on the Form 990s and the Judicial Watch website were used by others to attack Klayman.  For example, Peter Paul, a former Judicial Watch client republished the defamatory statements on his website and attacked Klayman based, in part, on the false statements published in the Form 990s.

152.   Fitton's and Judicial Watch's defamatory publications and statements about Klayman harmed Klayman's business reputation and are damaging per se.

153.   Fitton's and Judicial Watch's defamation of Klayman is continuous and ongoing.

154.   In response to the filing of the original Complaint, Fitton and Judicial Watch knowingly sent a false statement to all Judicial Watch employees, which stated that Klayman filed his lawsuit because he owed Judicial Watch a significant sum of money.

271748-1                              30

155.  Fitton, Orfanedes, Farrell and Judicial Watch knew that Klayman did not, individually, owe Judicial Watch any money when they published the false and misleading statement.

156.  Additionally, beginning on April 13, 2006, Fitton and Judicial Watch published knowingly false statements in the following media outlets: 1) The Washington Post (April 19, 2006); 2) The Washington Times (April 14, 2006); 3) World NetDaily.com (April 13, 2006); 4) Slate.com (April 28, 2006); and elsewhere.

157.  With wanton disregard for the truth, Fitton, Orfanedes, Farrell and Judicial Watch falsely told reporters that Klayman filed his suit as a "tactical maneuver designed to distract attention away from the fact that Klayman owes **more than a quarter of a million dollars to Judicial Watch**."

158.  When Fitton, Orfanedes, Farrell and Judicial Watch published their defamatory statements they did so with knowledge that 1) Klayman does not owe Judicial Watch any money; and 2) Klayman has a genuine dispute with Judicial Watch that has yet to be resolved.

159.  Fitton, Orfanedes, Farrell and Judicial Watch deliberately lied to sully Klayman's name and to imply that, among other things, Klayman filed a frivolous lawsuit.

160.  Fitton's and Judicial Watch's defamation of Klayman is part of Fitton's continuing effort to lower Klayman's esteem in the media and public's eye.

161.  Fitton Orfanedes, Farrell and Judicial Watch uttered and published false statements about Klayman and they harmed Klayman's reputation in his trade, and profession and had the effect of lowering him in the estimation of the community.

162.  As a result of Defendants' malicious conduct, Klayman was damaged in an amount to be determined at trial.

271748-1

31

**WHEREFORE**, Plaintiffs request the Court grant judgment in their favor and:

A.   **On Counts One, Two and Three** award Louise Benson a sum in excess of seventy-five thousand dollars ($75,000) plus interest, against the defendants jointly and severally;

B.   **On Count Three** award Louise Benson an amount of punitive damages to be determined at trial against the defendants, jointly and severally;

C.   **On Counts Four and Five** award Larry Klayman a sum in excess of one million five-hundred thousand dollars ($1,500,000) plus interest, a reasonable royalty, and an amount of punitive damages to be determined at trial against the defendants, jointly and severally;

D.   **On Count Six** Larry Klayman respectfully prays that this Honorable Court enter a Judgment against Judicial Watch, rescinding the Severance Agreement to preserve the interests of justice and provide such other relief as is just and equitable;

E.   **Alternatively, on Count Seven** award Larry Klayman a sum in excess of five-hundred thousand dollars ($500,000), plus interest, against the defendants, jointly and severally;

F.   **Alternatively, on Count Eight** Larry Klayman respectfully prays that this Honorable Court enter a Judgment against Judicial Watch and order Judicial Watch to specifically perform the terms of the Severance Agreement by: paying Klayman the remaining amounts due under the Severance Agreement, including reimbursing Klayman for business expenses; returning Klayman's personal items, property and artwork; returning the property of Klayman & Associates, P.C.; removing Klayman as a guarantor of all credit card accounts; removing Klayman as a guarantor for the Building; providing Klayman access to documents; and otherwise complying

271748-1

with the Severance Agreement as plead herein;

     G.    **On Count Nine** award Larry Klayman a sum in excess of one million five-hundred

thousand dollars ($1,500,000), plus interest, and an amount of punitive damages to be determined

at trial against the defendants, jointly and severally;

     H.    Award Plaintiffs the costs of the action, including attorneys' fees; and

     I.    Award Plaintiffs such further relief as is just and equitable.

### Jury Trial Demanded

Plaintiffs hereby demand a trial by jury for all issues so triable.

Respectfully submitted,

**SPECTOR GADON & ROSEN, P.C.**

By: _____ (DD 1339)
    Daniel J. Dugan, Esquire
    1635 Market Street, 7th floor
    Philadelphia, PA  19103
      215.241.8872
      215:241.8844 *fax*
      email: ddugan@lawsgr.com

June 14, 2006

*Attorneys for Plaintiffs Larry Klayman and*
*Louise Benson*

Of Counsel:

**SPECTOR GADON & ROSEN, P.C.**
Jason B. Schaeffer, Esquire
1635 Market Street, 7th Floor
Philadelphia, PA 19103
215.241.8887
215.241.8844 *fax*
Email: jschaeffer@lawsgr.com

271748-1                                                    33

# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LARRY KLAYMAN,

    Plaintiff,

      v.

JUDICIAL WATCH, INC., *et al.*,

    Defendants.

Civil Action No. 06-670 (CKK)

**MEMORANDUM OPINION**
(December 3, 2007)

Currently pending before the Court is the Motion for Leave to Amend Counterclaim filed

by Defendants/Counter-Claimants Judicial Watch, Inc., and Thomas J. Fitton (collectively,

"Judicial Watch"). Plaintiff opposes Judicial Watch's Motion for Leave to Amend on the

grounds that it was brought in bad faith and that the only new claim Judicial Watch seeks to add

via its Amended Counterclaim is futile. Plaintiff has also filed a Cross-Motion for Sanctions.

Upon a searching review of the filings currently before the Court in connection with Judicial

Watch's Motion for Leave to Amend and Plaintiff's Cross-Motion for Sanctions, the relevant

statutes and case law, and the entire record herein, the Court shall GRANT Judicial Watch's

Motion for Leave to Amend and shall DENY Plaintiff's Cross-Motion for Sanctions.

**I: BACKGROUND**

The Court shall assume familiarity with the Court's January 17, 2007 and April 3, 2007

Memorandum Opinions, which set forth in detail the factual background of this case, and shall

therefore only briefly address such facts as are necessary for resolution of the motions currently

before the Court. *See Klayman v. Judicial Watch, Inc.*, Civil Action No. 06-670, 2007 WL

140978 (D.D.C. Jan. 17, 2007) (hereinafter "MTD Slip Op."); *Klayman v. Judicial Watch, Inc.*,

Civil Action No. 06-670, 2007 WL 1034936 (Apr. 3, 2007) (hereinafter "Reconsid. Slip Op.";

and *Klayman v. Judicial Watch, Inc.*, Civil Action No. 06-670, 2007 WL 1034937 (Apr. 3, 2007)

(hereinafter "PSJ Slip Op."). Defendant Judicial Watch, Inc. is a 501(c)(3) organization formed

under the laws of the District of Columbia and headquartered in the District of Columbia. PSJ

Slip Op. at 3-4. Defendant Fitton is President of Judicial Watch, Defendant Orfanedes is the

Secretary and a Director of Judicial Watch, and Defendant Farrell is a Director of Judicial Watch.

*Id.* at 4. Plaintiff Larry Klayman ("Klayman") is the self-described founder and former

Chairman, General Counsel and Treasurer of Judicial Watch, who resides in and practices law in

the State of Florida. *Id.*

     In his Second Amended Complaint, Klayman brought six claims against various

combinations of Defendants, relating to events that occurred after Klayman left Judicial Watch in

September 2003. *Id.* In connection with Klayman's separation from Judicial Watch, on

September 19, 2003, the parties executed a detailed Severance Agreement, signed by Klayman

and Fitton, on behalf of Judicial Watch, and attested to by Orfanedes, as Corporate Secretary of

Judicial Watch. *Id.* Plaintiff's claims have been narrowed somewhat by the Court's January 17,

2007 and April 3, 2007 Memorandum Opinions. Specifically, the Court has dismissed Count

Five of Plaintiff's Second Amended Complaint, dismissed-in-part Count Nine of Plaintiff's

Second Amended Complaint, and granted-in-part Defendant's motion for summary judgment as

to Counts Six, Seven, and Eight of Plaintiff's Second Amended Complaint. *See generally* MTD

Slip Op., Reconsid. Slip Op., PSJ Slip Op.

     On June 28, 2006, Judicial Watch filed its Answer to Plaintiff's Second Amended

Complaint, and also filed its Counterclaim against Klayman, which includes nine Counts: Count

I (Breach of Contract) alleges that Klayman has not paid Judicial Watch, Inc. amounts due under

the Severance Agreement, Counterclaim ¶¶ 19-24; Count II (Breach of Contract) alleges that

Klayman has not repaid a debt owed to Judicial Watch, Inc. by Klayman's former law firm,

Klayman & Associates ("K&A"), which was re-affirmed in the Severance Agreement, *id.* ¶¶ 25-

30; Count III (Indemnification) alleges that Klayman is obligated to indemnify Judicial Watch,

Inc. for damages arising out of K&A's purported breach of the Severance Agreement, *id.* ¶¶ 31-

34; Counts IV and V (Trademark Infringement) allege that Klayman knowingly used Judicial

Watch, Inc.'s registered trademarks without consent, in violation of the Lanham Act, 15 U.S.C.

§§ 1114(1)(a) and 1125(a), *id.* ¶¶ 35-48; Counts VI and VII (Breach of Contract) allege that

Klayman has disparaged Judicial Watch, Inc. and Fitton in violation of the Severance Agreement,

*id.* ¶¶ 49-63; Count VIII (Breach of Contract) alleges that Klayman has used Confidential

Information in violation of the Severance Agreement, *id.* ¶¶ 64-70; and Count IX (Breach of

Contract) alleges that Klayman has violated the Severance Agreement's covenant not to compete

or solicit, *id.* ¶¶ 71-77. Klayman filed his Answer to Judicial Watch's Counterclaim on August

7, 2006.

Judicial Watch filed its Motion for Leave to Amend Counterclaim on May 25, 2007,

asserting that "[s]ince filing the Counterclaim, Judicial Watch has had an opportunity to learn

additional information . . . [and] Klayman has pursued a course of action that requires expanded

allegations concerning claims under the Lanham Act." JW Mot. for Leave to Amend

Counterclaim (hereinafter "JW Mot. to Amend") ¶ 1. Judicial Watch therefore seeks to expand

Count IV of the Counterclaim, split Count V into two claims (one for false advertising and one

3

for false association), and add a claim for cybersquatting.

In addition–and at the heart of Plaintiff's Opposition and Motion for Sanctions–Judicial

Watch seeks to add a number of allegations to its Counterclaim regarding the circumstances

under which Klayman separated from Judicial Watch in September 2003. Specifically, Judicial

Watch alleges that in May 2003, Klayman informed Fitton and Orfanedes that "his wife, a former

Judicial Watch employee, had commenced divorce proceedings against him" and that she

"alleged that Klayman had had an inappropriate relationship with a Judicial Watch employee

with whom he had been in love" and that "Klayman had assaulted her physically." JW Am.

Count. ¶ 10. According to Judicial Watch, "Klayman denied having a sexual relationship with

the employee" but acknowledged that he "had been in love with the employee," "that he had

purchased gifts for the employee and had kissed her," and also acknowledged "an incident with

his wife that clearly provided the basis for his wife's allegation of physical assault." *Id.* ¶ 11.

Judicial Watch alleges that Fitton and Orfanedes considered Klayman's "acknowledged behavior

[] entirely inconsistent with that of a leader of a conservative, pro-family organization," as well

as "Klayman's fiduciary duties to the organization," and that they were concerned about

Klayman's possible misuse of Judicial Watch resources. *Id.* ¶¶ 12. Judicial Watch further

alleges that, as a result of these revelations, "Fitton requested that Klayman resign," and "Fitton

and Orfanedes also insisted that Judicial Watch undertake an internal investigation into

Klayman's conduct, including an audit. . . ." *Id.* ¶ 13. According to Judicial Watch, "Klayman

offered to resign rather than face such an inquiry," and the parties began negotiating for his

separation from Judicial Watch, which eventually culminated in the September 19, 2003

Severance Agreement. *Id.* ¶¶ 14-18.

4

Plaintiff filed his Opposition and Cross-Motion for Sanctions on June 11, 2007, and

Judicial Watch filed its Reply in support of its motion to amend and Opposition to Plaintiff's

Cross-Motion on June 21, 2007.  On July 5, 2007, Plaintiff filed a motion to file out of time his

Reply in support of his Cross-Motion, which was granted on October 1, 2007.  Thereafter, as

permitted by the Court in its October 1, 2007 Minute Order, Judicial Watch filed a Sur-Reply

regarding Plaintiff's Cross-Motion for Sanctions.

## II: LEGAL STANDARDS

Under Federal Rule of Civil Procedure 15(a), a party may amend its pleading once as a

matter of course at any time before a responsive pleading is served.  *See* Fed. R. Civ. P. 15(a).

Once a responsive pleading is served, however, a party may amend its complaint only by leave of

the court or by written consent of the adverse party.  *Id.*; *Foman v. Davis*, 371 U.S. 178, 182

(1962).  The grant or denial of leave to amend is committed to the sound discretion of the district

court.  *See Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996).  The court must,

however, heed Rule 15's mandate that leave is to be "freely given when justice so requires." *Id.*;

*Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1083 (D.C. Cir. 1998).

Indeed, "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper

subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman*,

371 U.S. at 182.  As such, "[a]lthough the grant or denial of leave to amend is committed to a

district court's discretion, it is an abuse of discretion to deny leave to amend unless there is

sufficient reason, such as 'undue delay, bad faith or dilatory motive . . . repeated failure to cure

deficiencies by [previous] amendments . . . [or] futility of amendment.'" *Firestone*, 76 F.3d at

1208 (quoting *Foman*, 371 U.S. at 182); *see also Caribbean Broad. Sys.*, 148 F.3d at 1084 (a

5

district court's discretion to grant leave to amend is "severely restricted" by Rule 15's command

that such leave "be freely given").  Nevertheless, the Court may deny as futile a motion to amend

a complaint when the proposed complaint would not survive a motion to dismiss.  *James*

*Madison, Ltd. v. Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996); *see also* 3 Moore's Federal

Practice § 15.15[3] (3d ed. 2000) ("An amendment is futile if it merely restates the same facts as

the original complaint in different terms, reasserts a claim on which the court previously ruled,

fails to state a legal theory, or could not withstand a motion to dismiss.").

### III: DISCUSSION

Klayman opposes Judicial Watch's Motion for Leave to Amend on the grounds that it

was filed in bad faith for improper purposes and, with respect to Judicial Watch's proposed

cybersquatting claim, also argues that amendment is futile because the claim would not survive a

motion to dismiss.  The Court addresses each of these arguments in turn, before considering

Plaintiff's Cross-Motion for Sanctions.

A.      *The Court Cannot Conclude That Judicial Watch's Proposed Amendment Was
        Made in Bad Faith or For an Improper Purpose*

As an initial matter, the Court notes that Klayman does not oppose Judicial Watch's

proposed amendment insofar as it seeks to expand Count IV for trademark infringement and

divide Count V of its original Counterclaim into two unfair competition claims under the

Lanham Act, one for false advertising (Count V) and one for false association (Count VI).

Nevertheless, Klayman argues that Judicial Watch's proposed amendment "is brought in bad

faith and for the improper purpose of defaming, harassing and injuring Klayman, his family and

other innocent third parties." Pl.'s Opp'n at 5.  In particular,  Klayman opposes Judicial Watch's

6

proposed addition of Paragraphs 10-20 of its Amended Counterclaim–the allegations described

above concerning the circumstances of Klayman's departure from Judicial Watch. *Id.* at 6-7.

Klayman first argues that the allegations contained in Paragraphs 10-20 have no bearing

on Judicial Watch's current or proposed legal claims. *Id.* However, Klayman proffers no legal

challenge to Judicial Watch's proposed Count V, which alleges that "Klayman has made false

and/or misleading statements that have actually deceived and/or had the tendency to deceive a

substantial segment of the receiving audience." Am. Count. ¶ 93. The Court is unaware of any

reason for denying Judicial Watch leave to amend its Counterclaim to add its proposed Count V,

and it follows that Judicial Watch may also amend its Counterclaim to add the factual allegations

necessary to support that claim. To that end, Judicial Watch asserts that the allegations in

Paragraphs 10-20 are directly relevant, and in fact "critical" to Judicial Watch's claims for unfair

competition and breach of contract. JW Reply at 3-6. According to Judicial Watch, Klayman

has made a number of false or misleading statements concerning himself and his reasons for

leaving Judicial Watch via his direct mail and advertising campaign, which have resulted in harm

to Judicial Watch that is actionable under the Lanham Act. *Id.* at 5.[1] The Court finds this

explanation sufficient to demonstrate the relevance of Judicial Watch's proposed Paragraphs 10-

20 to its legal claims.[2]

---

[1] Judicial Watch also argues that in order to succeed on its claim that Klayman has disparaged Judicial Watch officers by falsely characterizing them as liars (Counts VIII and IX of Judicial Watch's proposed Amended Counterclaim), Judicial Watch will need to show that its officers did not falsely represent that the reasons for Klayman's departure were confidential. *Id.* at 5-6.

[2] Klayman's filings emphasize that Judicial Watch was aware of the allegations contained in Paragraphs 10-20 when it filed its original Counterclaim but did not include those allegations in that filing. According to Klayman, Judicial Watch threatened to do so, but chose not to after

Klayman next argues that Judicial Watch's proposed allegations regarding the

circumstances of Klayman's departure from Judicial Watch are made in bad faith because they

contradict the Severance Agreement's statement that Klayman's separation "shall be treated for

all purposes as a voluntary resignation," and actually violate the Severance Agreement's non-

disparagement provision. Pl.'s Opp'n at 6-8 (citing Severance Agreement ¶¶ 1, 17). While

Klayman is correct as to the language of the Severance Agreement, denying Judicial Watch leave

to amend its Counterclaim on the ground that the amendment violates the non-disparagement

provision of the Severance Agreement puts the cart before the horse. The proper interpretation of

the Severance Agreement's non-disparagement provision is directly at issue in Counts Six,

Seven, and Eight of Plaintiff's Second Amended Complaint. Thus, to the extent that Klayman

alleges Judicial Watch's proposed amendments constitute a violation of the non-disparagement

---

counsel exchanged letters on the subject. *See* Pl.'s Opp'n at 1-2; Pl.'s Reply at 1. The Court
need not resolve the parties' dispute over past events because Judicial Watch explains that, since
it filed its original Counterclaim, "Klayman has pursued a course of action that requires
expanded allegations concerning claims under the Lanham Act." JW Mot. to Amend. ¶ 1.
According to Judicial Watch, the allegations in Paragraphs 10-20 are included in the proposed
Amended Counterclaim because they are primarily relevant to Judicial Watch's expanded
Lanham Act claims. It therefore follows that the allegations were not included in Judicial
Watch's original Counterclaim because they were not relevant to the legal claims therein.
    Klayman also notes that Judicial Watch was aware of Klayman's website,
www.savingjudicialwatch.org, when it filed its original Counterclaim, and therefore could have
brought its proposed cybersquatting claim (Count VII of Judicial Watch's proposed Amended
Counterclaim) at that time. However, insofar as that Count alleges that "Klayman's actions have
harmed . . . the good will represented by Judicial Watch's JUDICIAL WATCH mark" and "have
caused Judicial Watch to suffer . . . damage and injury to its reputation and goodwill, as well as a
loss of fund raising revenues," it appears that Judicial Watch's proposed cybersquatting claim
relies upon events subsequent to the filing of its original Counterclaim. *See* Am. Count. ¶¶ 106-
16. Significantly, Klayman does not assert that Judicial Watch unduly delayed bringing either its
expanded Lanham Act or cybersquatting claim, or that he would be prejudiced by Judicial
Watch's addition of claims at this time. Furthermore, the Court notes that the parties are still
engaged in fact discovery, the deadline for which will be extended through January 31, 2008 by
separate order.

provision, he can argue as much in proving his breach of contract claims. The Court therefore

declines to deny Judicial Watch leave to amend based solely on Klayman's unproven allegation

that Judicial Watch's amendment violates the Severance Agreement, because doing so would

require the Court to interpret the language of the non-disparagement provision in a vacuum.

Finally, Klayman asserts that Judicial Watch need not amend its Counterclaim in order to

add documents that Judicial Watch identifies as examples of allegedly false and misleading

statements made by Klayman in his direct mail and advertising campaign (Exhibits C through Q

to the proposed Amended Counterclaim). *Id.* at 8-9. Klayman notes that "[u]nder the Federal

rules, pleading standards are minimal" and the "applicable rules of procedure do not mandate the

filing of exhibits or attachments to a complaint." *Id.* at 9 (citations omitted). Klayman appears

to suggest that because Judicial Watch is not required to attach exhibits to its Counterclaim,

Judicial Watch's attempt to do so somehow demonstrates bad faith. As, Judicial Watch correctly

notes, however, "Rule 8(a)(2) [of the Federal Rules of Civil Procedure] represents a floor, not a

ceiling." JW Reply at 8. The Court therefore does not accept Klayman's suggestion that Judicial

Watch acted in bad faith by opting to go beyond the minimal pleading requirements of the

Federal Rules.

> B.    *Judicial Watch's Proposed Cybersquatting Claim is Not Clearly Futile*

Klayman also argues that Judicial Watch should be denied leave to amend its

Counterclaim to add a claim for cybersquatting because Judicial Watch's proposed claim would

not survive a motion to dismiss. While futility of amendment is certainly grounds for denying

leave to amend, the Court cannot agree with Klayman that Judicial Watch's proposed

cybersquatting claim is not actionable. The Federal Rules of Civil Procedure require that a

9

complaint contain "'a short and plain statement of the claim showing that the pleader is entitled

to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon

which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. ___, 127 S. Ct. 1955, 1964 (2007)

(quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)); *accord Erickson v. Pardus*, 551 U.S. ___,

127 S. Ct. 2197, 2200 (2007) (per curiam).  Although "detailed factual allegations" are not

necessary to withstand a motion to dismiss for failure to state a claim, to provide the "grounds"

of "entitle[ment] to relief," a plaintiff must furnish "more than labels and conclusions" or "a

formulaic recitation of the elements of a cause of action." *Id.* at 1964-65; *see also Papasan v.

Allain*, 478 U.S. 265, 286 (1986).  In evaluating a motion to dismiss for failure to state a claim,

the court must construe the complaint in a light most favorable to the plaintiff and accept as true

all reasonable factual inferences drawn from well-pleaded factual allegations, but "need not

accept inferences drawn by the plaintiff[] if such inferences are unsupported by the facts set out

in the complaint." *Kowal v. MCI Comm'cns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

   Judicial Watch's proposed cybersquatting claim is brought under the Anti-Cybersquatting

Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d).  Am. Count. ¶¶ 106-16.  To state a

cybersquatting claim under the ACPA, Judicial Watch must allege that (1) JUDICIAL WATCH

is a distinctive or famous mark entitled to protection; (2) Klayman's

www.savingjudicialwatch.org domain name is identical or confusingly similar to Judicial

Watch's mark; and (3) that Klayman registered his domain name with the bad faith intent to

profit from it.  15 U.S.C. § 1125(d)(1)(A); *Shields v. Zuccarini*, 254 F.3d 476, 482 (3d Cir.

2001).  Klayman does not contest whether Judicial Watch's federally registered trademark,

JUDICIAL WATCH, is distinctive or famous, and the Court therefore assumes as much

*arguendo. See* Pl.'s Opp'n at 11; Am. Count. ¶ 54.

Instead, Klayman argues that Judicial Watch's proposed cybersquatting claim does not

sufficiently allege confusion or a bad faith intent to profit. Klayman argues that his website,

www.savingjudicialwatch.org is not confusingly similar to Judicial Watch's website,

www.judicialwatch.org because the "word 'saving' precedes the name, so that any search for

Judicial Watch on the world wide web would not track to Klayman's website." Pl.'s Opp'n at

11. Judicial Watch's proposed cybersquatting claim alleges the opposite–that the two marks are

"confusingly similar"–and further alleges that Klayman's website has "harmed, and will continue

to harm, the goodwill represented by Judicial Watch's [] mark . . .by creating a likelihood of

confusion as to the source, sponsorship, affiliation and endorsement of [Klayman's] site." Am.

Count. ¶¶ 108, 113. The Court agrees with Judicial Watch that whether Klayman's website is

actually confusingly similar to Judicial Watch's website is an issue of fact that cannot be

resolved on the limited record before the Court at this time, and would be unlikely to be resolved

at all on a motion to dismiss for failure to state a claim.

Klayman further argues that Judicial Watch's cybersquatting claim would not survive a

motion to dismiss because Judicial Watch "did not, and can not, allege that Klayman was

motivated by profit, let alone bad faith intent to profit." Pl.'s Opp'n at 12. Klayman posits that

the instant case is "a far cry from the 'squatting' activity made illegal by the ACPA," and cites to

cases in which courts have found insufficient evidence of the bad faith required under the ACPA

where defendants registered websites that they used to complain about experiences with, or

criticize, the defendants' companies. *Id.* at 11-12. To the contrary, Judicial Watch's proposed

Amended Counterclaim specifically alleges that "Klayman registered, used and continues to use

the savingjudicialwatch.org domain name with bad faith intent to divert supporters and donors

from Judicial Watch's websites to the websites previously and currently accessible at

savingjudicialwatch.org for Klayman's commercial gain and for purposes of promoting Klayman

d/b/a Saving Judicial [W]atch." Am. Count. ¶ 111. On its face, then, Judicial Watch's proposed

cybersquatting claim asserts that Klayman registered his website with an intent to profit by

diverting funds from Judicial Watch to his own coffers.

Finally, as to allegations of bad faith, Judicial Watch's proposed cybersquatting claim

charges that Klayman does not have prior trademark or intellectual property rights in the

JUDICIAL WATCH mark and made no prior use of the name, that he intended to divert Judicial

Watch supporters to his website, and that he purposefully concealed his identity in registering his

website. *Id.* ¶¶ 106-16. Each of these allegations is relevant to one of the nine factors that the

ACPA specifically provides courts may consider in determining whether a person has the

requisite bad faith. *See* 15 U.S.C. § 1125(d)(1)(B)(i). In light of these nine, non-exhaustive

factors, the Court cannot determine on the current record whether Klayman actually had the

requisite bad faith, but can determine that Judicial Watch's cybersquatting claim might survive a

motion to dismiss for failure to state a claim. The Court therefore rejects Klayman's argument

that Judicial Watch's proposed cybersquatting claim is futile. Moreover, for the reasons set forth

above, Klayman fails to demonstrate a sufficient reason for denying Judicial Watch leave to

amend its Counterclaim. Rather, because "the underlying facts or circumstances relied upon by

[Judicial Watch] may be a proper subject of relief, [it] ought to be afforded an opportunity to test

his claim on the merits." *Foman*, 371 U.S. at 182. The Court shall therefore grant Judicial

Watch's Motion for Leave to Amend.

C.    *Plaintiff's Cross-Motion for Sanctions Shall Be Denied*

The Court turns now to Klayman's cross-motion, in which he asks the Court to impose

sanctions upon Judicial Watch–including attorneys fees, additional fines, the striking of Judicial

Watch's proposed Amended Counterclaim, and a contempt order–under the Court's "inherent

power to impose sanctions for abusive litigation practices undertaken in bad faith." Pl.'s Opp'n

at 13, 16. The Court's inherent power to sanction is "'governed not by rule or statute but by the

control necessarily vested in courts to manage their own affairs so as to achieve the orderly and

expeditious disposition of cases.'" *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (quoting

*Link v. Wabash R.R. Co.*, 370 U.S. 626, 630-31 (1962)). However, "[b]ecause of their very

potency, inherent powers must be exercised with restraint and discretion." *Id.* at 44 (citing

*Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980)).

Klayman's motion for sanctions focuses on the allegations contained in Paragraphs 10-20

of Judicial Watch's proposed Amended Counterclaim regarding the circumstances in which

Klayman separated from Judicial Watch. As an initial matter, to the extent that Klayman's

motion for sanctions relies upon his argument that those allegations are irrelevant to any issue in

the case, and "unnecessary and violative of the pleading requirements of Fed.R.Civ.P. 8," *id.* at

13, the Court rejects Klayman's argument for the reasons discussed above. In further support of

his motion for sanctions, Klayman asserts that Judicial Watch filed its proposed Amended

Counterclaim with the knowledge that the allegations contained in Paragraphs 10-20 were "made

by Klayman's ex-wife during divorce proceedings, were false, and were later withdrawn," and

were "sealed by Order of the Circuit Court, Fairfax County, where the divorce was proceeding."

*Id.* at 13-14. Based on these claims, Klayman asks this Court to hold Judicial Watch and its

13

attorneys in civil contempt for filing the proposed Amended Counterclaim in derogation of the

June 19, 2003 Order of the Circuit Court of Fairfax County, Virginia, sealing the record of

Klayman's divorce proceeding. *See* Pl.'s Reply, Ex. 1. However, Judicial Watch explicitly

asserts that the "basis for the Amended Counterclaim is not the court file for Klayman's

divorce." JW Sur-Reply at 3. Rather, Judicial Watch maintains that its proposed Amended

Counterclaim is based on a conversation during which Klayman informed Fitton and Orfanedes

about his wife's allegations, "acknowledged to Fitton and Orfanedes that he had been in love

with the employee," "had purchased gifts for the employee and had kissed her," and also

"acknowledged an incident with his wife that clearly provided the basis for his wife's allegation

of physical assault." *Id.*; Am. Count. ¶¶ 10-11.

The Court notes that the relevant paragraphs of the proposed Amended Counterclaim

explicitly refer to a conversation that occurred on or about May 6, 2003 (notably before the seal

order was entered), and thus support Judicial Watch's claim as to the provenance of the

allegations contained therein. *Id.* For his part, Klayman admits that he "voluntarily revealed the

accusations" during a conversation "well prior to any discussion of his possible resignation."

Pl.'s Opp'n at 6. As it thus appears uncontested that Judicial Watch's allegations may be based

on the conversation rather than Klayman's sealed divorce record, the Court cannot conclude that

Judicial Watch has acted in a manner worthy of civil contempt.

Klayman also maintains that sanctions are appropriate because the disclosure of the

allegations contained in Paragraphs 10-20 violates the attorney-client privilege as well as various

Rules of Professional Conduct applicable to attorneys. *Id.* at 13-16; Pl.'s Reply at 6-10. Each of

these arguments turns on Klayman's assertion that he disclosed the information underlying

14

Paragraphs 10-20 of Judicial Watch's proposed Amended Counterclaim "in confidence, as attorney-client communications, to Orfanedes and to Judicial Watch's outside counsel, David Barmak." Pl.'s Reply at 8. The parties appear to dispute the circumstances of those communications. Specifically, Judicial Watch claims that Klayman confessed "the admissions described in the Amended Counterclaim . . . directly to Fitton and Orfanedes in their capacity as officers and directors of Judicial Watch." JW Reply at 12. Judicial Watch asserts that in the context of the conversations at issue "Orfanedes' role as an attorney, if any, would have been on behalf of his fiduciary, Judicial Watch" and "the purpose of consulting with Barmak was for Judicial Watch to obtain legal advice and assistance." JW Reply at 12. If Judicial Watch is correct that both Orfanedes and Barmak represented Judicial Watch, rather than Klayman individually, during the conversations at issue, then the attorney-client privilege would belong to Judicial Watch and Judicial Watch would have the option of waiving the privilege.

Ultimately Klayman does not clearly explain the basis on which he asserts the attorney-client privilege applies, and this failing is fatal because the party seeking to invoke the attorney-client privilege bears the burden of presenting to the court sufficient facts to establish the privilege. *See In re Sealed Case*, 737 F.2d 95, 99 (D.C. Cir. 1984). However, even accepting Klayman's version of the facts (to the extent that the Court is able to discern it), it appears that the attorney-client privilege and attorney duty of confidentiality are not applicable. Klayman's argument is that during the conversations in question, Orfanedes and Barmak were jointly representing Klayman, as Chairman of Judicial Watch, along with Judicial Watch itself. Pl.'s Reply at 8. Klayman proffers no evidence to establish that Orfanedes was his personal attorney rather than Judicial Watch's attorney. In contrast, Klayman cites to a letter dated May 8, 2003, in

15

which he and Fitton acknowledged that Barmak had "represented or may be deemed to have represented, Larry Klayman personally." *Id.*, Ex. 3. Nevertheless, even if Orfanedes or Barmak was engaged in a joint representation of Klayman individually and Judicial Watch, Klayman himself admits that "the prevailing rule is that, as between commonly represented clients, the [attorney-client privilege] does not attach." *Id.* at 9 (citing Comment 15 to D.C. R. of Prof. Cond. 1.7).

Finally, although the Court cannot discern whether Klayman in fact asserts as much, it does not appear that the attorney-client privilege would apply even if Orfanedes or Barmak represented Klayman individually during the conversations at issue. Klayman does not dispute Judicial Watch's contention that Fitton was present during the conversations and it is clear that Fitton is not a lawyer. *See* JW Reply at 12. "Normally the attorney-client privilege is destroyed once information is shared with any person other than the attorney and the client because the presence of a third party is inconsistent with the client's intent that the communication remain confidential." *Blumenthal v. Drudge*, 186 F.R.D. 236, 243 (D.D.C. 1999) (citing *In re Lindsay*, 158 F.3d 1263, 1270 (D.C. Cir. 1998)). It therefore appears that the attorney-client privilege would not apply if Klayman disclosed information to his attorneys in Fitton's presence. Moreover, as the party seeking to invoke the attorney-client privilege, Klayman bears the burden of presenting to the court sufficient facts to establish the privilege. *In re Sealed Case*, 737 F.2d at 99. Klayman has utterly failed to carry this burden, because he has not even clearly described the factual circumstances in which the conversations at issue are alleged to have taken place. As such, the Court cannot conclude that the attorney-client privilege has been violated.

Klayman also argues that the allegations Judicial Watch seeks to add are the fruit of an

16

improper disclosure by Orfanedes and Barmak, in violation of their duty of confidentiality under

Rule of Professional Conduct 1.6. That Rule prohibits a lawyer from knowingly revealing a

confidence of a client, using a confidence of a client to the client's disadvantage, or using a

confidence of a client for the advantage of a lawyer or of a third person. D.C. R. of Prof. Cond.

1.6. However, that Rule defines a "confidence" as "information protected by the attorney-client

privilege under applicable law." *Id.* Thus, because Klayman has not established the application

of the attorney-client privilege, he cannot demonstrate a violation of Rule 1.6. Furthermore, the

Court notes again that Klayman does not dispute that Fitton was present during the conversations

at issue and that Fitton is not a lawyer. As such, Fitton is not bound by any duty of

confidentiality with respect to the matters discussed and Klayman has not proffered any evidence

that the allegations at issue were disclosed by Orfanedes or Barmak, rather than Fitton.

Finally, in his Reply in support of his Cross-Motion for Sanctions, Klayman argues that

Judicial Watch violates other Rules of Professional Conduct by seeking to add the allegations

contained in Paragraphs 10-20 of its proposed Amended Counterclaim. Specifically, Klayman

argues that the allegations violate Rule 3.6 because they are "utterly irrelevant" to the instant

action and therefore constitute improper extra-judicial statements that will be disseminated and

will have a substantial likelihood of materially prejudicing an adjudicative proceeding. Pl.'s

Reply at 6-7; D.C. R. of Prof. Cond. 3.6. Klayman further asserts that the allegations "have no

substantial purpose other than to embarrass third persons" and therefore violate Rule 4.4(a).

Each of these assertions fails, however, because of the Court's conclusion above that the

allegations contained in Judicial Watch's proposed Paragraphs 10-20 are directly related to

17

Judicial Watch's actionable Lanham Act claims.[3]

In sum, Klayman has failed to support his Cross-Motion for Sanctions with any evidence of sanctionable conduct on the part of Judicial Watch, its officers, or its counsel. As such, the Court shall deny Klayman's Cross-Motion for Sanctions.

## IV: CONCLUSION

For the reasons set forth above, the Court shall GRANT Judicial Watch's Motion for Leave to Amend and shall DENY Plaintiff's Cross-Motion for Sanctions. An appropriate Order accompanies this Memorandum Opinion.

Date:   December 3, 2007


                                    _____/s/_____
                                    COLLEEN KOLLAR-KOTELLY
                                    United States District Judge

---

[3] Klayman's Cross-Motion for sanctions also accuses Judicial Watch of alerting the media to its filing of its proposed Amended Counterclaim. However, Klayman fails to proffer any factual support for this allegation, which Judicial Watch in turn denies. *See* Pl.'s Opp'n at 15; JW Reply at 13, Ex. 4. As such, the Court has not considered Klayman's unsupported assertion.

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LARRY KLAYMAN, *ET AL.*

        Plaintiffs,

v.

JUDICIAL WATCH, INC., *ET AL.*

        Defendants.

Civil Action No. 1:06-CV-00670
Honorable Colleen Kollar-Kotelly

## AMENDED COUNTERCLAIM OF
## JUDICIAL WATCH, INC. AND THOMAS J. FITTON

        Defendants/Counter-Claimants Judicial Watch, Inc. ("Judicial Watch") and Thomas J.

Fitton ("Fitton"), by counsel, hereby counterclaim against Plaintiff/Counter-Defendant Larry E.

Klayman ("Klayman") as follows:

### Parties

        1.      Judicial Watch is a non-profit, educational organization incorporated under the

laws of the District of Columbia and having its principal place of business at 501 School Street,

S.W., Suite 500, Washington, DC 20024. Judicial Watch's purpose and focus is to promote

accountability and integrity in government, politics and the law.

        2.      Fitton is an individual citizen and resident of the District of Columbia. Fitton is

president of Judicial Watch.

        3.      Klayman is an individual citizen and resident of the State of Florida. Klayman

was the Chairman and General Counsel of Judicial Watch until his separation with the

organization pursuant to a Severance Agreement dated September 19, 2003. He was also the

sole shareholder and officer of Klayman & Associates, P.C. ("K&A"), a law firm whose

registration has since been revoked by the District of Columbia. Upon information and belief, K&A is no longer in business anywhere.

4.    The claims asserted against Klayman arises out of the same facts, circumstances and occurrences as the subject matter of Klayman's Second Amended Complaint and therefore, constitute compulsory counterclaims under Rule 13(a) of the Federal Rules of Civil Procedure.

## Jurisdiction

5.    Jurisdiction arises under 28 U.S.C. § 1331, as Judicial Watch's claims against Klayman arise under the laws of the United States, specifically, section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

6.    Jurisdiction also arises under 28 U.S.C. § 1332(a) because of the parties' diversity of citizenship and because the amount in controversy, exclusive of interests and costs, exceeds $75,000.

## Venue

7.    Venue is proper in this Court district pursuant to 28 U.S.C. § 1391 because Klayman availed himself of this forum when he filed his Second Amended Complaint, which is now pending in this Court. In addition, Klayman consented to venue in this Court pursuant to ¶ 23 of the Severance Agreement.

## Facts

8.    Judicial Watch was founded in 1994 as a not-for profit, tax exempt educational organization. The organization seeks to promote transparency, integrity, and accountability in government, politics, and public life, as well as respect for the rule of law. It also seeks to promote conservative, pro-family values. Due to the hard work and dedication of a great many

employees and volunteers, as well as the contributions of hundreds of thousands of supporters, Judicial Watch has enjoyed substantial success since its inception in 1994.

9.    In May 2003, Klayman was the Treasurer and General Counsel of Judicial Watch. He also was an employee and member of the organization's Board of Directors. While Klayman referred to himself as the "Chairman" of Judicial Watch, the designation carried no legal authority, but, rather, was merely an honorarium.

### Klayman's Forced Resignation for Acknowledged Misconduct

10.    On or about May 6, 2003, Klayman, a married father of two small children, informed Thomas J. Fitton, Judicial Watch's president, and Paul J. Orfanedes, the organization's corporate secretary, that his wife, a former Judicial Watch employee, had commenced divorce proceedings against him. Klayman informed both Fitton and Orfanedes that, in her petition for divorce, Klayman's wife alleged that Klayman had had an inappropriate relationship with a Judicial Watch employee with whom he had been in love. Klayman also informed Fitton and Orfanedes that Mrs. Klayman alleged Klayman had assaulted her physically.

11.    While Klayman denied having a sexual relationship with the employee, who was a married mother of small children, Klayman acknowledged to Fitton and Orfanedes that he had been in love with the employee. He also acknowledged that he had purchased gifts for the employee and had kissed her. In addition, Klayman acknowledged an incident with his wife that clearly provided the basis for his wife's allegation of physical assault.

12.    Klayman's revelations caused Fitton and Orfanedes substantial concern. Klayman's acknowledged behavior was entirely inconsistent with that of a leader of a conservative, pro-family organization that promotes transparency, integrity and accountability in public life. It also was inconsistent with Klayman's fiduciary duties to the organization and had

3

placed the organization in potential legal jeopardy. Because Klayman and the employee had traveled together frequently, Fitton and Orfanedes were also concerned that Klayman may have misused Judicial Watch's resources to further Klayman's acknowledged, inappropriate relationship with the employee.

13.    Klayman's acknowledged conduct was a breach of his fiduciary duties to Judicial Watch and an abuse of his positions as aboard member, treasurer, chairman and general counsel.

14.    Based on the revelations and potential harm to Judicial Watch, Fitton requested that Klayman resign. Fitton and Orfanedes also insisted that Judicial Watch undertake an internal investigation into Klayman's conduct, including an audit to determine whether Klayman had misused the organization's resources for improper, personal reasons. Klayman offered to resign rather than face such an inquiry.

15.    Judicial Watch and Klayman thereafter commenced what became a long and extremely contentious series of negotiations.

16.    During the course of these investigations, Judicial Watch learned that Klayman had begun another relationship with a former Judicial Watch employee and potentially misused the organization's resources to further that relationship.

17.    The negotiations came to a head in late August 2003 when Klayman threatened to fire Fitton and Orfanedes, although he had no authority to do so. Fitton prepared to terminate Klayman's employment. In addition, Fitton and Orfanedes prepared to call a meeting of the Board of Directors to remove Klayman as an officer and director of the organization.

18.    Ultimately, the parties were able to reach a compromise, and, on September 19, 2003, Judicial Watch and Klayman entered into a severance agreement by which Klayman agreed to resign from the organization in exchange for payment of $400,000 in severance.

Klayman also agreed not to compete with Judicial Watch for a period of two years in exchange for payment of $200,000. The agreement, entitled a "Confidential Severance Agreement," expressly noted that the severance paid by Judicial Watch to Klayman was intended to amicably resolve "differences between the Parties."

19.    Following his forced separation from Judicial Watch, Klayman unsuccessfully ran for the Republican nomination for the U.S. Senate in the State of Florida.

20.    Although Klayman would later represent that the reason for his separation from Judicial Watch was to run for the U.S. Senate from Florida, the truth is that Klayman was forced to leave Judicial Watch because of his acknowledged, inappropriate, personal conduct. His candidacy for the U.S. Senate was merely cover for the embarrassing circumstances for his forced resignation.

### The Severance Agreement

21.    The Severance Agreement is a valid and enforceable contract. A true copy of the September 19, 2003, Severance Agreement is attached as Exhibit A. Judicial Watch has performed all of its obligations under the Severance Agreement, including payment of substantial compensation to Klayman. However, Klayman has not complied with the provisions setting forth his obligations.

22.    Among the duties imposed on Klayman by the Severance Agreement is ¶ 4, which relates to confidential information and reads, in relevant part:

> A.    Confidential Information. Klayman agrees that all non-public information and materials . . . concerning Judicial Watch, its operations, plans, programs, relationships, donors, prospective donors, clients, prospective clients, past or current employees, contracts, financial affairs or legal affairs (collectively, "Confidential Information") are confidential and shall be the exclusive property of Judicial Watch to which Klayman has no

right, title or interest. . . .   Confidential Information includes
matters not generally known outside Judicial Watch, such as . . .
donor lists, . . . contacts at or knowledge of . . . donors or
prospective . . . donors . . . .   Klayman agrees that after the
Separation Date, he shall not . . . use Confidential Information for
any purpose without written approval by an officer of Judicial
Watch, unless and until such Confidential Information has become
public knowledge through no fault or conduct by Klayman.

\*   \*   \*   \*

D.    Client and Donor Information. . . .   Klayman expressly
agrees and acknowledges that, following the Separation Date, he
shall not retain or have access to any Judicial Watch donor . . . lists
or donor . . . data.

23.    During his employment at Judicial Watch, Klayman obtained confidential

information regarding it operations, plans, programs, relationships, donors, prospective donors,

clients, prospective clients, past and current employees, contracts, financial affairs and legal

affairs.

24.    Pursuant to ¶ 10 of the Severance Agreement, Klayman agreed to reimburse

Judicial Watch for personal expenses that were charged to Judicial Watch.  Paragraph 10 reads,

in relevant part:

Klayman further agrees to reimburse Judicial Watch for personal
costs or expenses incurred by him during his employment, if any,
that Judicial Watch may determine in good faith were mistakenly
charged or allocated as costs or expenses of Judicial Watch, as well
as any additional expenses that Klayman has billed to Judicial
Watch or charged to a Judicial Watch credit card that Judicial
Watch determines in good faith are personal expenses of Klayman.
Klayman shall reimburse Judicial Watch for any such amounts
within seven (7) days of being notified by Judicial Watch and
being presented with supporting documentation of the amount,
date and category of cost or expense items for which
reimbursement is sought.

25.    Pursuant to ¶ 11 of the Severance Agreement, Klayman agreed to reimburse

Judicial Watch for Klayman & Associates, P.C.'s portion of shared expenses.  Paragraph 11(A)

reads, in relevant part:

> Klayman, and by its signature below, Klayman & Associates, P.C.
> ("K&A") re-affirm and acknowledge the debt of K&A to Judicial
> Watch, which was in the amount of $78,810 as of December 31,
> 2002, and agree that K&A shall pay the then full outstanding
> balance of the debt (including additional amounts allocated to
> K&A by Judicial Watch's accountants in accordance with their
> customary practice regarding this debt), without offset or
> deduction, together with accrued interest of 8% per annum, on or
> before May 15, 2004 . . . .    Klayman and K&A expressly
> acknowledge that Judicial Watch is not indebted to K&A.

26.    In addition to acknowledging the debt of K&A to Judicial Watch, Klayman

agreed to indemnify Judicial Watch for any damages that arise from a breach of the Severance

Agreement by K&A.  Paragraph 19(B) of the Severance Agreement reads, in relevant part:

> Klayman agrees to . . . indemnify and hold harmless Judicial
> Watch . . . from any and all . . . damages . . . which Judicial Watch
> . . . may incur . . . that arise . . . out of K&A's breach of its
> obligations under this Agreement.

27.    Without regard to the provisions of the Severance Agreement, or his professed

affection for Judicial Watch, Klayman has significantly harmed Judicial Watch by failing to

repay amounts owed for his personal expenses and for expenses that were fairly allocated to

K&A.

28.    Pursuant to ¶ 17 of the Severance Agreement, Klayman expressly agreed:

> that he will not, directly or indirectly, disseminate or publish, or
> cause or encourage anyone else to disseminate or publish, in any
> manner, disparaging, defamatory or negative remarks or comments
> about Judicial Watch or its present or past directors, officers, or
> employees. . . . Nothing in this paragraph is intended to, nor shall
> be deemed to, limit either party from making fair commentary on
> the positions or activities of the other . . . .

7

29.    Klayman's smear campaign against Judicial Watch and Fitton is in violation of the commitments he assumed under the Severance Agreement.

### Klayman's Smear Campaign of Distortion, Misrepresentation and Lies

30.    Initially, Klayman engaged in a smear campaign against Judicial Watch and Fitton to divert attention away from his failure to repay Judicial Watch for debts he confirmed in the Severance Agreement.

31.    Because Klayman has not enjoyed success, either financially or professionally, after being forced to leave Judicial Watch due to his own improper conduct, his purpose now appears to be an attempt to reclaim his position at Judicial Watch where he experienced public attention and frequently appeared in print and electronic media. Klayman apparently views his own misconduct, attempting to carry on an affair with one Judicial Watch employee and one former Judicial Watch employee, as having no impact on his qualifications to lead an organization that seeks to promote transparency, integrity, and accountability in government, politics, and public life, as well as respect for the rule of law. In an ironic twist, Klayman's conduct is eerily similar to the conduct for which he assailed the former President Clinton.

32.    On April 12, 2006, Klayman initiated a lawsuit against Judicial Watch and Fitton alleging breach of the Confidential Severance Agreement, violations of the Lanham Act and a Florida statute, and various claims of defamation. Klayman amended his lawsuit to include additional allegations of defamation arising from statements allegedly made by Fitton in response to the filing of Klayman's original complaint. He also subsequently named Orfanedes and Christopher J. Farrell (who joined Judicial Watch's Board of Directors after Klayman's departure in September 2003) as defendants. In addition to seeking monetary compensation, Klayman seeks to have the Severance Agreement rescinded.

33.     In an effort to fund his smear campaign, Klayman has misappropriated non-public Confidential Information belonging to Judicial Watch in the form of donor lists, information about direct mail solicitation operations, the identity of third-parties who assisted with direct mail solicitation operations and the terms on which such programs and operations were conducted.   Klayman has used this Confidential Information, without seeking or obtaining written approval of Judicial Watch, to solicit funding for this litigation in violation of the Severance Agreement.

34.     Almost immediately upon filing his lawsuit, Klayman launched a website, savingjudicialwatch.org, and commenced a fundraising campaign aimed directly at Judicial Watch's supporters.  This fundraising campaign purportedly seeks to finance Klayman's efforts to restore himself to his former positions with the organization and to "save" Judicial Watch.  In addition, Klayman, individually and doing business as "Saving Judicial Watch," has mailed, on information and belief, at least tens of thousands of direct mail solicitations to Judicial Watch supporters around the United States and has taken out advertisements in at least two national publications seeking donations.   The solicitations and advertisements are based largely on intentionally false, misleading and/or disparaging statements that have caused and continue to cause substantial harm to the very organization Klayman purports to be trying to "save."

35.     On or about April 13, 2006, Klayman issued a press release, which is now posted on the Web site savingjudicialwatch.org, which makes the following false, misleading and/or disparaging statements: "After Klayman left Judicial Watch in the fall of 2003, the current president Tom Fitton set out to hijack the group to further his own personal interests."

36.     Klayman makes the following false, misleading and/or disparaging statements on his Web site, savingjudicialwatch.org:

9

· After I left Judicial Watch, we were betrayed by those who we had trusted to lead the organization. . . . [T]hey lied to donors and supporters, misused their monies, failed to honor their agreement with me, and disparaged my name and reputation, all in a selfish power grab.

· Not only have the donors and supporters of Judicial Watch been served badly, but the financial condition of Judicial Watch has worsened to the point where, if this keeps up, there will be no Judicial Watch in two or four years. The current leadership is effectively writing checks to itself, until the considerable monies which we previously raised to clean up corruption run dry.

· We have too many good things to accomplish together, in bringing our country back to honest and decent government, to let Judicial Watch be killed by those who would use it for their own personal agenda.

· Without any real successes or initiatives, other than self promotion, it's no wonder Judicial Watch is in jeopardy of going out of business. . . .

37.    In a fundraising letter dated May 9, 2006, which Klayman mailed to Judicial Watch supporters across the United States, Klayman knowingly made the following intentionally false, misleading and/or disparaging statements, among others:

10

- In the fall of 2003, I left Judicial Watch to take the fight for ethical government inside the government . . .

- In 2003, I decided to run for a U.S. Senate seat in my home state of Florida.  My idea was to set up a Judicial Watch right inside our government . . . So, with a lot of thought, I stepped down as chairman and general counsel . . .

- While I tried to be supportive of my former colleagues after I left, regrettably one of them in particular, Tom Fitton, Judicial Watch's current president, feared my possible return and has used every dirty trick to block it.

- Not just asleep, the guard dog has deserted its post!  No longer is there any bite to Judicial Watch, Inc. . . .

- During the three years since I left, Judicial Watch sadly has weakened, ethically and otherwise. . . .

- My colleagues that I left behind at Judicial Watch promised me they would bring in someone to take over as chairman.  But this did not happen.  Instead, they seized control of Judicial Watch for their own interests.

- More than lying to donors and misusing their donations, Fitton did everything he could to harm both my U.S. Senate campaign and the wellbeing of my family and me.

11

· When people asked why I had left, frequently they were told the reasons were confidential. That created the false impression I left for some other reason than to run for the U.S. Senate, thus casting a negative light on me.

· But after I left, Fitton and company did not buy the [Washington, D.C. office building in which Judicial Watch, Inc. has its headquarters], instead keeping the money for some other purpose.

· Because Fitton and company failed to replace me with a knowledgeable general counsel or hire experienced lawyers, the group has lost nearly every case I filed.

· But nearly three years later, Judicial Watch is mostly just a bunch of empty shell offices eating up monies but doing little work.

· . . . Judicial Watch's finances have been harmed. I estimate that the more than $16 million dollars I left the organization in assets is now down to about half that amount . . . it's no wonder that Judicial Watch is in jeopardy of going out of business. At this rate, it could have to shut its doors in three years.

· In effect, Judicial Watch became Fitton's own little toy . . . .

· Last but not least, Fitton and company have tried to harm me and my family. . . .

· In effect, Fitton tried to bring me to my financial knees so I'd be too weak to ever come back. He obviously feared losing control over the organization and felt he needed to destroy me to assure his position.

12

The solicitation requested the recipients mail a "large contribution" to help Klayman "retake Judicial Watch and prevent it from being destroyed." A copy of Klayman's May 9, 2006 solicitation is attached as Exhibit B and is incorporated herein by reference.

38.     Klayman made these same false and/or misleading statements in nearly identical fundraising letter dated June 16, 2006, which he also mailed to Judicial Watch supporters across the United States. In addition, Klayman made the following intentionally false, misleading and/or disparaging representations, among others:

> . . . the current president of Judicial Watch, someone I trusted much like Ceasar trusted Brutus, has driven Judicial Watch to the verge of financial ruin, squandering and misusing hard earned donor monies . . . .

The solicitation requested the recipients mail a "generous financial gift" to "clean up the mess at Judicial Watch and be rid of Fitton and his minions." A copy of Klayman's June 16, 2006 solicitation is attached as Exhibit C and is incorporated herein by reference.

39.     In a fundraising letter dated November 20, 2006, which Klayman again mailed to Judicial Watch supporters across the United States, Klayman made the same, intentionally false, misleading and/or disparaging statements that were contained in his May 9, 2006, fundraising letter. The solicitation again requested the recipients mail a "large contribution" to help Klayman "retake Judicial Watch and prevent it from being destroyed." A copy of November 20, 2006 solicitation is attached as Exhibit D and is incorporated herein by reference.

40.     Klayman also caused advertisements to be placed in the December 11, 2006 and December 25, 2006 editions of the *Washington Times National Weekly Edition*, a nationwide publication read by Judicial Watch supporters and in which Judicial Watch itself has advertised.

In his advertisement, Klayman made the following intentionally false, misleading and/or disparaging statements, among others:

> ·     When Attorney Larry Klayman left his position as chairman and general counsel of Judicial Watch in 2003 to pursue a U.S. Senate seat from his native Florida . . .

> ·     When Klayman left, he was assured by his former associates that a new and competent chairman and general counsel would be brought on board.

> ·     Fearing the return of Larry Klayman, Fitton, under the auspices of Judicial Watch, proceeded to sabotage both Larry Klayman's Senatorial campaign . . . .

> ·     . . . callers to Judicial Watch asking why Klayman left the organization were frequently told the reasons were confidential. By creating the false impression that Klayman left for some reason other than to run for the Senate, Fitton effectively placed him in a distinctly disparaging light.

> ·     . . . Judicial Watch coffers held over $16 million in assets, with more in the pipeline when Klayman left for his Senate run in 2003.

> ·     Under [Fitton's] management, Judicial Watch has lost nearly EVERY case it has been involved with since Klayman's departure.

> ·     [Judicial Watch, Inc.'s current leadership] allowed finances and the organization to deteriorate so much that it has been estimated that in the three years since Larry Klayman's departure, the original $16 million has been cut approximately in half.

> ·     We need to save Judicial Watch before all of the assets are gone forever.

14

The advertisements included a request to "[p]lease send your gift to Larry Klayman dba Saving Judicial Watch" by check or credit card. Copies of Klayman's December 2006 advertisements in *The Washington Times National Weekly Edition* are attached as Exhibit E and are incorporated by reference herein.

41.    In a fundraising letter dated January 2, 2007, which Klayman mailed to Judicial Watch, Inc. supporters across the United States, Klayman made the following intentionally false, misleading and/or disparaging statements:

> · So to set up a "Judicial Watch" right inside our government, I ran for the U.S. Senate in 2003. To clean up the corruption that lets wrongdoers off the hook, I had to step down as chairman and general counsel.
>
> · Fitton, Judicial Watch's current president, feared my possible return . . .
>
> · You also know how Fitton disparaged me and sought to hurt my reputation, creating the false impression that I left for some reason other than to run for the Senate.
>
> · Three years later, it's mostly a bunch of empty offices. Without a knowledgeable general counsel or experienced lawyers, Judicial Watch has lost nearly every case I filed.
>
> · Worst of all, it appears that the assets have dwindled from more than $16 million on hand when I left to about half that. Judicial Watch is now in jeopardy of going under.

This time, the solicitation again requested the recipients mail a "large gift" to help Klayman "retake Judicial Watch and prevent it from being destroyed." A copy of Klayman's January 2, 2007 solicitation is attached as Exhibit F and is incorporated herein by reference.

15

42.    Klayman also caused the same intentionally false, misleading and/or disparaging advertisement that he placed in the December 2006 *Washington Times National Weekly Edition* to be placed in the January 22, 2007, edition of *Human Events*, a nationwide publication read by Judicial Watch supporters and in which Judicial Watch itself has advertised.    Again, the advertisement included a request to "[p]lease send your gift to Larry Klayman dba Saving Judicial Watch" by check or credit card.    A copy of Klayman's January 22, 2007, advertisement in *Human Events* is attached as Exhibit G and is incorporated herein by reference.

43.    In a fundraising letter dated January 29, 2007, which Klayman mailed and e-mailed to prominent members of the conservative movement across the United States, Klayman again made the same, intentionally false, misleading and/or disparaging statements that were contained in his May 9, 2006, fundraising letter.    Recipients of the fundraising letter and email include major financial contributors to conservative causes.    For years, Judicial Watch has included many of these prominent conservatives among its many supporters and donors.    The solicitation requested the recipients donate online or mail a "large contribution" to help Klayman "retake Judicial Watch and prevent it from being destroyed."    Copies of Klayman's January 29, 2007 solicitations are attached as Exhibit H and are incorporated herein by reference.

44.    Klayman caused a second advertisement to be placed in the January 29, 2007 edition of *Human Events* in which he made the following intentionally false, misleading and/or disparaging statements, among others:

·        [Fitton] has also misused donor monies and squandered Judicial Watch's considerable resources to the point that if we do not step in now, the organization will likely case to exist in a few years.

·        . . . shortly before I left Judicial Watch to run for the U.S. Senate . . .

16

> · . . . under Fitton, Judicial Watch has been run into the ground . . .

> · In the three years after I left Judicial Watch has become little more than a website which boasts frequently of the many appeals it has to file thanks to having lost the cases which I left for it to pursue.

Again, the advertisement included a request to "[p]lease send your gift to Larry Klayman dba Saving Judicial Watch" by check or credit card. A copy of Klayman's January 29, 2007, advertisement in *Human Events* is attached as Exhibit I and is incorporated herein by reference.

45.    In a fundraising letter dated January 30, 2007, which Klayman e-mailed to prominent members of the conservative movement across the United States, Klayman made the following intentionally false, misleading and/or disparaging statements, among others:

> · [Fitton] also misused donor monies and squandered Judicial Watch's considerable resources to the point that if we do not step in now, the organization will likely case to exist in a few years.

> · When people asked why I had left, frequently they were told the reasons were confidential. That created the false impression that I left for some reason other than to run for the U.S. Senate, thus casting a negative light on me.

The solicitation also touted a purported victory over Judicial Watch in Klayman's lawsuit, although it intentionally failed to disclosed the fact that all of the claims of Klayman's co-plaintiff were dismissed, together with the majority of Klayman's defamation claims. The solicitation concluded by again requesting a financial contribution, "Let's make sure we win and win big by having the financial resources to now go for the 'knock out punch.'" A copy of

17

Klayman's January 30, 2007 e-mail solicitation is attached as Exhibit J and is incorporated herein by reference.

46.    In a fundraising letter dated February 7, 2007, which Klayman mailed to Judicial Watch supporters across the United States, Klayman made the following intentionally false, misleading and/or disparaging statements:

·        [Judicial Watch and Fitton] misused donor monies and squandered Judicial Watch's considerable resources to the point that if we do not step in now, the organization will likely cease to exist in a few years.

·        . . . the court ruled against Tom Fitton in our favor! . . . the court ruled that if we win . . . I will be able to reassume control of Judicial Watch as its Chairman and General Counsel.

·        Judicial Watch has been run into the ground through [Fitton's] unethical fundraising practices.

·        Fitton and company did not buy the building for which I raised $1.2 million, instead keeping the money for some other purpose.

·        Fitton gave supporters and donors the impression in monthly newsletters that a building had been purchased . . . .

The solicitation requested that the recipients mail a contribution to help Klayman "move forward to restoring Judicial Watch." A copy of February 7, 2007, solicitation is attached as Exhibit K and is incorporated herein by reference.

47.    In a fundraising letter dated February 9, 2007, which Klayman mailed to Judicial Watch supporters across the United States, Klayman made the same, intentionally false, misleading and/or disparaging statements that were contained in his May 9, 2006, fundraising

letter. The solicitation again requested the recipients mail a "large contribution" to help Klayman "retake Judicial Watch and prevent it from being destroyed." A copy of the February 9, 2007, solicitation is attached as Exhibit L and is incorporated herein by reference.

48.     Klayman also caused an advertisement to be placed in the March 5, 2007, edition of the *Washington Times National Weekly Edition*, a nationwide publication read by Judicial Watch supporters and in which Judicial Watch itself has advertised. In his advertisement, Klayman made the following intentionally false, misleading and/or disparaging statements, among others:

> · When Attorney Larry Klayman left his position as chairman and general counsel of Judicial Watch in 2003 to pursue a U.S. Senate seat from his native Florida . . .

> · . . . Judicial Watch coffers held over $16 million in assets, with more in the pipeline when Klayman left for his Senate run in 2003.

> · Under [Fitton's] management, Judicial Watch has lost nearly EVERY case it has been involved with since Klayman's departure.

> · [Judicial Watch's current leadership] allowed finances and the organization to deteriorate so much that it has been estimated that in the three years since Larry Klayman's departure, the original $16 million has been cut approximately in half.

> · We need to save Judicial Watch before all of the assets are gone forever.

> · In the 48-page decision, the court finds that if Mr. Klayman is successful in his suit, he can regain control of Judicial Watch.

19

The advertisement included a request to "[p]lease send your gift to Larry Klayman dba Saving Judicial Watch" by check or credit card. A copy of Klayman's March 5, 2007, advertisement in *The Washington Times National Weekly Edition* is attached as Exhibit M and incorporated by reference herein.

49.    Klayman also caused an advertisement to be placed in the April 23, 2007, edition of the *Washington Times National Weekly Edition*, a nationwide publication read by Judicial Watch supporters and in which Judicial Watch itself has advertised. In his advertisement, Klayman made the following intentionally false, misleading and/or disparaging statements, among others:

> ·    Mr. Fitton and his team squandered the resources and prestige which had been established . . . .
>
> ·    Today, Judicial Watch has been reduced to little more than a web site and a few pictures.

The advertisement included a request to "[p]lease send your gift to Larry Klayman dba Saving Judicial Watch" by check or credit card. A copy of Klayman's April 23, 2007, advertisement in *The Washington Times National Weekly Edition* is attached as Exhibit N and incorporated by reference herein.

50.    In a fundraising letter dated April 30, 2007, which Klayman mailed to Judicial Watch supporters across the United States, Klayman made the following intentionally false, misleading and/or disparaging statements:

> ·    [Klayman] left Judicial Watch to run for the U.S. Senate from Florida . . . .
>
> ·    Fitton and company [have] misrepresented that it had bought a building from donor funds, squandered and misused other donor monies, failed to

aggressively pursue the cases [Klayman] had left it to prosecute against the Clintons and other corrupt politicians and judges, and turned the organization into little more than a web site that boasts about the appeals it is forced to take after it loses most of its cases.

· Judicial Watch . . . is in jeopardy of dying unless I reassume control and reassert adult leadership that actually fights for hones government rather than engaging in empty public relations gimmicks.

· The U.S. District Court for the District of Columbia ruled that I may regain control of Judicial Watch and fire Fitton and his comrades should I be successful in my lawsuit.

· Louise Benson, a major donor who was ripped off by Fitton by being induced to make donations to buy the building Judicial Watch occupies . . . .

· [Sandra Cobas] was smeared by Fitton over her Latin heritage.

· [T]he directors of Judicial Watch's other regional offices in Los Angeles, Chicago, and Dallas were also let go or fired – merely because they were loyal to [Klayman].

· Fitton, a cocky, self-aggrandizing and albeit dishonest kid who doesn't have a clue how to run Judicial Watch, feared someday I might return.

· [Peter Paul's Complaint] reads like a criminal indictment.

· [W]hen I left Judicial Watch, Fitton and his comrades promised to fill my position as Chairman, but instead kept control for their own ends . . . .

21

- Judicial Watch abandoned Peter Paul's case when he demanded they hire competent counsel to represent him.

- Fitton and company violated their duties and responsibilities toward Paul. Yet even after they quit, they gave the false impression to donors that Judicial Watch was still representing him!

- [Klayman regained] control of Judicial Watch.

The April 30, 2007, solicitation requested recipients to thank Klayman "for regaining control of Judicial Watch and asked for a contribution to finish the job of "restoring Judicial Watch to its greatness." A copy of April 30, 2007, solicitation is attached as Exhibit O and is incorporated herein by reference.

51.    In a fundraising email dated May 7, 2007, which Klayman sent to prominent members of the conservative movement across the United States, Klayman made the following intentionally false, misleading and/or disparaging statements, among others:

- Judicial Watch, under the leadership of Tom Fitton, has become a mere shell of the once proud organization . . . .

- Mr. Fitton and his team squandered the resources and prestige which had been established . . . .

- Today, Judicial Watch has been reduced to little more than a web site and a few pictures.

- [T]oday's Judicial Watch appears to be primarily interested in fundraising and little else.

- Saving Judicial Watch was formed by a concerned group of citizens . . . .

22

> . . . Tom Fitton and his collaborators who have all but destroyed Judicial
> Watch.

> And without your help, Judicial Watch will continue to die a slow death.

The email solicitation concluded by requesting a financial contribution. A copy of Klayman's May 7, 2007, e-mail solicitation is attached as Exhibit P and is incorporated herein by reference.

52.    In perhaps one of the more egregious examples of his smear campaign, Klayman caused an advertisement to be placed in the May 14, 2007, edition of the *Washington Times National Weekly Edition*, a nationwide publication read by Judicial Watch supporters and in which Judicial Watch itself has advertised. This advertisement can only be characterized as an intentional and malicious assembly of lies and misrepresentations of fact. Among the multitude of intentionally false, misleading and/or disparaging statements regarding Judicial Watch, Fitton and others are the following:

> Specifically, Fitton and his other two directors, Paul Orfanedes and
> Christopher Farrell have misled donors, misused their monies, abandoned
> key anti Clinton clients like Peter Paul, . . . and disparaged and harm
> Klayman and his family to try to prevent Klayman from returning to
> Judicial Watch.

> Misled donors and did not purchase the building they promised to buy
> with their donations.

> Used Klayman's name to raise money for Judicial Watch after Klayman
> left Judicial Watch to run for the Senate while disparaging Klayman with
> the media and others.

23

- Judicial Watch staff have lost virtually every major case, including those against Bill and Hillary Clinton since Klayman left to run for the Senate.

- Turned Judicial Watch into little more than a website and group that gives seminars on CSPAN, rather than a hard-hitting people's Justice Department that files and prosecutes government corruption, such as practiced by the Clintons.

- Disparaged Klayman with media outlets, trying to keep Klayman off the air. In addition, . . . [Judicial Watch] has become instead a promotional enterprise for Fitton's own self-aggrandizement.

The advertisement included a request to "[p]lease send your gift to Larry Klayman dba Saving Judicial Watch" by check or credit card. A copy of Klayman's May 14, 2007, advertisement in *The Washington Times National Weekly Edition* is attached as Exhibit Q and incorporated by reference herein.

### The Judicial Watch Trademarks

53.    Judicial Watch has used and continues to use the trademarks JUDICIAL WATCH and BECAUSE NO ONE IS ABOVE THE LAW, with and without additional terms, to identify its organization, as well as its related products and services. Judicial Watch has expended significant financial resources and man hours to develop its trademarked identity and associated goodwill. This process has been a continuing effort lasting several years at a significant cost.

54.    Judicial Watch is the owner of the trademarks JUDICIAL WATCH and BECAUSE NO ONE IS ABOVE THE LAW, and owns several federal registrations for such marks, including the following: a)  JUDICIAL WATCH WASHINGTON  D.C.", Registration No. 2896707; b)  JUDICIAL WATCH WASHINGTON  D.C., Registration No. 2892714;  c)

24

JUDICIAL WATCH, Registration No. 2819145;  d)  BECAUSE NO ONE IS ABOVE THE

LAW!, Registration No. 2797234; and   e) BECAUSE NO ONE IS ABOVE THE LAW!,

Registration No. 2857425. Judicial Watch filed applications for such registrations with the U.S.

Patent and Trademark Office prior to Klayman's separation from Judicial Watch.  At all relevant

times, Klayman had actual knowledge of Judicial Watch's ownership of such marks, as well as

the existence of such trademark registrations.

55.    Klayman has and continues to use, without Judicial Watch's consent or

authorization, trademarks belonging to Judicial Watch, with the intent of causing harm and

injury to Judicial Watch.

56.    On or about July 16, 1997, Judicial Watch registered the domain

judicialwatch.org in anticipation of operating a website relating to the organizational goals of

promoting accountability and integrity in government, politics and the law.  Judicial Watch

continues to operate its website relating to the organizational goals of promoting accountability

and integrity in government, politics and the law using the domain judicialwatch.org.

57.    The website for Klayman d/b/a Saving Judicial Watch is accessed via

savingjudicialwatch.org. The content of this site relates to services that are highly similar, if not

identical, to Judicial Watch's, and which falsely indicate that Saving Judicial Watch has some

association with or relationship to Judicial Watch.

58.    On or about March 1, 2006, Klayman registered the domain

savingjudicialwatch.org with Go Daddy Software, Inc. using that registrar's privacy division,

Domains By Proxy, Inc., so as to hide Klayman as the identifiable registrant of record.

59.    Domains by Proxy is operated on the world wide web at domainsbyproxy.com.

Among the services offered is the ability to shield a domain owner's identity by listing Domains

By Proxy as the registrant of record for a particular domain name. This allows the domain holder to hide his/her true identity and contact information. Upon information and belief, the purpose of Klayman's use of Domains by Proxy is and was to complicate and frustrate Judicial Watch's enforcement of its trademark rights against the infringing domain. In addition, Klayman utilizes Domains by Proxy to secret the ownership identity of his website savingjudicialwatch.org and create a false association with Judicial Watch.

60.    At all times relevant, Klayman knew that Judicial Watch possessed trademark rights in the term JUDICIAL WATCH, but consciously determined to use that mark in his domain in an intentional effort to divert clients from Judicial Watch's website to his website.

61.    Klayman's continued use of the savingjudicialwatch.com domain in commerce demonstrates his bad faith intent to divert donors from Judicial Watch's online locations to Saving Judicial Watch's site for commercial gain, which harms the goodwill represented by Judicial Watch's mark.

62.    Klayman has used and continues to use in commerce, without Judicial Watch's consent or authorization, trademarks belonging to Judicial Watch, in a manner that is likely to cause consumer confusion, and with the intent of fund raising and promotion of his organization (Saving Judicial Watch) and intentionally diverting Judicial Watch supporters and donors to his organization and away from Judicial Watch.

63.    Klayman has used, and will continue to use, Judicial Watch's trademarked name, JUDICIAL WATCH, in commerce to advertise and promote himself and his organization Saving Judicial Watch, in a manner that infringes Judicial Watch's trademark rights and which is false and misleading, and likely to cause confusion, mistake and deception among Judicial Watch supporters and donors. Currently known uses include the following:

26

- The Saving Judicial Watch website

- April 13, 2006 Press Release

- May 9, 2006, fundraising letter

- June 16, 2006, fundraising letter

- November 20, 2006, fundraising letter

- December 12, 2006, fundraising letter

- January 2, 2007, fundraising letter

- January 29, 2007, fundraising letter

- January 29, 2007, fundraising email

- January 30, 2007, fundraising email

- February 7, 2007, fundraising letter

- February 9, 2007, fundraising letter

- March 23, 2007, fundraising letter

- April 30, 2007, fundraising letter

- May 7, 2007, fundraising email

- December 2006, advertisement

- January 22, 2007, advertisement

- January 29, 2007, advertisement

- March 5, 2007, advertisement

- April 23, 2007, advertisement

- May 14, 2007, advertisement

64.    Klayman has used, and will continue to use, Judicial Watch's trademark, BECAUSE NO ONE IS ABOVE THE LAW, in commerce to advertise and promote himself and his organization Saving Judicial Watch, in a manner that infringes Judicial Watch's trademark rights and which is false and misleading, and likely to cause confusion, mistake and deception among Judicial Watch supporters and donors.  Currently known uses include the following:

- The Saving Judicial Watch Website

- May 9, 2006, fundraising letter

- June 16, 2006, fundraising letter

65.    Moreover, the envelope for the May 9, 2006, fundraising letter, Klayman used in commerce the following return address:  JUDICIAL WATCH, P.O. BOX 131567, Houston, TX 77219-1567, to advertise and promote himself, in a manner that infringes Judicial Watch's trademark rights and which is false and misleading, and likely to cause confusion, mistake and deception among Judicial Watch supporters and donors.

66.    Judicial Watch received telephone calls and letters from vendors and donors that demonstrate actual consumer confusion as a result of Klayman's unauthorized and deceptive use of Judicial Watch's name and trademarks in commerce to promote his organization and its services.  Klayman's advertisements, solicitations and mailings, have used and are using Judicial Watch's trademarks in commerce in a manner that is likely to cause consumer confusion, and as such, constitutes an infringement of Judicial Watch's marks, as well as causing consumers to falsely believe that Klayman and his organization "Saving Judicial Watch" are in association with and/or sponsored by Judicial Watch.

28

67.     Klayman's acts have and will continue to cause Judicial Watch to suffer damage and injury to its business, reputation and goodwill, as well as a loss of funding raising revenues.

### COUNT I – BREACH OF CONTRACT
### Asserted by Judicial Watch
### (Breach of ¶ 10 of the Severance Agreement by Klayman)

68.     The allegations made in the foregoing and subsequent paragraphs are incorporated as if fully set forth herein.

69.     As provided in the Severance Agreement, Judicial Watch promptly paid Klayman substantial severance and other consideration, none of which is at issue in this action.

70.     Pursuant to ¶ 10 of the Severance Agreement, Klayman promised to reimburse Judicial Watch for personal costs and expenses he incurred during his employment.

71.     Pursuant to ¶ 10 of the Severance Agreement, Judicial Watch reviewed its records and made a good faith identification of the personal expenses Klayman had incurred but not reimbursed to Judicial Watch. Between November 20, 2003, and December 16, 2003, Judicial Watch sent 48 itemized invoices, to Klayman, totaling nearly $75,000, specifically identifying each item of personal expense and providing supporting documentation. Pursuant to ¶ 10, Klayman was obligated to pay each of those invoices within 7 days of receipt. To date, he has paid only $4,572.68 of the total amount due.

72.     On or about May 31, 2004, Judicial Watch provided Klayman four more invoices, and with adjustments, his personal expense debt to Judicial Watch stood at $76,683.17.

73.     To date, he has not paid the outstanding balance of this debt, and it remains due and owing to Judicial Watch. With accrued interest through March 31, 2007, the debt currently stands at $80,741.16.

### COUNT II – BREACH OF CONTRACT

**Asserted by Judicial Watch**
**(Breach of ¶ 11 of the Severance Agreement by Klayman)**

74.    The allegations made in the foregoing and subsequent paragraphs are incorporated as if fully set forth herein.

75.    At all times relevant, Klayman was the sole shareholder and officer of K&A.

76.    Pursuant to ¶ 11(A) of the Severance Agreement, Klayman re-affirmed and acknowledged K&A's debt to Judicial Watch in the amount of $78,810 as of December 31, 2002.

77.    On May 10, 2004, Judicial Watch notified Klayman that as a result of Judicial Watch's 2003 audit performed by its accountant, the K&A debt then stood at $134,119.

78.    Although Klayman had agreed in ¶11 of the Severance Agreement that K&A would "pay the *then full outstanding balance of the debt (including additional amounts allocated to K&A by Judicial Watch's accountants in accordance with their customary practice regarding this debt)*, without offset or deduction, together with accrued interest of 8% per annum, on or before May 15, 2004" (emphasis added), no portion of that debt has been paid.

79.    With accrued interest through March 31, 2007, the debt currently stands at $173,792.98.

**COUNT III – INDEMNIFICATION**
**Asserted by Judicial Watch**
**(Indemnification by Klayman for K&A's Non-Payment)**

80.    The allegations made in the foregoing and subsequent paragraphs are incorporated as if fully set forth herein.

81.    In ¶ 19(B) of the Severance Agreement, Klayman agreed to indemnify Judicial Watch for any and all claims, liabilities, costs, damages or judgments of any and every kind

30

(including, without limitation, attorneys' fees and costs) that arise from a breach of the Severance Agreement by Klayman or K&A.

82.     As delineated in Count II of this Counterclaim, K&A has failed to make prompt payment to Judicial Watch in accordance with ¶ 11 of the Severance Agreement.  On account of this failure, Judicial Watch has suffered damages, through May 31, 2006, in the amount of $162,620.52, which loss Klayman is obligated to indemnify.  In addition, Judicial Watch has incurred other damages for which Klayman must indemnify Judicial Watch, which damages are estimated to exceed $100,000.00.

83.     Despite repeated demands, Klayman refuses to comply with his obligation to indemnify Judicial Watch, as required by the Severance Agreement.

**COUNT IV – TRADEMARK INFRINGEMENT**
**Asserted by Judicial Watch**
**(Lanham Act – 15 U.S.C. § 1114(1)(a))**

84.     The allegations made in the foregoing and subsequent paragraphs are incorporated as if fully set forth herein.

85.     Klayman has and is engaged in acts of trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114(1)(a) and the common law.

86.     Klayman has used and is using in commerce Judicial Watch's registered trademarks, JUDICIAL WATCH and BECAUSE NO ONE IS ABOVE THE LAW, without its consent or authorization, in connection with the solicitation of donations and support, and advertising for himself and Saving Judicial Watch in such a manner that is likely to cause and has actually caused confusion, mistake and deception among consumers.

87.     Klayman had knowledge of Judicial Watch's rights in the JUDICIAL WATCH and BECAUSE NO ONE IS ABOVE THE LAW trademarks when he began using a confusingly

similar names and slogans, and continues to have knowledge of Judicial Watch's rights in its marks. Thus, Klayman has and continues to knowingly and willfully conduct the aforesaid acts with the intent to cause confusion, mistake and deception among consumers.

88.　　Klayman's acts have and will continue to cause Judicial Watch to suffer damage and injury to its reputation and goodwill, together with a loss of fund raising revenues.

89.　　Unless enjoined by this Court, Klayman will continue the acts mentioned herein and cause said damages and injury, all to the immediate and irreparable harm of Judicial Watch.

90.　　Klayman's infringing conduct has caused and will continue to cause Judicial Watch substantial and irreparable injury in an amount not capable of determination and unless restrained, will cause further irreparable injury leaving Judicial Watch no adequate remedy at law.

## COUNT V – UNFAIR COMPETITION
### Asserted by Judicial Watch
### (Lanham Act -- 15 U.S.C. § 1125(a))

91.　　The allegations made in the foregoing and subsequent paragraphs are incorporated as if fully set forth herein.

92.　　Klayman has and is engaged in acts of unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a), and the common law.

93.　　Klayman has made false and/or misleading statements that have actually deceived and/or had the tendency to deceive a substantial segment of the receiving audience

94.　　Klayman's false and/or misleading statements misrepresent the nature, characteristics, qualities or geographic origin of Klayman and/or Klayman d/b/a/ Saving Judicial Watch's goods or services, as well as those of Judicial Watch.

32

95.    Klayman's false and/or misleading statements are material in that they are and/or were likely to mislead and influence supporters' decisions to provide support and/or donate to Saving Judicial Watch instead of Judicial Watch.

96.    Klayman's false and/or misleading statements were made in interstate commerce.

97.    Judicial Watch has been and will continue to be injured by Klayman's materially false and/or misleading statements. These injuries include, but are not limited to, the loss of donations, the diversion of donations from Judicial Watch to Klayman and/or Klayman d/b/a/ Saving Judicial Watch, and/or the lessening the good will Judicial Watch has enjoyed among its supporters.

### COUNT VI – UNFAIR COMPETITION
### Asserted by Judicial Watch
### (Lanham Act -- 15 U.S.C. § 1125(a))

98.    The allegations made in the foregoing and subsequent paragraphs are incorporated as if fully set forth herein.

99.    Klayman has and is engaged in acts of unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a), and the common law.

100.    Klayman has made false and/or misleading statements that have actually deceived and/or had the tendency to deceive a substantial segment of the receiving audience

101.    Klayman's false and/or misleading statements and representations are likely to cause the public and consumers to believe that Saving Judicial Watch is associated with, affiliated with, and/or sponsored or approved by Judicial Watch.

102.    Klayman's false and/or misleading statements are material in that they are and/or were likely to mislead and influence supporters' decisions to provide support and/or donate to Saving Judicial Watch instead of Judicial Watch.

103.    Klayman's false and/or misleading statements were made in interstate commerce.

104.    Klayman and/or Klayman d/b/a/ Saving Judicial Watch has knowingly and willfully conducted these acts with the intent to create a false affiliation, connection and association of Klayman and/or Klayman d/b/a Saving Judicial Watch with Judicial Watch.

105.    Judicial Watch has been and will continue to be injured by Klayman's materially false and/or misleading statements.  These injuries include, but are not limited to, the loss of donations, the diversion of donations from Judicial Watch to Klayman and/or Klayman d/b/a/ Saving Judicial Watch, and/or the lessening the good will Judicial Watch has enjoyed among its supporters.

## COUNT VII - CYBERSQUATTING
### Asserted by Judicial Watch
### (Lanham Act (15 U.S.C. § 1125(d))

106.    The allegations made in the foregoing and subsequent paragraphs are incorporated as if fully set forth herein.

107.    Klayman's    unauthorized    registration    and    use    of    the    domain savingjudicialwatch.org constitutes cybersquatting under the Lanham Act, 15 U.S.C. § 1125(d).

108.    Klayman's domain name savingjudicialwatch.org is confusingly similar to Plaintiff's distinctive JUDICIAL WATCH marks.

109.    Klayman does not have prior trademark or other intellectual property rights in the JUDICIAL WATCH mark, or any other similar term or name.

110.    Klayman made no prior use of the name prior to becoming acquainted with Plaintiff's JUDICIAL WATCH trademark.

111.    Klayman registered, used and continues to use the savingjudicialwatch.org domain name with bad faith intent to divert supporters and donors from Judicial Watch's

34

websites to the websites previously and currently accessible at savingjudicialwatch.org for Klayman's commercial gain and for purposes of promoting Klayman d/b/a Saving Judicial watch. Although Klayman's website may sporadically be inaccessible or evolving in content, there is no assurance that it will not be accessible in the future in a manner that continues to be unlawful and harmful to Plaintiff under the Lanham Act, 15 U.S.C. § 1125(d).

112.   Klayman intentionally and purposefully concealed his Registrant contact information for the domain name savingjudicialwatch.org, by substituting his personal contact information with Domains by Proxy as the registrant of record for the domain name. Such measures constitute an intentional failure to maintain accurate contact information for the domain name and a willful intent to conceal his association with the involved domain names.

113.   Klayman's actions have harmed, and will continue to harm, the goodwill represented by Judicial Watch's JUDICIAL WATCH mark, including seeking commercial gain to the detriment of Judicial Watch, by creating a likelihood of confusion as to the source, sponsorship, affiliation and endorsement of the site accessible at the domain name savingjudicialwatch.org.

114.   By its unauthorized registration and use of the infringing domain name, Klayman intentionally targets Judicial Watch's supporters and donors for commercial gain based upon Judicial Watch's distinctive mark.

115.   Klayman's acts have caused Judicial Watch to suffer and continue to suffer damage and injury to its reputation and goodwill, as well as a loss of fund raising revenues.

116.   Klayman's harmful conduct has caused and will continue to cause Plaintiff substantial and irreparable injury in an amount not capable of determination and unless restrained, will cause further irreparable injury leaving Judicial Watch no adequate remedy at

law.

## COUNT VIII – BREACH OF CONTRACT
### Asserted by Judicial Watch
#### (Breach of ¶ 17 of the Severance Agreement by Klayman)

117.    The allegations made in the foregoing and subsequent paragraphs are incorporated as if fully set forth herein.

118.    Paragraph 17 of the Severance Agreement requires that Klayman will not disparage, defame or utter negative remarks about Judicial Watch or its present and past directors, officers and employees.

119.    Klayman's statements on his website, in press releases, solicitation letters and emails, individually and collectively, disparage Judicial Watch within the meaning of ¶ 17 of the Severance Agreement and do not constitute "fair comment" on the positions or activities of Judicial Watch within the meaning of ¶ 17 of the Severance Agreement.

120.    Judicial Watch has suffered substantial damages as a result of the foregoing statements.

## COUNT IX – BREACH OF CONTRACT
### Asserted by Fitton
#### (Breach of  17 of the Severance Agreement by Klayman)

121.    The allegations made in the foregoing and subsequent paragraphs are incorporated as if fully set forth herein.

122.    Paragraph 17 of the Severance Agreement requires that Klayman will not disparage, defame or utter negative remarks about Judicial Watch or its present and past directors, officers and employees.

36

123.    Klayman's statements on his website, in press releases, solicitation letters and emails, individually and collectively, disparage Fitton within the meaning of ¶ 17 of the Severance Agreement.

124.    Fitton has suffered substantial damages as a result of the foregoing statements.

## COUNT X – BREACH OF CONTRACT
### Asserted by Judicial Watch
### (Breach of ¶ 4 of the Severance Agreement by Klayman)

125.    The allegations made in the foregoing and subsequent paragraphs are incorporated as if fully set forth herein.

126.    During his employment at Judicial Watch, Klayman obtained confidential information regarding it operations, plans, programs, relationships, donors, prospective donors, clients, prospective clients, past and current employees, contracts, financial affairs and legal affairs.

127.    Subsequent to the Separation Date, Klayman used non-public Confidential Information, including but not limited to, information about direct mail solicitation operations, the identity of third-parties who assisted with direct mail solicitation operations and the terms on which such programs and operations were conducted.    Klayman used this Confidential Information without seeking or obtaining written approval of an officer of Judicial Watch, and Klayman has used such information for purposes not authorized by Judicial Watch.

128.    Subsequent to the Separation Date, Klayman also used non-public Confidential Information, including but not limited to, Judicial Watch donor lists, without written approval by an officer of Judicial Watch.    Likewise, subsequent to the Separation Date, Klayman has retained or had access to Judicial Watch donor lists and/or donor data.    Specifically, after the Separation Date, Klayman obtained and/or retained, and therefore had access to, a Judicial Watch donor list

37

or lists from a third party or parties without written approval of an officer of Judicial Watch, and

Klayman has used such list(s) for purposes not authorized by Judicial Watch.

129.    Klayman has also misappropriated confidential information in the form of
proprietary knowledge about Judicial Watch's operations, programs and relationships, as well as
donor lists and donor data to solicit funding for various causes in violation of the Severance
Agreement.

130.    Klayman's conduct constitutes a breach of his obligations under ¶ 4 of the
Severance Agreement.

131.    Judicial Watch has suffered substantial damages as a result of the foregoing
conduct.

**COUNT XI – BREACH OF CONTRACT**
**Asserted by Judicial Watch**
**(Breach of ¶ 5 of the Severance Agreement by Klayman)**

132.    The allegations made in the foregoing and subsequent paragraphs are incorporated
as if fully set forth herein.

133.    As part of the Severance Agreement, Judicial Watch paid Klayman "$200,000 in
consideration of his agreement not to compete or solicit, as set forth in paragraph 5 . . . ."
(Severance Agreement ¶ 6.)

134.    In relevant part, ¶ 5(B) of the Severance Agreement states:

> B.    Covenant Not to Compete or Solicit. Klayman agrees that,
> in order to enable Judicial Watch to preserve and protect Judicial
> Watch's valuable and legitimate business interests, . . . and in
> exchange for the additional consideration referred to in paragraph
> 6 . . . (which the parties acknowledge to be separately bargained
> for), Klayman shall not, for a period of two (2) years following the
> Separation Date [September 19, 2003], directly or indirectly:

38

(i)    work or render advice as an individual or sole proprietor in Competition with Judicial Watch or work or render advice as an employee, agent, independent contractor, consultant or representative of any person, firm or legal entity which is engaged in or has plans to enter into Competition with Judicial Watch. For purposes of this Agreement, the term "Competition" means directly or indirectly engaging in the work or advancing the mission of any ethics, anti-corruption, public integrity and government accountability watchdog or similar public interest or educational organization, or engaging in any other activities the purpose or effect of which would be to provide information, programs, publications, services or products that Judicial Watch offers, develops or sells or has plans to offer, develop or sell, as of the Separation Date . . . .

135.    On June 3, 2004, Klayman issued a press release stating that on "behalf of the American public" he had filed a lawsuit in the United States District Court for the Southern District of Florida concerning the United Nations' "Oil-for-Food" program. According to Klayman's press release, the lawsuit was a demand under the Freedom of Information Act that the State Department "release all documents related to the scandal." The press release continued, "'The Oil-for-Food scandal has reached every aspect of the United Nations,' said Klayman. 'American taxpayer money has been supporting this corrupt program that rewards our enemies and enriches United Nations officials and their families. This practice must end.'"

136.    In October/November 2004, an organization called RightMarch.com ran a national newspaper advertisement touting that it had retained Klayman in its effort "to ensure the integrity of the vote over and against the Democrats' attempts at voter fraud" in the then upcoming 2004 Presidential election. The advertisement stated:

·    RightMarch.com is not sitting idly by. We have retained

THE TOP EXPERT in fighting the liberals' attempt to steal

this election. His name is Larry Klayman -- and he's going

39

> to prepare at least one STRONG lawsuit for OUR side, demanding that election officials use all possible means to insure that fraudulent voting does not occur! This is the SAME Larry Klayman who, while running the conservative legal foundation "Judicial Watch" . . . , succeeded in going to court to open the ballots in Florida's 2000 presidential election, and later PROVED that George W. Bush had WON the election, fair and square. Now, Larry is in private practice and his firm, "The Klayman Law Firm," is well positioned to assist RightMarch.com in preventing a repeat of the 2000 election mess.
>
> · [O]ur expert attorney Klayman will be ALL OVER the news, in the papers, on television and radio, explaining all of our strategies to help insure an ACCURATE vote count in the presidential election.

137. In March/April 2005, Klayman sent a fundraising solicitation out to Judicial Watch clients and/or donors advising that he and an individual named Paul Rodriguez had founded an organization called "Freedom Watch." The cover letter of the solicitation stated, "[I]n the style I perfected at Judicial Watch, Freedom Watch will not just talk, but with a no holds barred approach act, forcefully, to preserve the rich liberties that our founding fathers bequeathed to us." In an attached letter that describes Freedom Watch further, Klayman stated:

> · Utilizing a broad but targeted set of unique task forces, Freedom Watch will target key areas of concerns among

40

supporters . . . . Every one of these task forces will respond with actions -- not mere words. This is how Klayman and Rodriguez worked in the past to expose corruption, fraud and abuses that undermine American liberties. And this is how they are getting the job done now! . . .

· America's involvement in the U.N. cannot continue under present circumstances and Freedom Watch will be the catalyst for change. . . . Freedom Watch will push to reform the corrupt group, and we will bring legal and other actions to force Secretary General Kofi Annan to step down. Furthermore, we will demand that the rule of law the U.N. seeks to impose upon others is applied to the U.N. itself!

· We have a Constitutional right to express our faith, and we will not accept any restrictions amongst God-loving people to practice our religions in peace. Freedom Watch will take the fight to all those whose work threatens to extinguish our religious rights and freedoms. . . .

· Furthermore, we will work to shut down groups that use taxpayers' funds to promote acts that many consider deplorable.

· Protecting those from government intrusion will be a top priority for Freedom Watch, and we will stop at nothing to

41

> break down the wall of government "secrecy" that threatens us all.

· Using all available legal means, Freedom Watch will work to protect our borders from those that trample our country's laws. Freedom Watch will defend against those seeking to undermine our fundamental liberties.

· Freedom Watch also will, once and for all, light the fuse that will end in the abolishment of the IRS. No longer will individuals or groups be audited for political or improper purposes!

· Freedom Watch will not only *act forcefully* to protect your liberties, it will educate the American public through websites, publications, media appearances, seminars and conferences.

138. These and other actions, individually and collectively, engaged in by Klayman violate ¶ 5 of the Severance Agreement.

## Prayer for Relief

WHEREFORE, Judicial Watch and Fitton ask that the Court enter an Order against Klayman as follows:

A. One Count I, that Judicial Watch be awarded judgment in its favor in the amount of $77,399.45, plus pre- and post-judgment interest;

B. On Count II, that Judicial Watch be awarded judgment in its favor in the amount of $162,620.52, plus additional pre- and post-judgment interest;

42

C.    On Count III, that Judicial Watch be awarded judgment in its favor in the amount of $162,620.52, other damages that are estimated to exceed $100,000.00, plus additional pre- and post-judgment interest;

D.    On Counts IV-VI, that Judicial Watch be awarded judgment in its favor in an amount to be determined at the trial of this matter pursuant to 15 U.S.C. § 1117(a), and that such amount be trebled pursuant to 15 U.S.C. § 1117(a), and that Judicial Watch be awarded the costs of the action and reasonable attorney fees pursuant to 15 U.S.C. § 1117(a);

E.    On Counts IV-VI, that Judicial Watch be awarded injunctive relief pursuant to 15 U.S.C. § 1116;

F.    On Count VII, that Judicial Watch be awarded injunctive relief and forfeiture or cancellation of the domain name or the transfer of the domain name to Judicial Watch.

G.    On Count VIII, that Judicial Watch be awarded judgment in its favor in an amount to be determined at the trial of this matter;

H.    On Count IX, that Fitton be awarded judgment in his favor in an amount to be determined at the trial of this matter;

H.    On Count X, that Fitton be awarded judgment in his favor in an amount to be determined at the trial of this matter;

I.    On Count XI, that Judicial Watch be awarded judgment in its favor in an amount to be determined at the trial of this matter;

J.    That Judicial Watch and Fitton, respectively, be awarded attorney's fees, court costs, and other expenses in accordance with ¶¶ 19(B-C) of the Severance Agreement.

K.    That the Court award such other and further relief as the Court may deem just and equitable in the circumstances.

## **Demand for Jury Trial**

Judicial Watch demands a jury trial on all issues so triable.

Respectfully submitted,

/s/ *Richard W. Driscoll*

_____

Richard W. Driscoll (436471)
Terence J. Everett (492139)
DRISCOLL & SELTZER, PLLC
600 Cameron Street
Alexandria, Virginia 22314
703.340.1625 Telephone
703.997.4892 Facsimile
Email: rdriscoll@driscollseltzer.com

*Counsel for Defendants Judicial Watch, Inc.,*
*Thomas J. Fitton, Paul Orfanedes, and Christopher*
*Farrell*

Dated: May 25, 2007

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 25th day of May 2007, a copy of the foregoing Amended Counterclaims of Judicial Watch, Inc. and Thomas J. Fitton was served by electronic filing upon counsel listed on the Notice of Electronic Filing.

/s/ *Richard W. Driscoll*

_____

Richard W. Driscoll