IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| LARRY KLAYMAN | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 08-1005 (JDB) |
| | : | |
| DAVID BARMAK, individually, and | : | |
| MINTZ, LEVIN, COHN, FERRIS, | : | |
| GLOVSKY and POPEO, P.C., a professional | : | |
| corporation | : | |
| | : | |
| Defendants. | : | |
| | : | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

Defendants David Barmak and Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.

("Defendants"), through counsel, respectfully submit this Memorandum of Points and

Authorities in support of their Motion to Dismiss Plaintiff's Amended Complaint.

## I.      INTRODUCTION

The present action ("Action") is an obvious attempt by Plaintiff, Larry Klayman, to

obtain a "second bite at the apple" by asserting claims against Defendants, counsel to his former

employer, Judicial Watch, Inc. ("Judicial Watch") when his direct action against Judicial Watch

based on the *same set of operative facts*, has been unsuccessful.  Plaintiff's Amended Complaint

fails to state a cause of action upon which relief can be granted for either of Plaintiff's claims of

breach of contract and breach of fiduciary duty because both of these claims are time barred.

Further, Plaintiff's claims should be dismissed based on the doctrine of collateral estoppel, as

allowing Plaintiff's claims to proceed would require this Court to issue inconsistent rulings in

two cases before it that share the same set of operative facts.  For these reasons, the Amended

Complaint in this Action should be dismissed, with prejudice.

## II.    FACTS ALLEGED AND PROCEDURAL HISTORY

Plaintiff has two actions pending in this Court that relate to the same underlying set of

factual allegations.  Plaintiff commenced *Klayman, et al.  v. Judicial Watch, Inc., et al.*, 1:06-

CV-00670 (CKK) (the "Judicial Watch Action") in this Court on April 12, 2006.  On or about

November 1, 2007, Plaintiff commenced the present Action in state court in Florida and the case

was subsequently removed by the Defendants to federal court and transferred to this Court.[1/]  A

review of the procedural history of these two actions, and a comparison of the factual allegations

contained in the Amended Complaint in the present Action (the "Am. Compl.") and the Second

Amended Complaint in the Judicial Watch Action (the "JW Compl.," attached as Exhibit A)

establish that Plaintiff is asserting claims in both actions based on the same set of operative facts.

For this reason, and to avoid inconsistent rulings and the waste of judicial resources, the

procedural history and allegations summarized here encompass both the history and allegations

in the present Action, as well as the history and allegations contained in the Judicial Watch

Action.[2/]

The following facts as alleged in the Amended Complaint and the Second Amended

Complaint in the Judicial Watch Action are accepted as true only for purposes of this Motion to

Dismiss, and not otherwise.

---

[1/]    Plaintiff's filing of this action in Florida state court was a transparent effort to avoid the D.C. statute of limitations and obtain a different (and inconsistent) result in a different forum.

[2/]    Defendants filed a Notice of Related case seeking to have the present action designated as "related" to the Judicial Watch Action and assigned accordingly.  Given the differing procedural posture of these two cases, Defendants *oppose* consolidation of the cases.

## A.    Brief Factual Background

Plaintiff Larry Klayman is the founder of a public interest non-profit, Judicial Watch. Am. Compl., ¶ 5.  Plaintiff founded Judicial Watch in 1994 and stepped down from the non-profit in September 2003.  *Id.*  Prior to the time he stepped down from Judicial Watch, on or about May 2003, Plaintiff claims that Defendants represented both Judicial Watch and Plaintiff, personally.  *Id.* at ¶ 6.  Plaintiff concedes that he cannot produce a written agreement between the Plaintiff and the Defendants.  *Id.* at ¶ 25.

On or about May 2003, Plaintiff commenced discussions with Judicial Watch that led to the execution of a Severance Agreement between Plaintiff and Judicial Watch.  *Id.* at ¶ 7. Plaintiff retained and was represented by separate counsel in the negotiation of the Severance Agreement.  *Id.* at ¶ 8.  Plaintiff and Judicial Watch both signed a written waiver permitting Judicial Watch to consult with the Defendants with respect to the negotiation of the Severance Agreement.  *Id.*  The Severance Agreement was executed on September 19, 2003 and Plaintiff stepped down from his position at Judicial Watch on or about September 23, 2003 "in order to seek the Republican nomination for Senate in Florida."  *Id.* at ¶ 5; JW Compl., ¶ 32.  Plaintiff announced his bid for U.S. Senate from Florida on September 19, 2003.  JW Compl., ¶ 35.

## B.    Factual Basis For Plaintiff's Claims Of Breach Of Contract And Breach of Fiduciary Duty

Plaintiff asserts claims for breach of contract and breach of fiduciary duty against Defendants based on the allegations set forth above regarding the relationship between Plaintiff and Defendants, and the allegation that Defendants disclosed confidential attorney-client privileged information and took other "improper and illegal acts to benefit other clients at the expense of the Plaintiff."  *Id.* at ¶ 1.  Specifically, Plaintiff makes the following factual allegations in support of his claims for breach of contract and breach of fiduciary duty:

### 1.    Alleged Disclosure Of Plaintiff's Ex-Wife's Allegations

Plaintiff asserts that, prior to May 2003, he disclosed to the Defendants, in their capacity as Plaintiff's personal attorney and "in the context of the attorney-client representation" that Plaintiff's then-wife had made certain "defamatory and false allegations" against Plaintiff "for tactical reasons" in divorce proceedings between Plaintiff and his then-wife in Fairfax County Virginia Circuit Court. *Id.* at ¶¶ 9-10. Plaintiff further alleges that he made this disclosure to Defendants "because the Defendants concurrently represented Judicial Watch then and continue to represent them now." *Id.* at ¶ 10. Plaintiff further alleges that Defendants, in violation of their contractual and fiduciary obligations of confidentiality "consulted, advised and caused or participated in causing Judicial Watch to publish" the "scurrilous, false, recanted and sealed allegations made by the Plaintiff's ex-wife in the divorce action." *Id.* at ¶ 16. As discussed below, this Court has *rejected* the allegation that Plaintiff's disclosure of this information was made in the context of a protected or confidential communication.

### 2.    Alleged Disclosure Of Claims That Plaintiff Owed Judicial Watch Reimbursable Expenses

Plaintiff alleges that Defendants "violated their fiduciary duties and duty to maintain client confidences" by "counseling and assisting" Judicial Watch in asserting "false and contrived claims" that Plaintiff owed Judicial Watch reimbursable expenses. Am. Compl., ¶ 22(A). Plaintiff claims that this alleged violation of Defendants' duties also included "assisting in the creation of false and misleading invoices and tax returns, threatening Plaintiff with adverse publicity if he did not pay … and publishing this misleading and false information on Judicial Watch and other websites." Plaintiff also alleges in this context that Defendants' falsified and provided misleading information to Judicial Watch's accountants. Am. Compl., ¶ 22(F). As discussed below, this Court has *rejected* the allegation that this alleged conduct is actionable.

###    3.    Alleged Threats To Plaintiff If He Represented Himself As The Founder And Former Chairman And General Counsel Of Judicial Watch

Plaintiff alleges that Defendants threatened him "with litigation and other retaliatory actions if he ever represented or referred to himself as the founder and former Chairman and General Counsel of Judicial Watch."  Plaintiff further alleges that Defendants "counsel[ed] and suggest[ed] to Judicial Watch … to publish statements that Plaintiff was only an employee of Judicial Watch and not its founder and Chairman …" Am. Compl., ¶ 22(B), (D).

Plaintiff fails to make any allegation in the present Action regarding *when* the alleged threats were made by Defendants.  However, in the Judicial Watch Action, Plaintiff alleges that "[s]hortly after Plaintiff's announcement that he was a candidate for the Senate" on September 19, 2003, "David Barmak, Esquire, made a frivolous demand on Plaintiff, purporting to prohibit Plaintiff from ever mentioning that he was the founder of Judicial Watch and threatening to take legal action against Plaintiff if he failed to comply with the demand."  JW Compl., ¶ 39.

###    4.    Alleged Interference With Plaintiff's Relationship With The Media

Plaintiff claims that Defendants "counsel[ed] and assist[ed] Judicial Watch … on ways to interfere with Plaintiff's relationships with the media …"  Am. Compl., ¶ 22(C).

###    5.    Alleged Interference With Plaintiff's Rights Under The Severance Agreement

Plaintiff alleges that Defendants "counsel[ed] and suggest[ed] to Judicial Watch … that they need not adhere to and in fact could violate and interfere with the implementation of the terms of the Severance Agreement and Plaintiff's legal rights in general" by (i) "not removing in good faith Plaintiff as guarantor of the organization's multi-million dollar building lease, and" (ii) "not paying for Plaintiff's children's health insurance under Cobra and for a period terminating Plaintiff's family coverage in its entirely when he was ill;" (ii) "opening Plaintiff's mail;" (iv) "not providing forwarding information concerning Plaintiff;" (v) "stating false and

misleading reasons for Plaintiff's leaving Judicial Watch," (vi) "not paying Plaintiff's expenditures on behalf of Judicial Watch," (vii) "disparaging Plaintiff with Judicial Watch employees;" (viii) "telling employees not to talk to Plaintiff; and (ix) "misusing of Plaintiff's name and identity in mailings into Florida and elsewhere." Am. Compl., ¶ 22(E).

Here, again, Plaintiff fails to make any allegation in the present Action regarding *when* this alleged interference took place. In the Second Amended Complaint in the Judicial Watch Action, however, Plaintiff alleges that Judicial Watch breached the Severance Agreement "[c]ommencing almost immediately after Plaintiff's departure" on September 23, 2003. JW Compl., ¶ 48.

## III.    ARGUMENT

In considering a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), "the Court must construe the complaint in the light most favorable to the plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations." *In re United Mine Workers of Am. Employee Benefit Plans Litig.*, 854 F. Supp. 914, 915 (D.D.C. 1994). This deference to the allegations in the plaintiff's complaint is not absolute, as the Court "need not accept inferences … if such inferences are unsupported by the facts set out in the complaint." *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). In addition to the allegations in the complaint, the court can consider matters of which the court may take judicial notice, and matters of public record. *See EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997); *Marshall County Health Care Autho. v. Shalala*, 988 F.2d 1221, 1226 n.6 (D.C. Cir. 1993). As the Supreme Court recently stated in *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955 (2007), dismissal for failure to

state a claim upon which relief may be granted does not require appearance, beyond a doubt, that plaintiff can prove no set of facts in support of claim that would entitle him to relief.

**A.    Plaintiff's Claims Are Barred By The Statute Of Limitations And Should Be Dismissed**

A cause of action "must be brought within a certain period 'from the time the right to maintain the action accrues.'" *Capitol Place I Assoc. L.P. v. Geo. Hyman Construction Co.,* 673 A.2d 194,  (1994, D.C. Ct. App.), *quoting* D.C. Code § 12-301.  A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is the proper vehicle for raising a statute of limitations defense. *Tolbert v. National Harmony Memorial Park*, 520 F. Supp.2d 209 (D.D.C. 2007).  It is the plaintiff's burden to establish facts that take the case outside the statute of limitations.  In the present Action, Klayman's claims for breach of contract and breach of fiduciary duty, brought more than three years after the accrual of these causes of action, are barred by the applicable statute of limitations.  As such, the present Action should be dismissed, with prejudice.

The present Action is before this Court solely on the basis of diversity jurisdiction.  As a federal court sitting in diversity, this Court must look to the law of the state in which it sits to determine whether the state law claims asserted by Klayman have expired. *A.I. Trade Finance, Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1458 (D.C. Cir. 1995).  The breach of contract and breach of fiduciary duty claims asserted by Klayman in the present Action are thus both governed by the District of Columbia's three year statute of limitations.  D.C. Code § 12-301(3) and (7).

A breach of contract action must be brought within three years of the date on which the contract is first breached. *Capital Place*, 673 A.2d at 198; *Allison v. Howard University*, 209 F.Supp.2d 55, 59 (D.D.C. 2002).  An action for breach of fiduciary duty must be brought within three years of the date on which the injury results from the alleged breach. *Capital Place*, 673

A.2d at 198.  In the present case, both of these dates are three years prior to November 1, 2007, the date upon which Plaintiff commenced this action.  Plaintiff's allegations in the present action and the Judicial Watch Action make clear that *both* of these causes of action accrued prior to November 1, 2007.  While Plaintiff's Amended Complaint is seemingly devoid of allegations as to *when* any alleged action occurred, two allegations in the Judicial Watch Action evidence the fact that both causes of action alleged in this Action by Plaintiff are time barred.

First, in the Judicial Watch Action, Plaintiff alleges that Judicial Watch breached the Severance Agreement "[c]ommencing almost immediately after Plaintiff's departure" on September 23, 2003.  JW Compl. ¶ 33.  Given this claim, Defendants' alleged counsel, assistance or suggestions *to* Judicial Watch that it take these actions to breach the Severance Agreement must necessarily have occurred at or before September 23, 2003.  The "breach" thus occurred at or before September 23, 2003, as did the "injury" from the alleged breach of fiduciary duty.  Thus, as Plaintiff bases both his breach of contract and breach of fiduciary duty claims on a breach of contract that occurred more than three years before the date of he commenced this Action and more than three years after the date on which Plaintiff alleges he was injured by a breach of fiduciary duty, Plaintiff's claims are time barred and should be dismissed with prejudice.

Second, in the Judicial Watch Action, Plaintiff alleges: "[s]hortly after Plaintiff's announcement that he was a candidate for the Senate" on September 19, 2003, "David Barmak, Esquire, made a frivolous demand on Plaintiff, purporting to prohibit Plaintiff from ever mentioning that he was the founder of Judicial Watch and threatening to take legal action against Plaintiff if he failed to comply with the demand."  JW Compl., ¶ 39.  Plaintiff makes a similar factual allegation, without reference to the time frame, in the Amended Complain in this Action.

Am. Compl., ¶ 22(B). This alleged conduct is clearly a basis for Plaintiff's breach of contract claim, which, as alleged by Plaintiff, includes actions taken by Defendants to "benefit another client at the expense of Plaintiff." Am. Compl., ¶ 24. As such, Plaintiff's breach of contract claim should have been commenced within three years of a date "shortly after" the September 29, 2003 "date on which the contract is first breached." *See*, *Capital Place*, 673 A.2d at 198. Plaintiff's failure to bring a claim for breach of contract until November 1, 2007, over *four years* after the date on which the alleged contract was purportedly first breached by Defendants is fatal to his claim. Plaintiff's breach of contract claim, commenced more than three years after the date on which Plaintiff alleges the contract was first breached, is barred by the statute of limitations. Accordingly, Plaintiff's claim for breach of contract should be dismissed with prejudice.

**B.     Plaintiff's Claims Are Barred, In Part, By The Doctrine Of Collateral Estoppel**

Plaintiff should be precluded by the doctrine of collateral estoppel from asserting claims here based on factual arguments that have been *rejected* by this Court in the Judicial Watch Action. Collateral estoppel, or issue preclusion, prevents a party from relitigating issues that have already been adjudicated against it in other litigation. It serves to "conserve judicial resources, protect citizens from multiple lawsuits, and reduce the likelihood of inconsistent verdicts." *Bryson v. Gere*, 268 F. Supp.2d 46, 54 (D.D.C. 2003). This Court, sitting in diversity will apply the law of the District of Columbia with respect to collateral estoppel. *Id.* at 54-56.

The federal courts in the District of Columbia apply a three-part test to determine if collateral estoppel should preclude a claim. First, the same issue now being raised must have been contested by the parties and submitted for judicial determination in the prior case. Second, the issue must have been actually and necessarily determined by a court of competent

jurisdiction in that prior case.  Third, preclusion in the second case must not work a basic unfairness to the party bound by the first determination.  *Rogers v. Johnson-Norman*, 466 F. Supp.2d 162, 168-69 (D.D.C. 2006).  "Defensive use" of a prior judgment -- a defendant's assertion of collateral estoppel to prevent a plaintiff's litigation of issues the plaintiff previously litigated and lost --  is permissible even though the defendant was not himself bound by the prior judgment.  *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 324-25 (1971); *see also*, *Parklane Hosiery v. Shore*, 439 U.S. 322, 329-31 (1979) (defensive use of collateral estoppel promotes judicial economy without being unfair).

In defensive collateral estoppel, the first prong of the collateral estoppel test can be met when the facts and evidence used to support a claim are the same, and the applicable legal standards are similar.  *See McCord v. Bailey*, 636 F.2d 606, 609-610 (D.C. Cir. 1980) (where plaintiff's allegations in civil case encompassed in all material respects the same claims he asserted in his criminal conviction appeal, estoppel may be considered if the issues were actually litigated in prior criminal proceedings).  Where the basic facts underlying a new claim are "indistinguishable from the facts at issue in the prior adjudication, the new claims are properly precluded."  *Rogers*, 466 F. Supp.2d at 169 (internal quotations omitted); *see also, McLaughlin v. Bradlee*, 803 F.2d 1197, 1202 (D.C. Cir. 1986) (dismissing claim on the basis of collateral estoppel where "differences between this claim and the … claim asserted in the previous cases appear to us no more than cosmetic changes … made to perpetuate litigation on the same basic issues.").

In its January 17, 2007 Memorandum and Opinion in the Judicial Watch Action (attached as Exhibit B), this Court (Kollar-Kotelly, J.) dismissed Plaintiff's claim against Judicial Watch for defamation "insofar as it is based on the allegedly defamatory statements made in Judicial

Watch Form 990 tax returns." This Court found that Judicial Watch's publication of these tax returns, which Judicial Watch was obligated to make public (and permitted to post as a means of making the information "widely available") was privileged and thus could not be the basis for a claim of defamation.

Despite this dismissal in the Judicial Watch Action, Plaintiff, in ¶ 22(A) and (F) of the Amended Complaint, alleges as the basis for his breach of contract and breach of fiduciary duty claims against Defendants, the *very same* publication of these 990 tax returns. Specifically, Plaintiff alleges that Defendants "counsel[ed] and assist[ed]" Judicial Watch in publishing these allegations and in providing the information to Raffa and Associates, P.C. "to prepare and sign" these tax returns. Am. Compl., ¶ 22(A) and (F). To the extent that Plaintiff's claims for breach of contract and breach of fiduciary duty also rest on factual allegations regarding the publication of these 990 tax returns, Plaintiff's Amended Complaint should be dismissed, with prejudice.

While the breach of fiduciary duty and breach of contract claims asserted by Plaintiff against Defendants in this Action are not the *same* as the defamation claim asserted by Plaintiff against Judicial Watch in the Judicial Watch action, the basic facts underlying both claims are indistinguishable. *Compare*, Am. Compl., ¶ 22(A) and (F) and JW Compl., ¶ 66(B). Because the factual allegations behind the claims are the same, the first prong of the collateral estoppel test is met. *See*, *Rogers*, 466 F. Supp.2d at 169. If, as this Court has determined on Judicial Watch's Motion to Dismiss, this alleged conduct by Judicial Watch is privileged and not actionable, Defendants' alleged counsel and assistance regarding this *very same conduct* cannot be actionable. *McCord*, 636 F.2d at 610 (doctrine of collateral estoppel permitted in a subsequent proceeding when disposition of the previous claims by dismissal). On the final prong of the collateral estoppel test, preclusion of Plaintiff's claims based on this set of facts in the

present Action does not work a basic unfairness to the Plaintiff.  Plaintiff had a full and fair

opportunity to assert claims based on the publication of the tax returns.  The rejection of such

claims in the Judicial Watch Action on substantive grounds should act as a bar to Plaintiff's

assertion of claims based on the same set of facts -- and not an invitation to make "cosmetic"

changes and "perpetuate" litigation based on previously dismissed factual theories.  *McLaughlin

v. Bradlee*, 803 F.2d at 1202.

Similarly, to the extent Plaintiff's claims for breach of contract and breach of fiduciary

duty rely on factual allegations that Defendants, in violation of their contractual and fiduciary

obligations of confidentiality "consulted, advised and caused or participated in causing Judicial

Watch to publish" the "scurrilous, false, recanted and sealed allegations made by the Plaintiff's

ex-wife in the divorce action," these claims should be dismissed, with prejudice.  Am. Compl., ¶

16.  To succeed on any claim based on these factual allegations, Plaintiff must establish that his

disclosure of his then-wife's allegations to Defendants was, indeed, a privileged communication.

Because this Court has already determined that such disclosure was *not* made during a privileged

communication, Plaintiff's claim must fail.

In the Judicial Watch Action, Plaintiff asked this Court to impose sanctions against

Judicial Watch based on Judicial Watch's inclusion in its Amended Counterclaim of the

allegations made by Plaintiff's then-wife during divorce proceedings.  Plaintiff seeks in this

action to recover on claims of breach of contract and breach of fiduciary duty against Defendants

based on allegations that it was the Defendants who caused or otherwise advised Judicial Watch

to "publish" these allegations in Judicial Watch's Amended Counterclaim.  Plaintiff's claim rests

on the theory that in providing such "counsel" to Judicial Watch or in causing Judicial Watch to

include these allegations in its Amended Counterclaim, Defendants breached their contractual and fiduciary obligations to Plaintiff.

In denying Plaintiff's request for sanctions in the Judicial Watch Action, this Court noted that Plaintiff *admitted* that he "voluntarily revealed the accusations" to Judicial Watch during a conversation. December 3, 2007 Memo. and Opinion at p. 14 (attached as Exhibit C). In the Judicial Watch Action, this Court rejected Plaintiff's argument that sanctions were appropriate because the disclosures were a violation of the attorney-client privilege and "various Rules of Professional Conduct applicable to attorneys." *Id.* Even accepting Plaintiff's "version of the facts," this Court found that "the attorney-client privilege and attorney duty of confidentiality are not applicable" because Plaintiff argues that the conversation in which the disclosures were made occurred during a joint representation of Judicial Watch *and* Plaintiff. *Id.* at p. 15. Since, "as between commonly represented clients" the attorney-client privilege does not attach, this Court, based on Plaintiff's own version of the facts, rejected Plaintiff's allegations that the disclosures were made during confidential communications. Based on this prior finding, Plaintiff should not be permitted to proceed on his claims against Defendants for breach of contract and breach of fiduciary duty to the extent that those claims rely on Plaintiff's allegation that this disclosure was confidential or privileged.

## IV.     CONCLUSION

For the foregoing reasons, Plaintiff's Amended Complaint should be dismissed, with

prejudice.

July 17, 2008

Respectfully submitted,

*/s/Helen Gerostathos Guyton*
Helen Gerostathos Guyton (Bar No: 499203)
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
701 Pennsylvania Ave., N.W.
Suite 900
Washington, D.C.  20004-2608
(202) 434-7300

*Counsel for Defendants*

## **CERTIFICATE OF SERVICE**

     I, Helen Gerostathos Guyton, hereby certify that a true copy of this document was served on all counsel of record by either electronic or first class mail, postage prepaid on July 17, 2008.


                                      */s/ Helen Gerostathos Guyton*    
                                        Helen Gerostathos Guyton

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Larry Klayman,<br>540 Brickell Key Drive<br>Miami, FL 33131; | : | |
| | : | |
| Louise Benson,<br>5779 Rolling Road<br>Woodland Hills, CA 91367 | : | |
| | : | |
| *Plaintiffs,* | : | Civil Action No. 1:06-CV-00670 |
| | : | |
| v. | : | Honorable Colleen Kollar-Kotelly |
| | : | |
| Judicial Watch, Inc.<br>501 School Street, S.W.<br>Suite 500<br>Washington, D.C. 20024; | : | |
| | : | |
| Thomas J. Fitton<br>5245 42nd Street N.W.<br>Washington, D.C. 20015; | : | **Jury Trial Demanded.** |
| | : | |
| Paul Orfanedes<br>1050 North Stuart Street<br>Unit 515<br>Arlington, VA 22201; and | : | |
| | : | |
| Christopher Farrell<br>501 School Street, S.W.<br>Suite 500<br>Washington, D.C. 20024<br>*Defendants.* | : | |
| | : | |

## SECOND AMENDED COMPLAINT

Plaintiffs, Larry Klayman ("Klayman"), and Louise Benson ("Benson"), complain against

the Defendants as follows:

**Introduction**

1.    This is an action by the founder and former Chairman of Judicial Watch, and a high value donor and volunteer to Judicial Watch to remedy defendants' breach of various agreements and laws, and to ultimately restore ethics and honesty to Judicial Watch. Since Klayman left Judicial Watch to run for the United States Senate, Judicial Watch has failed to honor its commitments to Klayman, Benson and other donors. Moreover, Judicial Watch, at the direction of its President, Thomas J. Fitton, has failed to respect its severance agreement with Klayman by engaging in a pattern of fraud, disparagement, defamation, false advertising and other egregious acts against Klayman. Regrettably, this complaint was filed because the Defendants failed to correct their conduct and remedy the damage, despite repeated demands.

2.    In 1994, Klayman conceived of, incorporated and founded Judicial Watch to restore and promote ethics in the government and in the legal profession and he was the first to use the trademark "Judicial Watch" in commerce. The mark has a double meaning, as Judicial Watch was not only intended to help ensure that the court system acts ethically and correctly, but also to use the judiciary to oversee and police the executive and legislative branches of government.

3.    Klayman conceived of Judicial Watch to serve as a private Justice Department for the people, in effect a "True Independent Counsel," free from the influences of politics he had seen as a trial attorney at the U.S. Justice Department. It was a novel concept to form an innovative group to advocate on behalf of its members and the public through concrete and forceful legal actions and educational endeavors, including but not limited to the use of the courts and the media.

4.    During the approximately ten (10) years since Klayman founded and lead Judicial Watch, the organization grew from one office with a volunteer staff to, by the year 2000, a $28

million dollar plus, per annum, foundation with headquarters in Washington, D.C. and regional

offices in Los Angeles, California; Chicago, Illinois; Dallas, Texas; Miami, Florida; and Norfolk,

Virginia.  By the year 2003, Judicial Watch had about 50 employees with plans to expand not only

domestically, but also internationally.  It also had nationally syndicated radio and television shows

called "The Judicial Watch Report," expanding the group's prestige and influence.  Moreover,

under Klayman's leadership, Judicial Watch achieved many notable successful verdicts or findings

in courts throughout the United States.

    5.    In 2003, a seat in the United States Senate (the "Senate") opened in Klayman's home

state of Florida.  After representing many Florida citizens in legal matters, Klayman decided that

he could be even more effective in his fight against corruption by being elected to the Senate.

    6.    Though Judicial Watch had become a substantial organization, Klayman believed

that the most effective way to effectuate a non-partisan "clean-up" of government was to transition

Judicial Watch to a suitable successor while he was elected to the Senate.  Klayman intended to

take his "Judicial Watch" style of advocacy inside the government, while Judicial Watch continued

its work as an independent non-profit organization.

    7.    Accordingly, Klayman decided to enter into severance negotiations with Thomas J.

Fitton, then President of Judicial Watch ("Fitton") and the Judicial Watch board members,

including Paul Orfanedes ("Orfanedes") and Christopher Farrell ("Farrell"), to begin the transition

of leadership.  Ultimately, Klayman entered into a detailed severance agreement (the "Severance

Agreement").

    8.    Shortly before Klayman left Judicial Watch, he discovered that, contrary to Fitton's

representations he made when Klayman hired him, Fitton had not obtained his undergraduate

degree. Klayman pressed, and Fitton agreed (a) to obtain his college degree, and (b) to continue the process to find a qualified individual with a legal background to lead Judicial Watch, particularly in light of Fitton's lack of qualifications.

9.      Before departing Klayman discussed the position with and interviewed highly respected and qualified candidates to become Chairman of Judicial Watch.

10.     As a condition to his signing the Severance Agreement and stepping down from Judicial Watch, Klayman insisted, and Fitton agreed, to have Judicial Watch hire a qualified person to become Chairman.  Klayman discussed with Fitton possible candidates that were suitable to lead Judicial Watch.

11.     Instead of taking the steps he promised to find a distinguished and qualified Chairman to run Judicial Watch, Fitton has solely acted to entrench himself as head of Judicial Watch.

12.     Even today there is no Chairman, and Fitton controls Judicial Watch.

13.     Fitton mislead Klayman and others to promote his personal agenda, interests, and political ideology to the detriment of Judicial Watch, Klayman, and Judicial Watch's donors and supporters.

14.     Fitton viewed Klayman's departure as an opportunity to take complete control of the organization to the detriment of Judicial Watch's donors, and employees, including many attorneys and staff that were hired by Klayman.  Since Klayman's departure, Fitton has mismanaged Judicial Watch and closed regional offices or eliminated the staff of the regional offices to the point that the remaining offices are shells that perform virtually no service.  On information and belief, many of the employees were wrongfully terminated by Fitton, for reasons that include age, sex and national

origin discrimination.

15.    Moreover, upon information and belief, since Fitton took control of Judicial Watch, Fitton purchased two resort properties in Belize by using numbered accounts and limiting disclosure of his name on the sale documents to hide the fact that Fitton was involved in the purchases (the "Belize Properties").  Fitton's attempt to "hide" his purchase of the Belize Properties raises an inference that he has committed similar acts at Judicial Watch, secreting his potentially improper or questionable conduct that is detrimental to donors, supporters, Klayman and others.

16.    From the time Klayman stepped down from his posts at Judicial Watch, Fitton, Orfanedes and Farrell, directly and through other agents of Judicial Watch defamed, disparaged and cast Klayman in a false light to denigrate Klayman, and in an effort to undermine Klayman's ability to return to the helm of Judicial Watch or compete with Judicial Watch in the future.

17.    As plead more fully below, Judicial Watch, through Fitton, Orfanedes and Farrell and other agents and representatives breached the Severance Agreement and have mislead donors, including but not limited to Louise Benson, the media, and the public with their false advertisements, and other publicity, and solicitations and their continued defamation and disparagement of Klayman.

**Parties**

18.    Larry Klayman ("Klayman") is an individual citizen and resident of the State of Florida.  Klayman practices law and bases his legal practice in Florida.

19.    Louise Benson ("Benson") is an individual citizen of California and was at all times material to the allegations made in the complaint a supporter and donor to Judicial Watch.

20.     Judicial Watch, Inc. ("Judicial Watch") is a 501(c) (3) organization formed under laws of the District of Columbia with its headquarters in the District of Columbia. Klayman founded Judicial Watch in 1994 as a public interest government watchdog to investigate and prosecute government corruption and abuse. He not only conceived of and was the first to use the trademark, "Judicial Watch" in commerce, but Klayman also gave Judicial Watch the motto "Because No One is Above the Law!"

21.     Thomas J. Fitton ("Fitton") is President of Judicial Watch. At all times material to the allegations made in this complaint, Judicial Watch was controlled by Fitton.

22.     Paul J. Orfanedes ("Orfanedes") is the Secretary and a Director of Judicial Watch. At all times material to the allegations made in this complaint, Orfanedes was the Secretary of Judicial Watch, a director, and the attorney managing cases at Judicial Watch.

23.     Christopher J. Farrell ("Farrell") is a Director of Judicial Watch. At all times material to the allegations made in this complaint, Farrell was a director of Judicial Watch and acted as its lead investigator.

## Jurisdiction And Venue

24.     The court has jurisdiction under 42 U.S.C. § 1332 because the matter is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. Jurisdiction is also proper pursuant to 15 U.S.C. §§ 1125(a), *et. seq.* and 18 U.S.C. §§ 1962, *et. seq.* This court has supplemental jurisdiction over the claims in this complaint that arise under state law, because the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from the same operative facts.

25.     Venue is proper pursuant to 28 U.S.C. § 1391.  The actions occurred in whole or in

part in this jurisdiction, and Klayman and Judicial Watch have agreed venue is appropriate in this jurisdiction.

### Statement of Facts

26.    Klayman is an honors graduate of Duke University, and Emory University School of Law, former U.S. Justice Department prosecutor and civil trial attorney.  Klayman was the founder and former Chairman and General Counsel of Judicial Watch and in 2004 he was a candidate for the Senate from Florida.

27.    Judicial Watch has acted in a variety of matters ranging from challenges to the President and Mrs. Clinton's Legal Defense Fund, he is credited with uncovering "Chinagate" or campaign finance scandal with John Huang, a suspected Chinese agent; lawsuits over the theft of nuclear codes at Los Alamos Nuclear Laboratories;  political misuse of the Internal Revenue Service; fraud and/or corruption at the United Nations, the pre- and post September 11 cover-up of incompetence and other misconduct at the Federal Bureau of Investigation and a number of government agencies; the resignation of House Speaker Newt Gingrich when he admitted to having brought disgrace on the House of Representatives; various ethics complaints; a lawsuit to open Vice-President Cheney's Energy Task Force – a suit that was ultimately heard by the United States Supreme Court; and complaints against former House Majority Leader Tom Delay and other Republican Congressmen and Senators for selling access to government.  The prestigious "National Journal" has called Klayman a "major force in Washington" and "the major public interest litigator at this time." National Journal, June 24, 2002.

A.    Klayman's Departure from Judicial Watch and the Severance Agreement

28.    In 2003, Klayman decided to step down from Judicial Watch and run for the Senate

from Florida as long as a suitable replacement could be found for him as Chairman of Judicial

Watch.  Accordingly, Klayman decided to enter into severance negotiations with Fitton and the

Judicial Watch board members to begin the transition of leadership.  Ultimately, Klayman entered

into a detailed severance agreement (the "Severance Agreement").

29.    During the severance negotiations, Klayman discovered that Fitton had not obtained

his undergraduate degree. Shocked that Fitton had misrepresented his educational background to

Klayman when he was hired years earlier, Klayman pressed and Fitton agreed (a) to obtain his

college degree, and (b) to continue the process to find a qualified individual, with a legal

background to lead Judicial Watch, particularly in light of Fitton's lack of qualifications.

30.    Fitton also deliberately misrepresented that he would find a suitable successor for

Klayman as Chairman.  Instead of taking steps that he promised, to find a successor to run Judicial

Watch, Fitton has acted to entrench himself in control of Judicial Watch and run it as his own

partisan operation for his own personal gain.

31.    During the negotiation of the severance agreement, Fitton and two other directors of

Judicial Watch, Orfanedes and Farrell, acted in secret to remove persons loyal to Klayman from

Judicial Watch in order to take over and completely change the nature of Judicial Watch after his

departure.

32.    The Severance Agreement was signed on September 19, 2003.  The Severance

Agreement provides, in pertinent part, as follows:

A.    Judicial Watch would pay Klayman, *inter alia*: (i) all compensation due to

him through his last day of work, (ii) a severance payment, (iii) compensation for agreeing not to

compete with Judicial Watch for two (2) years; (iv) health insurance benefits for himself and his

family, for one (1) year; and (v) the monies Klayman had expended for or on behalf of Judicial

Watch.

           B.      Klayman would have continued access to Judicial Watch documents and

information in the event that he ever needed it to defend himself against accusations or legal

actions;

           C.      Judicial Watch would advise and permit Klayman to comment in advance

concerning any information about him that Judicial Watch intended to submit to the Internal

Revenue Service.

           D.      Judicial Watch would return Klayman's personal property and assets to him,

including those belonging to Klayman and Associates, his law firm;

           E.      Judicial Watch would work in good faith to remove Klayman as a personal

guarantor of the multi-million dollar lease of the headquarters space at 501 School Street, S.W.,

Washington D.C.;

           F.      Judicial Watch and its officers and directors would not, in any way,

disparage, denigrate or defame Klayman;

           G.      On or before September 27, 2003, Judicial Watch was to issue a press

release announcing Klayman's departure that was to state as follows:

> Judicial Watch announced today that Larry Klayman has
> stepped down as Chairman and General Counsel of Judicial
> Watch, to pursue other endeavors. Tom Fitton, who is
> President of Judicial Watch, said:
>
> Larry conceived, founded and helped build Judicial Watch to
> the organization it is today, and we will miss his day to day
> involvement. Judicial Watch now has a very strong presence
> and has become the leading non-partisan, public interest
> watchdog seeking to promote and ensure ethics in
> government, and Larry leaves us well positioned to continue

our important work."

H.     Judicial Watch agreed that Klayman shall be permitted to use, publish and
otherwise disseminate to third parties the following additional statement of Judicial Watch:

> Larry was the creator and founder of Judicial Watch, and
> helped build it to be a stable, successful and widely respected
> organization. We thank him for his service.

I.     Judicial Watch agreed that Klayman would be permitted to comment on
Judicial Watch activities after the separation date;

J.     Judicial Watch and Klayman agreed to limit any statements to third parties
regarding Klayman's leaving Judicial Watch to be consistent with the Press Release and
statements set forth above in subparagraphs G and H.

B.     <u>Breach of the Severance Agreement – The Disparagement and Portrayal of
Klayman in a False Light</u>

33.     Commencing almost immediately upon Klayman's departure, Fitton caused Judicial
Watch to breach the Severance Agreement, to further Fitton's efforts to entrench himself in power
at Judicial Watch to pursue his own personal interests, as well as to take Judicial Watch in a
direction wholly inconsistent with Judicial Watch's non-partisan mission -- and to harm Klayman.

34.     Fitton breached the Severance Agreement to promote his personal agenda and
political ideology.

35.     After Klayman announced his candidacy for the Senate from Florida on September
19, 2003, Fitton, in concert with two other directors of Judicial Watch, orchestrated a campaign to
disparage, defame and cast a false light on Klayman.

36.     Among other things, in breach of the Severance Agreement, Fitton and Judicial

Watch employees and agents concealed from and misrepresented Klayman's location from people that called asking for Klayman.

37.     Furthermore, they affirmatively told callers they could not discuss the "reasons" why Klayman left Judicial Watch, contrary to the express provisions in the Severance Agreement, in order to create the erroneous impression that Klayman was forced to leave Judicial Watch. Moreover, they told callers that they did not know where Klayman could be contacted.  This course of conduct has continued up to the present.

38.     Fitton ordered employees in Judicial Watch's headquarters and regional offices not to speak with or contact Klayman.

39.     Shortly after Klayman's announcement that he was a candidate for the Senate, Fitton, in conjunction with Judicial Watch's outside counsel, David Barmak, Esquire, made a frivolous demand on Klayman, purporting to prohibit Klayman from ever mentioning that he was the founder of Judicial Watch and threatening to take legal action against Klayman if he failed to comply with the demand.

40.     Fitton and others caused Judicial Watch to orchestrate an effort to cause media outlets, including radio and television stations and broadcast and cable networks, to shun Klayman and persuade them not to discuss matters of public concern with Klayman.

41.     On information and belief, Fitton, Orfanedes, Farrell and others on behalf of Judicial Watch represented, *inter alia*, that Judicial Watch could and would take legal action against the media outlets if they permitted Klayman to appear and truthfully state he was the founder and former Chairman of Judicial Watch.  Such threats, however unfounded, were sufficient to cause the media to shun Klayman and refrain from inviting him to appear or comment to them.

271748-1                                              11

42.    Throughout his tenure at Judicial Watch, Klayman had established a strong relationship with the media.  Klayman, already a well-known lawyer, became a regular guest on many television network, cable and radio programs.  Klayman was so well known and widely recognized that a semi-fictional character, based on Klayman, was created for the television show "West Wing."  Klayman enjoyed celebrity status within the non-profit legal/political community.  In fact, by working under Klayman, Fitton learned that the most powerful tool for finding clients and raising his stature in the legal community was through the media outlets.  During his years at Judicial Watch, Klayman was regularly called to comment on legal or political affairs as Judicial Watch's founder and Chairman.

43.    While at Judicial Watch Klayman was synonymous with Judicial Watch, and his media presence resulted in numerous clients contacting Judicial Watch for legal counsel.

44.    By threatening the media, and directing media outlets that they could no longer refer to Klayman as Judicial Watch's founder and former Chairman, or ever discuss anything that concerned or related to Judicial Watch, Fitton and others breached the Severance Agreement and disparaged, defamed and portrayed Klayman in a false light.

45.    The actions of Fitton Orfanedes, Farrell and other Judicial Watch employees and agents had the desired effect of chilling the media.  Without the ability to freely refer to Klayman as Judicial Watch's founder and former Chairman, or to comment on Judicial Watch's activities, the media would not be able to identify Klayman to its viewers. Instead of calling on Klayman to comment on political and legal affairs -- and have to confront Judicial Watch's threats of retaliation in doing so -- the media sought to avoid injecting themselves into any disputes between Judicial Watch and Klayman by ignoring Klayman and seeking other commentators.

46.     Fitton and Judicial Watch engaged in this pattern of disparagement and portrayal of Klayman in a false light to ensure that Klayman could never compete with Judicial Watch or Fitton himself.

47.     Fitton's improper acts were done to further his own agenda to marginalize Klayman and promote Fitton's status within the media and elsewhere.

C.      Breach of the Severance Agreement – Fraudulent Mailings, Misrepresentation False Advertising and Portrayal of Klayman in a False Light

48.     Over one month after Klayman stepped down as Chairman and General Counsel of Judicial Watch, Fitton caused Judicial Watch to send fund raising letter solicitations through the U.S. Mail that falsely represented that Klayman was Chairman and General Counsel of Judicial Watch.  This mailing used Klayman's name and image without permission.  A sample copy of this fraudulent direct mail piece is attached hereto as Exhibit "A."

49.     This fraudulent fundraising practice created confusion among donors, and they mistakenly sent donations to Judicial Watch believing that Klayman was still there running the organization and using their donations for proper purposes.

D.      Fraud on Louise Benson and the other Building Fund Donors

50.     In November 2002, while Klayman was Chairman and General Counsel of Judicial Watch, Judicial Watch began a campaign to raise funds from the supporters of Judicial Watch to purchase the building that housed their headquarters office space at 501 School Street, S.W., in Washington, D.C (the "Building").  Judicial Watch sent appeals to potential donors, including but not limited to Benson, seeking funds solely for the purpose of purchasing the Building and no other reason.  A copy of the solicitation sent to Benson is attached hereto as Exhibit "B."

51.     Benson relied on the representations made by Judicial Watch in the solicitation in

making a pledge for $50,000. She would not have made the pledge, and paid $15,000 up front to purchase Fitton's office space at Judicial Watch, but for the representation in Judicial Watch's solicitation that the money would be used to purchase the Building and provide her with naming rights.

52.    Benson made her pledge solely on the condition that Judicial Watch was and would continue to actively pursue the purchase of the Building, as Judicial Watch represented in its solicitation.

53.    After Klayman's departure from Judicial Watch, Fitton caused Judicial Watch to cease actively pursuing the purchase of the Building, but concealed that fact from Benson and other similarly situated donors and supporters of Judicial Watch.

54.    Fitton and Judicial Watch never contacted the landlord, Robert Wolpe, and owner of the headquarters building to negotiate the purchase of the Building.

55.    Fitton caused Judicial Watch to publish a newsletter in February 2005 which concealed the truth and led Benson and other donors to believe Judicial Watch was actively pursuing the sale, and had been consistently maintaining donations from Benson and 3,686 others in a segregated, interest bearing account. A copy of the newsletter is attached as Exhibit "C."

56.    On information and belief, the truth was, however, that Fitton caused Judicial Watch to commingle with Judicial Watch's operating funds, or misuse in other ways, the approximately $1.4 million raised from Benson and others. This misuse of funds further demonstrates Fitton's agenda to takeover Judicial Watch for his own personal gain.

57.    Fitton caused Judicial Watch to continue to mislead Benson and other donors in a newsletter dated September 2005, which falsely states:

> This fund has been one of the most comprehensive

> fundraising efforts in Judicial Watch history. The
> long term goal of the fund is to provide financial
> stability for Judicial Watch through the ownership of
> an office building.

A copy of the newsletter is attached as Exhibit "D."

58.    The truth is that after Fitton took control when Klayman left, he caused Judicial

Watch to take little or no action to increase the fund, failed to communicate with donors at all

about the Building until Klayman pressed more and threatened to go to appropriate government

authorities and the donors themselves.

59.    At all material times Judicial Watch had sufficient resources to purchase the

Building.  Fitton however, chose to deceive donors by failing to even communicate with the owner

of the Building.

60.    Moreover, when Benson questioned Judicial Watch about the status of her donation

and the attempts to purchase the Building, Gregg Mills, Judicial Watch fundraiser, deliberately

misrepresented that Judicial Watch was actively attempting to purchase the Building.

61.    Robert G. Mills, a/k/a, Gregg Mills, is the high-dollar fundraiser for Judicial Watch.

 He deliberately mislead Benson to believe that Judicial Watch was engaged in efforts to purchase

the Building.

62.    Fitton continued to employ Mills on behalf of Judicial Watch even though he knew

or should have known that Mills' prior actions exposed Judicial Watch's reputation for

non-partisan integrity to injury.  For example Fitton knew, and or should have known that:

        (a)      Mills had been president of U.S. Family Network, found by the Federal

Election Commission to have funneled corporate money into attack advertisements against

Democrats;

271748-1                                        15

(b)     Mills led a nonprofit group that received millions of dollars from clients of former lobbyist Jack Abramoff;

(c)     Prosecutors recently subpoenaed Mills in connection with the investigation into Congressman Tom DeLay's alleged money laundering and campaign finance scandal case in Texas; and

(d)     Mills' refusal to take a polygraph exam in 2003 after allegations surfaced that he allegedly stole funds from another organization, which he admittedly repaid.

63.     Benson detrimentally relied on Mills', Fitton's, and Judicial Watch's fraudulent misrepresentations.

E.     Defamation, Disparagement of Klayman and Misrepresentation

64.     During the period of Fitton's leadership, Judicial Watch's assets have been reduced almost fifty-percent (50%) percent, based on Judicial Watch's annual submissions to the IRS.  On information and belief, Judicial Watch's assets now are between $8 and 9 million dollars - down from almost about $16 million in actual booked assets as of September 19, 2003, when Klayman left. And, if inheritances and prospective attorneys' fees awards had been booked at that time, Judicial Watch's assets would have been in the $20 million dollar range.

65.     Fitton has caused Judicial Watch to disparage, and defame Klayman in violation of the Severance Agreement by putting false statements on its website in which references in press quotations originally made about Klayman are doctored to refer to Judicial Watch instead.  The effect is to denigrate Klayman by rewriting history, a la the novel 1984, by George Orwell.  Some examples of the "rewrites" Fitton caused Judicial Watch to make are as follows:

compare

**Fitton's Judicial Watch Quote:** "Judicial Watch appears to be the main

public interest litigator at this time, no small feat." *National Journal*, June 24, 2002.

with

**Real Quote:** "He (Klayman) appears to be the major public litigator at this time." *National Journal*, June 24, 2002

compare

**Fitton's Judicial Watch Quote:** "Thanks, in part, to its aggressive litigation, Judicial Watch was recently named one of the top ten most effective government watchdog organizations by *The Hill* newspaper and a force in Washington by the *National Journal*."

with

**Real Quote:** "...through his challenge of secrecy rules, Klayman has become a major force in Washington." *National Journal*, June 24, 2002.

A copy of the Judicial Watch's website, with the false quotations, as well as the reprints from published articles containing the correct quotations attributing Judicial Watch success to Klayman are attached hereto collectively as Exhibit "E."

66.     Fitton also caused Judicial Watch to harm and damage Klayman, in order that they could continue to control and misuse the organization. To further their means and ends, assisted by Barmak, they engaged in the following additional conduct in breach of the Severance Agreement:

A.      Judicial Watch illegally and systematically opened mail sent to Klayman at Judicial Watch and tortiously interfered with another entity funded by Klayman, Freedom Watch, Inc., which is a 501 (c) (3) founded to promote freedom domestically and around the world;

B.      Judicial Watch made false statements on IRS Form 990s, and then published them on Judicial Watch's website, claiming that Klayman owned certain monies to Judicial Watch. Fitton signed the 2003 and 2004 Judicial Watch tax returns and made these false

statements under oath, in violation of 18 U.S.C. §1001. These fraudulent statements were intended to harm and defame Klayman. Despite Klayman's repeated requests for corrections and retraction, Judicial Watch refused and continued to publish these falsehoods throughout November and December, 2005 and continuing until at least August 2005 and beyond;

        C.     Judicial Watch failed to pay Klayman and his family for health care insurance.

        D.     Judicial Watch failed to pay Klayman his last paycheck while employed by Judicial Watch;

        E.     Judicial Watch converted Klayman's personal property and assets, as well as those of Klayman's law firm Klayman & Associates;

        F.     Judicial Watch failed to make a good faith effort to remove Klayman as a personal guarantor from the lease for Judicial Watch's headquarters at 501 School Street, S.W., Washington D.C.;

        G.     Judicial Watch filed false and frivolous legal pleadings to attempt to have Klayman removed as counsel for Sandra Cobas in the Miami Elian Gonzalez litigation concerning the alleged use of excessive force during the Easter, 2000 raid on his uncle's house, fraudulently representing to the court that Klayman was legally barred from representing her;

        H.     Fitton and Judicial Watch failed to forward telephone messages and mail to Klayman, and opened mail that was not addressed to or did not pertain to Judicial Watch;

        J.     On information and belief, Judicial Watch interfered with Klayman's relationships with Klayman's former clients who had offered to help Klayman in his Senate campaign, by disparaging, defaming, holding in a false light and providing false and misleading

271748-1                  18

information to them to cause them to sever their relationships with Klayman; and

        I.     Fitton and Judicial Watch defamed Klayman among the media outlets and the general public.

67.    Defendants' deliberate wrongful conduct is part of a pattern of abuse that is intended to mislead the public and harm Klayman, Judicial Watch and its donors.

## COUNT ONE – FRAUDULENT MISREPRESENTATION

<u>Louise Benson v. Judicial Watch and Thomas Fitton</u>

68.    Plaintiffs incorporate by reference the allegations of paragraphs 1 through 67 as if fully set forth herein:

69.    As alleged above Benson contributed funds to Judicial Watch in reliance on the specific representations made by Judicial Watch that it intended to use them to purchase the Building located at 501 School Street, S.W., Washington, D.C. (the "Building").

70.    Since Benson pledged her money, and made her $15,000 payment, Fitton and Judicial Watch have continued to misrepresent that it intends to use her money, and those of other similarly situated donors, to purchase the Building or another property.

71.    Upon information and belief, since Fitton has taken over Judicial Watch, Fitton and Judicial Watch have not intended to, taken no steps to and is not, now, because of the dissipation of Judicial Watch assets, in a position to purchase the Building.

72.    Greg Mills, fundraiser for Judicial Watch, deliberately mislead Benson by fraudulently representing that the funds were being used to purchase the Building.

73.    Benson justifiably relied to her detriment on the misrepresentations of Fitton, Mills and Judicial Watch.

271748-1

19

74.    These misrepresentations were calculated to placate Benson and stop her and other similarly situated donors from filing suit and/or seeking a return of the donations.

75.    Defendants' representations since October 2003 are false and fraudulent, and Fitton and others who caused those representations to be made in, inter alia, Judicial Watch newsletters sent to Benson and others in February and September 2005, knew they were false at the time they were made.

76.    Judicial Watch, Fitton, and Mills made those misrepresentations to induce Benson and the other 3,864 donors who gave money to buy the Building to refrain from demanding a refund of their donations so Judicial Watch could retain the benefit of their donations.

77.    The fraud and deceit of Judicial Watch, Fitton, and Mills was knowing and intentional and has damaged Benson.

78.    The actions of Judicial Watch in retaining Benson's money under false pretense is so outrageous as to shock the conscience, thereby entitling Benson to an award of punitive damages.

## COUNT TWO – BREACH OF CONTRACT

### Louise Benson v. Judicial Watch

79.    Plaintiffs incorporate by reference the allegations of paragraphs 1 through 78 as if fully set forth herein.

80.    As alleged above Benson contributed funds to Judicial Watch in response to a direct solicitation and in reliance on the specific representations made by Judicial Watch that it intended to use her contribution to purchase the Building located at 501 School Street, S.W., Washington, D.C. (the "Building").

81.    Benson entered into a contract with Judicial Watch to obtain the naming rights to a

particular space in the Building, specifically the office of Fitton.

82. Specifically, Benson was induced to pledge $50,000 and pay $15,000 in return for the naming rights of the either Chairman's Office, the President's Office, Guest Reception Area, or the Lounge and Key Witness Room.

83. As consideration for her $50,000 pledge, and $15,000, payment Judicial Watch agreed to name the President's (Fitton's) Office after Louise Benson. Judicial Watch agreed that after purchasing the Building it would recognize her generous pledge by placing a plaque on the President's Office.

84. Since Benson pledged her money, Judicial Watch has continued to misrepresent that it intends to use her money, and those of other similarly situated donors, to purchase the Building or another property.

85. Since Fitton has taken over Judicial Watch, Judicial Watch has not intended to, taken no steps to, and is not now, due to the dissipation of Judicial Watch assets, in a position to purchase the Building.

86. Greg Mills, fundraiser for Judicial Watch, deliberately mislead Benson by fraudulently representing that the funds were being used to purchase the Building.

87. Benson relied to her detriment on the misrepresentations of Fitton, Mills and Judicial Watch.

88. Judicial Watch has not purchased the Building and is in breach of the agreement that offered Benson the naming rights to the President's Office in consideration for her pledge and contribution.

271748-1                                   21

## COUNT THREE – UNJUST ENRICHMENT

### Louise Benson v. Judicial Watch

89.     Plaintiffs incorporate by reference the allegations of paragraphs 1 through 88 as if fully set forth herein:

90.     As alleged above Benson contributed funds to Judicial Watch in response to a direct solicitation and in reliance on the specific representations made by Judicial Watch that it intended to use her contribution to purchase the Building located at 501 School Street, S.W., Washington, D.C. (the "Building").

91.     As set forth herein, the Judicial Watch accepted, used and enjoyed the benefits of Benson's $15,000 payment made in the belief that Judicial Watch would purchase the Building and provide her naming rights.

92.     As set forth herein, Benson conferred a valuable benefit upon Judicial Watch by pledging $50,000 and making payment of $15,000 in consideration of Judicial Watch's promise to purchase the Building and provide Benson naming rights for the President's Office.

93.     Judicial Watch has not purchased the Building and is misusing Benson's payment.

94.     As set forth herein, because of the relationship between the parties, Benson is entitled to receive the reasonable value of the benefits conferred upon Judicial Watch, which is $15,000 plus interest.

95.     In addition, Benson conferred a substantial benefit upon Judicial Watch in an amount in excess of $65,000 through the services that she provided by working at Judicial Watch's San Marino, CA office, and through the services she provided to Judicial Watch's "Judicial Monitoring Project," with the expectation that Fitton and others would act honestly and ethically toward her

271748-1                                          22

and to the public generally.

96.     Because Fitton and Judicial Watch have not acted properly by deliberately misleading donors and improperly converting Judicial Watch into a partisan organization, Benson is entitled to receive the value of the services she provided.

## COUNT FOUR – Violation of Section 43(a) of the Lanham Act

### Klayman v. Judicial Watch and Thomas Fitton, Paul Orfanedes, and Christopher Farrell

97.     Plaintiffs Klayman incorporates by reference paragraphs the allegations of paragraphs 1 to 96 as if fully stated herein.

98.     By placing in the U.S. mails and on the Internet letters, newsletters and other solicitations that misrepresented that Klayman was the Chairman and General Counsel of Judicial Watch, and using these published misrepresentations to raise money for Judicial Watch, Judicial Watch engaged in false designation of origin, false and misleading descriptions, false and misleading representations, false and misleading advertising and other illegal acts of unfair competition which are likely and did cause confusion, mistake, and/or deception and misrepresented the nature, characteristics and qualities of plaintiffs' products, services, and activities in violation of 15 U.S.C. §1125(a)(1)(A) and (B). These illegal acts were perpetrated and occurred both nationally and internationally.

99.     Defendants deliberately misrepresented and falsely advertised that Klayman was Chairman and General Counsel of Judicial Watch after he left Judicial Watch to run for the Senate.

100.    The misuse of Klayman's name and likeness were calculated to confuse donors into believing that Klayman was soliciting their donations and that he was still running Judicial Watch.

101.    Klayman is a celebrity within the non-profit legal/political community.  Klayman is

widely recognized, both nationally and internationally, as the leading figure in the world of government and judicial oversight and pubic "watchdog" groups.

102.   Fitton and Judicial Watch knew that donors that received the misleading fundraising publications would be confused by the publication and use of Klayman's name and likeness.

103.   Fitton Orfanedes, Farrell and Judicial Watch deliberately used Klayman's image and name to confuse donors into thinking that Klayman was still affiliated with Judicial Watch.

104.   Fitton's Orfanedes', Farrell's and Judicial Watch's false portrayal of Klayman was used to misrepresent the status of Judicial Watch to entice donors to continue giving donations to Judicial Watch.

105.   As a result of the foregoing, plaintiff has been damaged in an amount that will be ascertained at trial. In addition to plaintiff's actual damages, he is entitled to receive Defendants' profits pursuant to 15 U.S.C. § 1117(a). These damages and profits should be enhanced to achieve justice pursuant to 15 U.S.C. § 1117(a) and/or trebled pursuant to 15 U.S.C. § 1117(b) because defendants conduct was willful.

106.   The activities of defendants have caused and will cause irreparable harm to Plaintiff's personal and business relationships and good will for which he has no adequate remedy at law.

## COUNT FIVE

### Violation of Florida Statute 540.08 – Unauthorized Publication of Name or Likeness
### Klayman v. Judicial Watch Thomas Fitton, Paul Orfanedes, and Christopher Farrell

107.   Plaintiff Klayman incorporates by reference paragraphs the allegations of paragraphs 1 to 106 as if fully stated herein.

108.   By placing in the U.S. mails and on the Internet letters, newsletters and other

271748-1                                                24

solicitations that used his image and name, and misrepresented that Klayman was the Chairman and General Counsel of Judicial Watch, where such published misrepresentations sought to raise money for Judicial Watch, Judicial Watch engaged in unauthorized use of the name, portrait, photograph, other likeness of Klayman without the express written or oral consent of Klayman to such use of his name or likeness. These illegal acts were perpetrated and occurred both nationally and internationally and were in violation of Florida Statute 540.08.

109.   Defendants deliberately misrepresented and falsely advertised that Klayman was Chairman and General Counsel of Judicial Watch after he left Judicial Watch to run for the Senate.

110.   The misuse of Klayman's name and likeness were calculated to confuse donors into believing that Klayman was soliciting their donations.

111.   Fitton Orfanedes, Farrell and Judicial Watch knew that donors that received the misleading fundraising publications would be confused by the publication and use of Klayman's name and likeness.

112.   As a result of the foregoing, Klayman has been damaged in an amount that will be ascertained at trial. In addition to Klayman's actual damages, he is entitled to recover damages for an amount which would have been a reasonable royalty, and punitive or exemplary damages.

113.   Plaintiff is entitled to punitive damages because defendants conduct was willful.

114.   The activities of defendants have caused and will cause irreparable harm to Plaintiff's personal and business relationships and good will for which it has no adequate remedy at law.

### COUNT SIX - Breach of Contract – Rescission

#### Klayman v. Judicial Watch

115.   Klayman incorporates by reference the allegations of paragraphs 1 through 114 as if

fully stated herein.

116. As alleged above, Judicial Watch breached the Severance Agreement as set forth in above in Paragraph 66.

117. Fitton's deliberate and calculating steps to breach the Severance Agreement were egregious and were taken to further his personal gain to the detriment of Klayman, Judicial Watch and the public.

118. By disparaging, defaming, and casting Klayman in a false light to the public and media, Fitton and Judicial Watch breached the Severance Agreement with the malicious intent to eliminate Klayman as a competitive force.

119. By disparaging, defaming and casting Klayman in a false light to the public and media, Fitton breached the Severance Agreement to ensure that Judicial Watch would no longer be a non-partisan organization and instead become an organization that promoted Fitton's own interests and agenda without regard for the public interest at large.

120. By filing false statements on its Form 990s, and then posting them on the Judicial Watch website, Fitton and Judicial Watch defamed Klayman—a direct breach of the Severance Agreement.

121. The false statements on Judicial Watch's IRS Form 990s were intended to and had the effect of suggesting that Klayman defrauded Judicial Watch or improperly withheld certain monies from Judicial Watch.

122. By actively misrepresenting the reasons for Klayman's departure from Judicial Watch, Fitton and Judicial Watch disparaged Klayman by creating the false impression that Klayman was forced to leave Judicial Watch. This pattern of disparagement is a direct violation of the terms of

the Severance Agreement.

123. Judicial Watch, through Fitton and other agents and representatives, contrary the expressly negotiated terms of the Severance Agreement, falsely stated that they could not discuss the reasons that Klayman left Judicial Watch.

124. Judicial Watch, through Fitton and other agents and representatives, falsely instructed the television, cable and the written media that Klayman could not speak on the air about Judicial Watch cases or public events.

125. On information and belief, Judicial Watch, through Fitton, Orfanedes, Farrell and other agents and representatives, falsely instructed the television, cable, and the written media that Klayman could not be referred to as the "Founder and former Chairman of Judicial Watch."

126. By failing to pay Klayman the full amount due under the Severance Agreement, and in failing to return all of Klayman's property, Fitton and Judicial Watch breached the Severance Agreement.

127. By failing to take affirmative steps to purchase the Building and remove Klayman as a guarantor for the Judicial Watch lease, Fitton and Judicial Watch have breached the Severance Agreement.

128. After Klayman discovered that Fitton had not obtained a college degree, Klayman insisted that Fitton obtain a college degree, and that he find a suitable candidate, one who was distinguished and qualified, to fill the position of Chairman of Judicial Watch.

129. Fitton assured Klayman that the Chairman position would be filled.

130. In fact, just prior to Klayman's departure, Klayman had been discussing and consulting with highly qualified and distinguished candidates to lead Judicial Watch.

131. Fitton deliberately misrepresented that he would take steps to find a suitable successor for Klayman as Chairman to induce Klayman to enter into the Severance Agreement. Fitton persuaded Klayman that Fitton would actively work to find a legal/public figure to succeed Klayman and run Judicial Watch.

132. Fitton never intended to find a suitable successor for Klayman, and instead always intended to take over Judicial Watch for his own personal gain. Without a law degree, let alone a college degree, Fitton was not equipped to run a non-profit legal organization.

133. Fitton's deliberate misrepresentations materially induced Klayman to enter into the Severance Agreement.

134. Klayman relied on Fitton's fraudulent misrepresentations to his detriment and the detriment of Judicial Watch.

135. Fitton's and Judicial Watch's breaches of the Severance Agreement are so pervasive and widespread that monetary damages would be inadequate. The Severance Agreement must be rescinded, and the parties must be returned to the status quo anta. Klayman should be restored to his position as Chairman of Judicial Watch.

136. Without rescission of the Severance Agreement, Klayman and Judicial Watch will continue to be harmed.

137. If this Court rescinds the Severance Agreement, Klayman will be restored to his position as Chairman and General Counsel of Judicial Watch.

## COUNT SEVEN - Breach of Contract – Damages

### Klayman v. Judicial Watch

138. Klayman incorporates by reference the allegations of paragraphs 1 through 137 as if

fully stated herein.

139.   As alleged above, Judicial Watch breached the Severance Agreement as set forth in above in Paragraph 66.

140.   Fitton's deliberate and calculating steps to breach the Severance Agreement were egregious and were taken to further his personal gain to the detriment of Klayman, Judicial Watch and the public.

## COUNT EIGHT -  Breach of Contract – Specific Performance

### Klayman v. Judicial Watch

141.   Klayman incorporates by reference the allegations of paragraphs 1 through 140 as if fully stated herein.

142.   Judicial Watch has failed to pay Klayman and owes him amounts due Klayman under the Severance Agreement.

143.   Judicial Watch has failed to return Klayman's personal items property, and artwork, and Klayman & Associates, P.C., property as required by the Severance Agreement.

144.   Judicial Watch has failed to remove Klayman as a guarantor for all credit card accounts as required by the Severance Agreement.

145.   Judicial Watch has failed to remove Klayman as a guarantor for the Building as required by the Severance Agreement.

146.   Judicial Watch has failed to provide Klayman access to documents as required under the Severance Agreement.

147.   Despite repeated demands to adhere to and honor the terms of the Severance Agreement, Judicial Watch remains in breach of the agreement and it must be ordered to

specifically perform its obligations.

## COUNT NINE - Defamation

### Klayman v. Judicial Watch, Thomas Fitton, Paul Orfanedes, and Christopher Farrell

148.   Klayman incorporates by reference the allegations of paragraphs 1 through 147 as if fully stated herein.

149.   Judicial Watch, through Fitton, Orfanedes, Farrell and other agents and representatives, including but not limited to Barmak, have defamed Klayman, by publishing false statements to various persons and entities as alleged above.

150.   Judicial Watch, through Fitton, Orfanedes, Farrell and other agents and representatives, published false and misleading statements in Judicial Watch's 2003 and 2004 Form 990 IRS Returns.  These false statements were prominently published on Judicial Watch's website and falsely stated unequivocally that Klayman owed a certain amount of monies to Judicial Watch.

151.   The false and defamatory publications on the Form 990s and the Judicial Watch website were used by others to attack Klayman.  For example, Peter Paul, a former Judicial Watch client republished the defamatory statements on his website and attacked Klayman based, in part, on the false statements published in the Form 990s.

152.   Fitton's and Judicial Watch's defamatory publications and statements about Klayman harmed Klayman's business reputation and are damaging per se.

153.   Fitton's and Judicial Watch's defamation of Klayman is continuous and ongoing.

154.   In response to the filing of the original Complaint, Fitton and Judicial Watch knowingly sent a false statement to all Judicial Watch employees, which stated that Klayman filed his lawsuit because he owed Judicial Watch a significant sum of money.

155. Fitton, Orfanedes, Farrell and Judicial Watch knew that Klayman did not, individually, owe Judicial Watch any money when they published the false and misleading statement.

156. Additionally, beginning on April 13, 2006, Fitton and Judicial Watch published knowingly false statements in the following media outlets: 1) The Washington Post (April 19, 2006); 2) The Washington Times (April 14, 2006); 3) World NetDaily.com (April 13, 2006); 4) Slate.com (April 28, 2006); and elsewhere.

157. With wanton disregard for the truth, Fitton, Orfanedes, Farrell and Judicial Watch falsely told reporters that Klayman filed his suit as a "tactical maneuver designed to distract attention away from the fact that Klayman owes **more than a quarter of a million dollars to Judicial Watch**."

158. When Fitton, Orfanedes, Farrell and Judicial Watch published their defamatory statements they did so with knowledge that 1) Klayman does not owe Judicial Watch any money; and 2) Klayman has a genuine dispute with Judicial Watch that has yet to be resolved.

159. Fitton, Orfanedes, Farrell and Judicial Watch deliberately lied to sully Klayman's name and to imply that, among other things, Klayman filed a frivolous lawsuit.

160. Fitton's and Judicial Watch's defamation of Klayman is part of Fitton's continuing effort to lower Klayman's esteem in the media and public's eye.

161. Fitton Orfanedes, Farrell and Judicial Watch uttered and published false statements about Klayman and they harmed Klayman's reputation in his trade, and profession and had the effect of lowering him in the estimation of the community.

162. As a result of Defendants' malicious conduct, Klayman was damaged in an amount to be determined at trial.

**WHEREFORE**, Plaintiffs request the Court grant judgment in their favor and:

A. **On Counts One, Two and Three** award Louise Benson a sum in excess of seventy-five thousand dollars ($75,000) plus interest, against the defendants jointly and severally;

B. **On Count Three** award Louise Benson an amount of punitive damages to be determined at trial against the defendants, jointly and severally;

C. **On Counts Four and Five** award Larry Klayman a sum in excess of one million five-hundred thousand dollars ($1,500,000) plus interest, a reasonable royalty, and an amount of punitive damages to be determined at trial against the defendants, jointly and severally;

D. **On Count Six** Larry Klayman respectfully prays that this Honorable Court enter a Judgment against Judicial Watch, rescinding the Severance Agreement to preserve the interests of justice and provide such other relief as is just and equitable;

E. **Alternatively, on Count Seven** award Larry Klayman a sum in excess of five-hundred thousand dollars ($500,000), plus interest, against the defendants, jointly and severally;

F. **Alternatively, on Count Eight** Larry Klayman respectfully prays that this Honorable Court enter a Judgment against Judicial Watch and order Judicial Watch to specifically perform the terms of the Severance Agreement by: paying Klayman the remaining amounts due under the Severance Agreement, including reimbursing Klayman for business expenses; returning Klayman's personal items, property and artwork; returning the property of Klayman & Associates, P.C.; removing Klayman as a guarantor of all credit card accounts; removing Klayman as a guarantor for the Building; providing Klayman access to documents; and otherwise complying

with the Severance Agreement as plead herein;

      G.     **On Count Nine** award Larry Klayman a sum in excess of one million five-hundred thousand dollars ($1,500,000), plus interest, and an amount of punitive damages to be determined at trial against the defendants, jointly and severally;

      H.     Award Plaintiffs the costs of the action, including attorneys' fees; and

      I.     Award Plaintiffs such further relief as is just and equitable.

### Jury Trial Demanded

Plaintiffs hereby demand a trial by jury for all issues so triable.

Respectfully submitted,

**SPECTOR GADON & ROSEN, P.C.**

By: _Daniel J. Dugan_ (DD 1339)
Daniel J. Dugan, Esquire
1635 Market Street, 7th floor
Philadelphia, PA  19103
215.241.8872
215.241.8844 *fax*
email: ddugan@lawsgr.com

June 14, 2006

*Attorneys for Plaintiffs Larry Klayman and Louise Benson*

Of Counsel:

**SPECTOR GADON & ROSEN, P.C.**
Jason B. Schaeffer, Esquire
1635 Market Street, 7th Floor
Philadelphia, PA 19103
215.241.8887
215.241.8844 *fax*
Email: jschaeffer@lawsgr.com

271748-1

33

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LARRY KLAYMAN, *et al.*,

    Plaintiffs,

     v.

JUDICIAL WATCH, INC., *et al.*,

    Defendants.

Civil Action No. 06-670 (CKK)

**MEMORANDUM OPINION**
(January 17, 2007)

    Plaintiffs, Larry Klayman and Louise Benson, brought this action against Defendants –

Judicial Watch, Inc. (hereinafter "Judicial Watch"), a non-profit public interest government

watchdog organization; Thomas J. Fitton, President of Judicial Watch; Paul J. Orfanedes,

Secretary and a Director of Judicial Watch; and Christopher J. Farrell, a Director of Judicial

Watch – alleging fraudulent misrepresentation, breach of contract, unjust enrichment, violation

of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) and (B), violation of Florida Statute § 540.08, and

defamation. Presently before the Court are a number of motions, including: (1) the motion to

dismiss Counts One, Two, Three, Four, Five, Six, and Nine of Plaintiffs' Second Amended

Complaint brought by Defendants Judicial Watch and Fitton; (2) Plaintiffs' motion for leave to

file a sur-reply regarding the motion to dismiss brought by Defendants Judicial Watch and Fitton;

(3) the separate motion to dismiss the Second Amended Complaint brought by Defendants

Orfanedes and Farrell; (4) the motion to strike portions of Plaintiffs' Second Amended

Complaint brought by Defendants Judicial Watch and Fitton; and (5) the motion to sever the

claims of Plaintiff Benson from those of Plaintiff Klayman, brought by Defendants Judicial

Watch and Fitton.

Upon a searching consideration of the filings currently before the Court on these motions, the attached exhibits, and the relevant statutes and case law, with respect to the motion to dismiss Plaintiffs' Second Amended Complaint brought by Defendants Judicial Watch and Fitton, the Court shall (1) dismiss without prejudice Counts One, Two, and Three of Plaintiffs' Second Amended Complaint for lack of subject matter jurisdiction; (2) deny the motion to dismiss as to Counts Four, Five, and Six; (3) as to Count Nine of Plaintiffs' Second Amended Complaint, grant-in-part the motion to dismiss brought by Defendants Judicial Watch and Fitton insofar as it relates to allegedly defamatory statements made in Judicial Watch Form 990 tax returns and allegedly doctored press quotations posted on the Judicial Watch website; and (4) as to Count Nine of Plaintiffs' Second Amended Complaint, deny-in-part the motion to dismiss brought by Defendants Judicial Watch and Fitton insofar as it is based on allegedly false statements to Judicial Watch employees and the media.[1]  To the extent that Defendants Orfanedes and Farrell have joined in Fitton and Judicial Watch's motion to dismiss as to Counts Four, Five, and Nine, the Court's conclusions with respect to those Counts apply equally to Orfanedes and Farrell. Furthermore, the Court shall (5) deny Plaintiffs' motion for leave to file a sur-reply; (6) deny the motion to dismiss Plaintiffs' Second Amended Complaint brought by Defendants Orfanedes and Farrell (insofar as it raises an additional argument not addressed in Fitton and Judicial Watch's

---

[1] In light of the Court's granting-in-part and denying-in-part the motion to dismiss brought by Defendants Judicial Watch and Fitton, Counts Four, Five, Six, Seven, Eight, and Nine (to the extent that Count Nine is based on allegedly defamatory statements made to Judicial Watch employees and the media) of the Second Amended Complaint remain viable as to Defendants Judicial Watch and Fitton.  In addition, with respect to Defendants Orfanedes and Farrell, Counts Four, Five, and Nine (to the extent that Count Nine is based on allegedly defamatory statements made to Judicial Watch employees and the media) remain viable.

2

motion to dismiss); (7) deny the motion to strike brought by Defendants Fitton and Judicial

Watch; and (8) deny as moot the motion to sever brought by Defendants Judicial Watch and

Fitton.

## I: BACKGROUND

### A.    The Parties

Defendant Judicial Watch, Inc. is a 501(c)(3) organization formed under the laws of the

District of Columbia and headquartered in the District of Columbia, which Plaintiffs describe as

a "public interest government watchdog to investigate and prosecute government corruption and

abuse."  Second Am. Compl. (hereinafter "SAC") ¶ 20.  Defendant Fitton is President of Judicial

Watch, Defendant Orfanedes is the Secretary and a Director of Judicial Watch, and Defendant

Farrell is a Director of Judicial Watch.  *Id.* ¶¶ 21-23.

Plaintiff Larry Klayman ("Klayman") is the self-described founder and former Chairman

and General Counsel of Judicial Watch, who resides in and practices law in the State of Florida.

*Id.* ¶¶ 1, 18, 26.  Plaintiff Louise Benson ("Benson") is a resident of California who has been a

supporter of and donor to Judicial Watch.  *Id.* ¶ 19.

### B.    Klayman's Tenure At and Decision to Leave Judicial Watch

Klayman alleges that in 1994, he "conceived of, incorporated and founded Judicial Watch

to restore and promote ethics in the government and in the legal profession . . . ."  *Id.* ¶ 2.

According to Klayman, during the ten (10) years after he founded Judicial Watch, the

organization grew to a $28 million plus per year foundation with regional offices in five cities,

employed about 50 employees, and planned to expand nationally and internationally.  *Id.* ¶ 4.  In

addition, Judicial Watch had nationally syndicated radio and television shows called "The

3

Judicial Watch Report," and, according to Klayman, "achieved many notable successful verdicts or findings in courts throughout the United States." *Id.*

Klayman further alleges that in 2003, he decided to leave Judicial Watch in order to run for a seat in the United States Senate from his home state of Florida. *Id.* ¶¶ 5-6. As a result, Klayman entered into severance negotiations with Fitton, Orfanedes, and Farrell. *Id.* ¶ 7. On September 19, 2003, Klayman entered into a detailed Severance Agreement, signed by Klayman and Fitton, on behalf of Judicial Watch, and attested to by Orfanedes, as Corporate Secretary of Judicial Watch. *Id.*; Defs.' Judicial Watch and Fitton Mot. to Dismiss Second Am. Compl. (hereinafter "Fitton/JW Mot. to Dismiss"); Ex. 1 (9/19/03 Severance Agreement). In addition, Klayman alleges that before he left Judicial Watch, he discovered that, contrary to representations Fitton had previously made, Fitton had not obtained an undergraduate degree. *Id.* ¶ 8. As a result, Klayman alleges that, "[a]s a condition to his signing the Severance Agreement and stepping down from Judicial Watch, Klayman insisted, and Fitton agreed, to have Judicial Watch hire a qualified person to become Chairman." *Id.* ¶ 10.

C. *Events Subsequent to Klayman's Departure from Judicial Watch*

Klayman alleges that, "[i]nstead of taking the steps he promised to find a distinguished and qualified Chairman to run Judicial Watch, Fitton has solely acted to entrench himself as head of Judicial Watch," and that as a result, "today there is no Chairman, and Fitton controls Judicial Watch." *Id.* ¶¶ 11-12. Klayman further alleges that, since Klayman's departure from Judicial Watch, Fitton has mismanaged Judicial Watch and misled "Klayman and others to promote his personal agenda, interests, and political ideology to the detriment of Judicial Watch, Klayman, and Judicial Watch's donors and supporters." *Id.* ¶¶ 13-14. Klayman also alleges that Judicial

Watch, Fitton, Orfanedes, and Farrell have "defamed, disparaged and cast Klayman in a false

light to denigrate Klayman, and in an effort to undermine Klayman's ability to return to the helm

of Judicial Watch or compete with Judicial Watch in the future." *Id.* ¶ 16.

In addition, Klayman alleges that, more than a month after he stepped down as Chairman

and General Counsel of Judicial Watch, Fitton caused Judicial Watch to send a fund-raising letter

that falsely represented that Klayman was still Chairman and General Counsel of Judicial Watch,

and used Klayman's name and image without permission. *Id.* ¶ 48; Ex. A (10/03 Judicial Watch

Verdict mailing). Klayman alleges that this mailing created confusion among donors, who

mistakenly sent donations to Judicial Watch, believing that Klayman was still running Judicial

Watch. *Id.* ¶ 49.

### D. *Benson's Donation to Judicial Watch*

Plaintiffs allege that in November 2002, while Klayman was still Chairman and General

Counsel of Judicial Watch, Judicial Watch began a campaign to raise funds to purchase the

building in which Judicial Watch's headquarters was located. *Id.* ¶ 50. As a result, Judicial

Watch sent solicitations to potential donors, including Benson. *Id.*; Ex. B (copy of solicitation

sent to Benson). Benson alleges that, relying on representations made in that solicitation that the

money raised would be used to purchase the Judicial Watch headquarters building, she pledged

$50,000 to Judicial Watch and paid $15,000 up front to Judicial Watch. *Id.* ¶ 51. In addition,

Benson alleges that she entered into an agreement with Judicial Watch that, as consideration for

her $50,000 pledge and $15,000 up-front payment, Judicial Watch would name the President's

Office in the headquarters after Benson, and that Judicial Watch further agreed that after

purchasing the building, Judicial Watch would place a plaque on the President's Office

5

recognizing Benson's contribution.  *Id.* ¶¶ 81-83.

Benson alleges that, after Klayman's departure from Judicial Watch, "Fitton caused Judicial Watch to cease actively pursuing the purchase of the Building, but concealed that fact from Benson and other similarly situated donors and supporters of Judicial Watch."  *Id.* ¶ 53. Indeed, Benson alleges "on information and belief" that "Fitton caused Judicial Watch to commingle with Judicial Watch's operating funds, or misuse in other ways, the approximately $1.4 million raised from Benson and others."  *Id.* ¶ 56.  Nevertheless, Benson alleges, Judicial Watch published newsletters in February 2005 and September 2005 which led Benson and other donors to believe that Judicial Watch was actively pursuing the purchase of the headquarters building and maintaining donations in a segregated, interest-bearing account.  *Id.* ¶¶ 55, 57; Exs. C (2/05 Judicial Watch Verdict) and D (9/05 Judicial Watch Verdict).  Benson specifically alleges that when she questioned Judicial Watch about the status of her donation and Judicial Watch's attempts to purchase the headquarters building, Judicial Watch fund-raiser Robert G. Mills "deliberately misrepresented that Judicial Watch was actively attempting to purchase the Building."  *Id.* ¶¶ 60-61.

### E.    *Plaintiffs' Second Amended Complaint*

Plaintiffs filed their initial Complaint against Defendants Judicial Watch and Fitton on April 12, 2006, and thereafter filed an Amended Complaint against Judicial Watch and Fitton on May 1, 2006.  Plaintiffs filed their Second Amended Complaint on June 14, 2006, in which they maintained the same nine Counts, but added Defendants Orfanedes and Farrell.  Counts One, through Three of Plaintiffs' Second Amended Complaint are brought by Plaintiff Benson, while Counts Four through Nine of Plaintiffs' Second Amended Complaint are brought by Plaintiff

Klayman.

In Count One, Benson claims Fraudulent Misrepresentation against Fitton and Judicial
Watch, alleging that Fitton and Judicial Watch misrepresented that they intend to use Benson's
money to purchase a headquarters for Judicial Watch, despite having taken no steps to purchase
the building, in order to induce Benson from demanding a refund of her donation.  SAC ¶¶ 68-
78.  In Count Two, Benson claims Breach of Contract solely against Judicial Watch, alleging that
by not purchasing a building for Judicial Watch headquarters, Judicial Watch breached its
agreement offering Benson naming rights to the President's Office in consideration for her
pledge of $50,000 and contribution of $15,000.  *Id.* ¶¶ 79-88.  In Count Three, Benson claims
Unjust Enrichment solely against Judicial Watch, alleging that Judicial Watch accepted and used
the benefit of Benson's $15,000 contribution, which she made in the belief that Judicial Watch
would purchase the headquarters building and provide her with naming rights.  Count Three
further alleges that Benson "conferred a substantial benefit upon Judicial Watch in an amount in
excess of $65,000" through support services she provided Judicial Watch "with the expectation
that Fitton and others would act honestly and ethically toward her and to the public generally."
*Id.* ¶¶ 89-96.

Counts Four and Five are brought by Klayman against all Defendants, and relate to the
fund-raising mailing sent by Judicial Watch a month after Klayman's departure which allegedly
misrepresented that Klayman was still Chairman and General Counsel of Judicial Watch.  Count
Four alleges that the mailing constituted false designation of origin, false and misleading
descriptions, false and misleading representations, false and misleading advertising, and other
acts of unfair competition, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §

1125(a)(1)(A) and (B).  *Id.* ¶¶ 97-106.  Count Five alleges that the mailing constituted an

unauthorized use of Klayman's name and likeness, in violation of Florida Statute § 540.08.  *Id.*

¶¶ 107-114.

Counts Six, Seven, and Eight are brought by Klayman solely against Judicial Watch and

seek three separate remedies for Breach of Contract – rescission, damages, and specific

performance.  Count Six alleges that Judicial Watch willfully breached the Severance Agreement

by (1) defaming, disparaging and casting Klayman in a false light to the public and the media; (2)

failing to pay Klayman the full amount due under the Severance Agreement; (3) failing to return

all of Klayman's property; (4) failing to take affirmative steps to purchase the Judicial Watch

headquarters building and remove Klayman as guarantor for the Judicial Watch lease; and (5)

failing to find a suitable successor for Klayman as Chairman of Judicial Watch.  *Id.* ¶¶ 33-47;

115-132.  Klayman alleges that these "deliberate misrepresentations materially induced [him] to

enter into the Severance Agreement," and further claims that in light of Judicial Watch's

pervasive breaches of the Severance Agreement, monetary damages would be inadequate.  *Id.* ¶¶

133-135.  As a result, Klayman claims that the Severance Agreement must be rescinded, with

Klayman restored to his position as Chairman of Judicial Watch.  *Id.* ¶¶ 135-137.

Count Seven incorporates by reference Klayman's previous allegations and seeks

damages for Judicial Watch's alleged breach of the Severance Agreement.  *Id.* ¶¶ 138-140.

Count Eight seeks specific performance as a remedy for Judicial Watch's alleged breach of the

Severance Agreement, incorporating by reference Klayman's previous allegations, and further

alleging that Judicial Watch has breached the Severance Agreement by: (1) failing to remove

Klayman as guarantor for all credit card accounts; and (2) failing to provide Klayman access to

documents. *Id.* ¶¶ 141-147.

Finally, Klayman brings Count Nine against all Defendants for Defamation. Under the heading "Count Nine" of the Second Amended Complaint, Klayman describes three allegedly defamatory publications. First, Klayman alleges that, in its 2003 and 2004 Form 990 tax returns, Judicial Watch knowingly published false and misleading statements that Klayman owed Judicial Watch certain monies, and that Judicial Watch subsequently published the false tax returns on its website. *Id.* ¶¶ 66, 150-151. Second, Klayman alleges that, in response to his filing of the initial Complaint in this action, Fitton and Judicial Watch knowingly sent a false statement to Judicial Watch employees claiming that Klayman filed this action because he owed Judicial Watch a significant sum of money. *Id.* ¶ 154. Klayman alleges that when they published the false and misleading statement, "all Defendants knew that Klayman did not, individually, owe Judicial Watch any money." *Id.* ¶ 155. Third, Klayman alleges that Fitton and Judicial Watch published knowingly false statements in a number of media outlets, including *The Washington Post*, *The Washington Times*, *World NetDaily.com*, and *Slate.com*, by telling reporters that "Klayman filed his suit as a 'tactical maneuver designed to distract attention away from the fact that Klayman owes **more than a quarter of a million dollars to Judicial Watch**.'" *Id.* ¶¶ 156-157 (emphasis in original).

In addition, elsewhere in the Second Amended Complaint, under the heading "Defamation, Disparagement of Klayman and Misrepresentation," Klayman alleges that Fitton has caused Judicial Watch to disparage and defame Klayman "in violation of the Severance Agreement" by allegedly doctoring press quotations originally made about Klayman so that they refer to Judicial Watch instead, and then posting these false statements on the Judicial Watch

website.  *Id.* ¶ 65.  It is unclear whether these allegations support Klayman's three Counts for breach of contract or instead relate to Count Nine, Klayman's claim for defamation.

On June 28, 2006, Defendants Fitton and Judicial Watch filed a Motion to Dismiss Counts One, Two, Three, Four, Five, Six, and Nine of Plaintiffs' Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  The Motion to Dismiss brought by Defendants Fitton and Judicial Watch did not address Count Seven, Klayman's claim for damages based on breach of the Severance Agreement, or Count Eight, Klayman's claim for specific performance based on breach of the Severance Agreement.[2]  Plaintiffs filed their Opposition to the motion to dismiss brought by Defendants Fitton and Judicial Watch (hereinafter "Pls' Opp'n to Fitton/JW Mot.") on August 8, 2006, and Defendants Fitton and Judicial Watch filed their reply (hereinafter "Fitton/JW Reply") on September 1, 2006.  Plaintiffs subsequently filed a motion for leave to file a sur-reply on September 14, 2006, which all Defendants opposed on September 22, 2006.

Also on June 28, 2006, Defendants Fitton and Judicial Watch filed a Motion to Sever the Claims of Plaintiff Benson from the Claims of Plaintiff Klayman, pursuant to Federal Rule of Civil Procedure 20(a) and Local Civil Rule 7.1, as well as a Motion to Strike portions of the Second Amended Complaint, pursuant to Federal Rule of Civil Procedure 12(f).  *See* Mot. to Sever; Mot. to Strike.  Plaintiffs opposed each of these motions on August 7, 2006, and Fitton and Judicial Watch filed their replies in further support of these motions on September 1, 2006.

Furthermore, on July 10, 2006, Defendants Orfanedes and Farrell filed a separate Motion

---

[2]  The Court notes that on December 26, 2006, all Defendants filed a Motion for Summary Judgment as to Klayman's breach of contract claims, Counts Six, Seven, and Eight of the Second Amended Complaint.  That Motion for Summary Judgment is not yet ripe.

to Dismiss the Second Amended Complaint (hereinafter "Orfanedes/Farrell Mot. to Dismiss"), in

which they expressly join the Motion to Dismiss previously filed by Defendants Fitton and

Judicial Watch as to the substance of those Counts in which they were named as defendants

(Count Four - Violation of the Lanham Act; Count Five - Violation of Florida Statute 540.08;

and Count Nine - Defamation).  In addition, Defendants Orfanedes and Farrell argue that

Klayman's claims against them should be dismissed because the allegations contained in the

Second Amended Complaint fail to support individual liability on their parts.  *See generally*

Orfanedes/Farrell Mot. to Dismiss.  Plaintiffs filed their Opposition to that motion on August 7,

2006 (hereinafter "Pls' Opp'n to Orfanedes/Farrell Mot."), and Defendants Orfanedes and Farrell

filed their Reply on September 1, 2006 (hereinafter "Orfanedes/Farrell Reply").

## II: LEGAL STANDARDS

In evaluating a motion to dismiss for failure to state a claim made pursuant to Federal

Rule of Civil Procedure 12(b)(6), "the Court must construe the complaint in the light most

favorable to plaintiff and must accept as true all reasonable factual inferences drawn from well-

pleaded factual allegations."  *In re United Mine Workers of Am. Employee Benefit Plans Litig.*,

854 F. Supp. 914, 915 (D.D.C. 1994); *see also Schuler v. United States*, 617 F.2d 605, 608 (D.C.

Cir. 1979) ("The complaint must be 'liberally construed in favor of the plaintiff,' who must be

granted the benefit of all inferences that can be derived from the facts alleged.").  While the

Court must construe the complaint in the Plaintiff's favor, it "need not accept inferences drawn

by [the] plaintif[f] if such inferences are unsupported by the facts set out in the complaint."

*Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).  Moreover, the

Court is not bound to accept the legal conclusions of the non-moving party.  *See Taylor v. FDIC*,

132 F.3d 753, 762 (D.C. Cir. 1997).  The Court is limited to considering facts alleged in the complaint, any documents attached to or incorporated in the complaint, matters of which the court may take judicial notice, and matters of public record.  *See EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997); *Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 n.6 (D.C. Cir. 1993).  Factual allegations in briefs of memoranda of law may not be considered when deciding a Rule 12(b)(6) motion, particularly when the facts they contain contradict those alleged in the complaint.  *Henthorn v. Dep't of Navy*, 29 F.3d 682, 688 (D.C. Cir. 1994); *cf. Behrens v. Pelletier*, 516 U.S. 299, 309 (1996) (when a motion to dismiss is based on the complaint, the facts alleged in the complaint control).

### III: DISCUSSION

*A.      Motion to Dismiss Brought by Defendants Judicial Watch and Fitton*

Defendants Fitton and Judicial Watch argue that Counts One, Two, Three, Four, Five, Six, and Nine of the Second Amended Complaint should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  For their part, Plaintiffs contend that the allegations contained in each of the challenged counts are sufficient to state a cause of action, and that dismissal is therefore inappropriate.  The Court shall address each of the challenged counts in turn.

*1.      Plaintiff Benson's Claims - Counts One, Two, and Three*

Plaintiff Benson brings claims of fraudulent misrepresentation, breach of contract, and unjust enrichment, alleging that she pledged $50,000 to Judicial Watch, $15,000 of which she donated up front, in reliance on representations made by Judicial Watch while Klayman was still Chairman and General Counsel that the money she contributed would be used to purchase the

building housing Judicial Watch's headquarters. SAC ¶¶ 50-51. Benson further alleges that she

entered into an agreement with Judicial Watch that, as consideration for her pledge and

contribution, she would receive naming rights to the President's Office in the headquarters

building. *Id.* ¶¶ 81-83. Benson alleges that Judicial Watch and Fitton have continued to

represent to her and other donors, in mailings and orally, that they are actively working to

purchase the headquarters building, despite the fact that they have ceased actively pursuing the

purchase of the building. *Id.* ¶¶ 53-61. In addition, Benson alleges that she provided Judicial

Watch with support services worth in excess of $65,000 "with the expectation that Fitton and

others would act honestly and ethically toward her," but that Fitton and others have failed to do

so. *Id.* ¶¶ 89-96. Defendants Fitton and Judicial Watch argue that Benson's allegations fail to

state a claim for fraudulent misrepresentation, breach of contract, or unjust enrichment.

### a.     Count One - Fraudulent Misrepresentation

To state a claim for fraudulent misrepresentation, Benson must show "(1) a false

representation (2) made in reference to a material fact, (3) with knowledge of its falsity, (4) with

the intent to deceive, and (5) an action that is taken in reliance upon the representation." *Chedick

v. Nash*, 151 F.3d 1077, 1081 (D.C. Cir. 1998) (citing *Hercules & Co., Ltd. v. Shama Restaurant

Corp.*, 613 A.2d 916, 923 (D.C. 1992)). To prevail, Benson must also show that she has

"suffered some injury as a consequence of [her] reliance on the misrepresentation." *Id.* (citing

*Dresser v. Sunderland Apartments Tenants Ass'n, Inc.*, 465 A.2d 835, 839 (D.C. 1983)). Fitton

and Judicial Watch argue that, because Benson alleges that she made her pledge and contribution

in reliance on representations made by Judicial Watch while Klayman was still Chairman and

General Counsel, *see* SAC ¶¶ 50-51, she does not allege detrimental reliance on any

misrepresentation by either Fitton or Judicial Watch. Fitton/JW Mot. to Dismiss at 4-5. Fitton

and Judicial Watch further argue that Benson does not allege detrimental reliance because she

does not allege any deadline by which Judicial Watch was required to purchase a headquarters

building. *Id.*

        Benson's allegations are sufficient to state a claim for fraudulent misrepresentation.

Benson specifically alleges that after Klayman left, Judicial Watch ceased actively pursuing the

purchase of a headquarters building. SAC ¶ 53. Nevertheless, Benson alleges, Judicial Watch

published newsletters in February and September 2005 representing that Judicial Watch was

actively pursuing the purchase of a headquarters building, and a Judicial Watch fund-raiser told

Benson that Judicial Watch was actively pursuing the purchase when Benson inquired as to the

status of her donation. *Id.* ¶¶ 55-61. Benson further alleges that Fitton and Judicial Watch knew

that these representations were fraudulent, and made these misrepresentations to induce Benson

and other donors not to seek a return of their donations. *Id.* ¶¶ 75-76. Notwithstanding the

argument made by Fitton and Judicial Watch that Judicial Watch never committed to purchase a

headquarters building by a date certain, Benson states a claim for fraudulent misrepresentation by

alleging that Judicial Watch specifically misrepresented that it was actively pursuing the

purchase of the building, when it had actually ceased to do so, in order to prevent Benson from

seeking a return of her donation.

        Benson's claim for fraudulent misrepresentation is, however, limited to her allegation that

she did not seek a return of her $15,000 donation. Benson does not allege that she ever donated

the additional $35,000 she pledged to Judicial Watch, and as such cannot demonstrate

detrimental reliance with respect to that amount. *See* SAC; Ex. B at 40 (list of Benson donations

totaling $15,000 to Judicial Watch, indicating that last donation dated 7/24/03).

                           *b.*       *Count Two - Breach of Contract*

      Fitton and Judicial Watch make three arguments with respect to Benson's claim for breach of contract.  First, they argue that, rather than being consideration for an agreement, Benson's donation was a gift that was complete upon delivery.  Fitton/JW Mot. to Dismiss at 5-6.  Second, they argue that Benson's failure to donate the additional $35,000 she pledged to Judicial Watch constitutes a breach of contract that precludes her from enforcing the terms of the contract she alleges.  *Id.* at 6-7.  Finally, they argue that because Benson does not allege that Judicial Watch committed to purchase a headquarters building by a date certain, her claim for breach of contract is not yet ripe.  *Id.* at 7-8.  Fitton and Judicial Watch's second two arguments merit little attention.  Benson has alleged that she entered into an agreement with Judicial Watch whereby she pledged $50,000 and donated $15,000 up front in order to secure naming rights to the President's Office.  SAC ¶¶ 50-51, 81-83.  Benson specifically alleges that she "made her pledge solely on the condition that Judicial Watch was and would continue to actively pursue the purchase of the [headquarters] Building."  *Id.* ¶ 52.  Construing these allegations in the light most favorable to Benson, she has alleged that she entered into a conditional agreement with Judicial Watch, which Judicial Watch breached by failing to actively pursue the purchase of a headquarters building, and further that Judicial Watch's breach relieved her of her obligation to donate the additional $35,000 she had pledged.

      Fitton and Judicial Watch's argument that Benson's $15,000 donation was a gift is more compelling, but nevertheless ultimately unsuccessful at the motion to dismiss stage.  As Fitton and Judicial Watch acknowledge, under the law of the District of Columbia, the essential

elements of a valid *inter vivos* gift are donative intent, delivery, and acceptance. *Zoob v. Jordan*,

841 A2d 761, 765 (D.C. 2004); *see also Murray v. Gadsden*, 197 F.2d 194 (D.C. Cir. 1952).

Moreover, "to prove donative intent, it must be shown from the evidence that the donor clearly

and unmistakenly intended to permanently relinquish all interest in and control over the gift."

*Zoob*, 841 A.2d at 765 (citing *Ross v. Fierro*, 659 A.2d 234, 239 (D.C. 1995)).  Benson clearly

alleges that she did not intend her $15,000 donation to Judicial Watch to be a gift, but rather

intended it as payment in consideration for naming rights in the Judicial Watch headquarters.

SAC ¶¶ 50-51, 81-83.  Whether Benson, in fact, intended to make a gift is therefore a question of

fact that cannot be resolved on a motion to dismiss.  *See Nwaoha v. Onyeoziri*, Civ. A. No. 04-

1799 (GK), 2006 WL 3361540, *3 (D.D.C. Nov. 20, 2006).

### c.  Count Three - Unjust Enrichment

Unjust enrichment is a quasi-contractual claim, which requires Benson to show that

Judicial Watch was unjustly enriched at her expense and that the circumstances are such that in

good conscience Judicial Watch should make restitution.  *News World Commc'ns , Inc. v.

Thompsen*, 878 A.2d 1218, 1222 (D.C. 2005) (citing *Vereen v. Clayborne*, 623 A.2d 1190, 1194

(D.C. 1993)).  However, where the recipient of a benefit was under no notice that the person

conferring a benefit expected payment in exchange, no injustice can be shown.  *See H.G. Smithy

Co. v. Washington Med. Ctr.*, 374 A.2d 891, 895 (D.C. 1977).  Benson alleges that she entered

into an agreement with Judicial Watch whereby she would receive naming rights in the Judicial

Watch headquarters.  SAC ¶¶ 50-51, 81-83.  Her allegations regarding her $15,000 contribution

to Judicial Watch are thus sufficient to state a claim for unjust enrichment because she alleges

that Judicial Watch was on notice that she expected them to actively pursue the purchase of a

16

headquarters building in exchange for her donation.

Benson also alleges, however, that she "conferred a substantial benefit upon Judicial Watch" by providing support services worth at least $65,000 to the organization "with the expectation that Fitton and others would act honestly and ethically toward her." *Id.* ¶ 95.  Fitton and Judicial Watch correctly argue that this allegation does not state a claim for unjust enrichment because Benson does not allege that Judicial Watch had notice that she expected to be paid for her support services if Fitton and others did not live up to Benson's expectations regarding their conduct.  *See* Fitton/JW Mot. to Dismiss at 7-9.  Instead, Benson alleges that, at some unspecified time, she volunteered her services to Judicial Watch and that she now believes that "Fitton and Judicial Watch have not acted properly by deliberately misleading donors and improperly converting Judicial Watch into a partisan organization."  SAC ¶ 96.  These allegations are entirely insufficient to demonstrate that "the circumstances were such that in good conscience [Judicial Watch] should make restitution."  *News World Commc'ns*, 878 A.2d at 1222; *Vereen*, 623 A.2d at 1194.  As Benson cannot maintain a claim for unjust enrichment based on the support services she allegedly provided to Judicial Watch, her claim for unjust enrichment, like her claims for fraudulent misrepresentation and breach of contract, are limited to the $15,000 she allegedly donated to Judicial Watch.

### d.    This Court Lacks Jurisdiction Over Plaintiff Benson's Claims

"When it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, it shall dismiss the action."  Fed. R. Civ. P. 12(h)(3).  Moreover, "[i]f a court determines that it lacks subject matter jurisdiction, it therefore is duty bound to dismiss the case on its own motion."  *Hawk v. Olson*, 326 U.S. 271, 272. 66 S. Ct. 116, 90 L. Ed. 61 (1945).

As discussed above, Benson's allegations are sufficient to state claims for fraudulent

misrepresentation, breach of contract, and unjust enrichment; however, each of those claims is

limited to Benson's allegations regarding the $15,000 she donated to Judicial Watch. Benson's

claims therefore do not establish that the amount in controversy exceeds $75,000, as is required

for this Court to exercise diversity jurisdiction under 28 U.S.C. §1332(a).

The Court is aware that in *Exxon Mobil Corporation v. Allapattah Services, Inc.*, 545

U.S. 546, 125 S. Ct. 2611, 162 L. Ed. 2d 502 (2005), the Supreme Court declared:

> If the court has original jurisdiction over a single claim in the complaint, it has
> original jurisdiction over a "civil action" within the meaning of § 1367(a), even if
> the civil action over which it has jurisdiction comprises fewer claims than were
> included in the complaint. Once the court determines it has original jurisdiction
> over the civil action, it can turn to the question whether it has a constitutional and
> statutory basis for exercising supplemental jurisdiction over the other claims in
> the action.

*Exxon Mobil*, 545 U.S. at __, 125 S. Ct. at 2620-21. Here, Plaintiff Klayman alleges damages

totaling at least $3,500,000. *See* SAC at 32-33.[3] As a result, if Klayman's claims meet the

amount in controversy requirement of 28 U.S.C. § 1332(a), the Court has original jurisdiction

over the instant "civil action," and may, if proper, exercise supplemental jurisdiction over

Benson's claims.

Pursuant to 28 U.S.C. § 1367(a), a district court that has original jurisdiction over a civil

action "shall have supplemental jurisdiction over all other claims that are so related to claims in

---

[3] The Court shall not, at this point, address whether Klayman has, in fact, stated a claim
with respect to each Count comprising his total alleged damages, but rather shall assume that
Klayman's claims meet the amount in controversy requirement and continue to determine
whether the Court has a "constitutional and statutory basis for exercising supplemental
jurisdiction" over Benson's claims. *Exxon Mobil*, 545 U.S. at __, 125 S. Ct. at 2620-21.

18

the action . . . that they form part of the same case or controversy under Article III of the United

States Constitution." 28 U.S.C. § 1367(a). The Court of Appeals for the District of Columbia

Circuit has stated that "it is clear that section 1367(a) authorizes a district court to exercise its

supplemental jurisdiction in mandatory language." *Lindsay v. Gov't Employees Ins. Co.*, 448

F.3d 416, 421 (D.C. Cir. 2006) (citing, *inter alia*, *McCoy v. Webster*, 47 F.3d 404, 406 n. 3 (11th

Cir. 1995) ("Section 1367(a) *requires* the district court to exercise supplemental jurisdiction over

claims which are closely related to claims over which the district court has original jurisdiction.")

(emphasis in *Lindsay*)). However, 28 U.S.C. § 1367(a) also provides bases on which a district

court may decline to exercise supplemental jurisdiction, including that "the 'other' claims are *not*

'so related' to the claims within the court's original jurisdiction that they constitute part of the

same 'case or controversy.'" *Lindsay*, 448 F.3d at 421 (emphasis in original).

 The Court concludes that, even if this Court properly has original jurisdiction over

Klayman's claims, Benson claims are not "so related" to Klayman's claims as to form part of the

same "case or controversy" because the two Plaintiffs' claims do not "derive from a common

nucleus of operative fact." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725, 86 S. Ct.

1130, 16 L. Ed. 2d 218 (1966). Benson's claims relate solely to her allegations that she donated

$15,000 to Judicial Watch based on representations that her contribution would be used to

purchase a headquarters building and that she would receive naming rights in the building. In

contrast, Klayman's claims arise out of a wide range of events, including the negotiation and

signing of the Severance Agreement, Judicial Watch's subsequent mailing of allegedly

misleading fund-raising materials, Judicial Watch's alleged efforts to defame and disparage

Klayman once he departed, and Judicial Watch's various alleged breaches of the Severance

Agreement. As such, Klayman and Benson's claims cannot be said to "derive from the same nucleus of operative fact" and are not "so related" to each other as to form part of the same "case or controversy." The Court therefore declines to exercise supplemental jurisdiction over Benson's claims and, as a result, shall dismiss without prejudice Counts One, Two, and Three of the Second Amended Complaint for lack of subject matter jurisdiction.

        2.     *Plaintiff Klayman's Claims - Counts Four, Five, Six, and Nine*

           a.     *Count Four - Violation of the Lanham Act*

Plaintiff Klayman alleges that, more than a month after he stepped down as Chairman and General Counsel of Judicial Watch, Fitton caused Judicial Watch to send a fund-raising letter which falsely represented that Klayman was still Chairman and General Counsel of Judicial Watch and used Klayman's name and image without permission. *Id.* ¶ 48; Ex. A (10/03 Judicial Watch Verdict mailing). Klayman alleges that this mailing created confusion among donors, who mistakenly sent donations to Judicial Watch, believing that Klayman was still running Judicial Watch. *Id.* ¶ 49. Furthermore, Klayman alleges that he "is a celebrity within the non-profit legal/political community" and is "widely recognized, both nationally and internationally, as the leading figure in the world of government and judicial oversight and public 'watchdog' groups." *Id.* ¶ 101. As a result, Klayman alleges that Defendants knowingly used his name and likeness on fund-raising materials a month after he stepped down as Chairman of Judicial Watch, thereby violating Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a)(1)(A) and (B). *Id.* ¶¶ 97-106.

Section 43(a) of the Lanham Act provides, in relevant part, as follows:

Any person who, in connection with any goods or services . . . uses in commerce

20

> any word, term, name, symbol, or device, or any combination thereof . . . which –
>
>> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>>
>> (B) in commercial advertising or promotion misrepresents the nature, characteristics, qualities, or geographic origin of his or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. §1125(a).  In Count Four, Klayman claims that the allegedly misleading mailing violated both prongs of the Lanham Act – the "false endorsement" prong, Section 43(a)(1)(A), and the "false advertising" prong, Section 43(a)(1)(B).  SAC ¶ 98.  Although Fitton and Judicial Watch interpret Klayman's claim as one asserting false endorsement under Section 43(a)(1)(A), *see* Fitton/JW Mot. to Dismiss at 11, they do not challenge his standing to bring a cause of action under the false advertising prong, Section 43(a)(1)(B).  Nevertheless, the Court notes that this Circuit has not addressed whether a celebrity may bring a claim under Section 43(a) of the Lanham Act based on misleading or deceptive use of their name or likeness, and that the two Circuits and various District Courts that appear to have addressed the issue have allowed such claims to be brought under Section 43(a)(1)(A), the false endorsement prong of Section 43(a) of the Lanham Act.  *See, e.g.*, *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 812 (9th Cir. 1997); *Parks v. LaFace Records*, 329 F.3d 437, 445-46 (6th Cir. 2003); *Albert Fürst von Thurn und Taxis v. Karl Prince von Thurn und Taxis*, No. 04 Civ. 6107 (DAB), 2006 WL 2289847, * 10-11 (S.D.N.Y. Aug. 8, 2006).  As a result, the Court shall consider whether Klayman states a claim for false endorsement in violation of Section 43(a)(1)(A) of the Lanham Act.

"Celebrities have standing to sue under § 43(a) because they possess an economic interest in their identities akin to that of a traditional trademark holder." *Parks*, 329 F.3d at 445 (citing *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1110 (9th Cir. 1992)). "A celebrity has a . . . commercial investment in the 'drawing power' of his or her name and face in endorsing products and in marketing a career," *Allen v. National Video, Inc.*, 610 F. Supp. 612, 625 (S.D.N.Y. 1985), which has been compared to the "property interest" of a trademark holder, *Parks*, 329 F.3d at 447. Fitton and Judicial Watch do not dispute that celebrities, in general, may bring false endorsement claims under Section 43(a) of the Lanham Act, and for purposes of their motion to dismiss they accept, as the Court must, Klayman's allegations that he is a "celebrity within the non-profit legal/political community" and is "widely recognized, both nationally and internationally, as the leading figure in the world of government and judicial oversight and public 'watchdog' groups." *See* Fitton/JW Mot. to Dismiss at 11-12 (citing SAC ¶ 101). Instead, Fitton and Judicial Watch maintain that Klayman fails to state a claim for false endorsement because he does not claim "that his name and likeness have any uniquely exploitable commercial or economic value." *Id.* at 12. However, Fitton and Judicial Watch do not cite to the Court any legal authority – nor is the Court aware of any such authority – to support their argument that Klayman is required, in addition to alleging that he is a celebrity, to allege "that his name and likeness have [a] uniquely exploitable commercial or economic value."[4]

_____

[4] Fitton and Judicial Watch may have drawn the idea that Klayman is required to specifically allege "that his name and likeness have [a] uniquely exploitable commercial or economic value," Fitton/JW Mot. to Dismiss at 12, from *Allen v. National Video, Inc.*, in which the court stated that the familiarity of millions of people with Woody Allen's face and his "reputation for artistic integrity, have significant, exploitable, commercial value." *Allen*, 610 F. Supp. at 617. *Allen* does not state, however, that a plaintiff must specifically allege as much in order to maintain a claim of "false endorsement" under Section 43(a) of the Lanham Act.

The Second Amended Complaint includes the following allegations, which the Court finds sufficient to state a claim for false endorsement under Section 43(a) of the Lanham Act: (1) he is a "celebrity within the non-profit legal/political community" and is "widely recognized, both nationally and internationally, as the leading figure in the world of government and judicial oversight and public 'watchdog' groups," SAC ¶ 101; (2) Defendants "deliberately used Klayman's image and name to confuse donors into thinking that Klayman was still affiliated with Judicial Watch" and "to entice donors to continue giving donations to Judicial Watch," *id.* ¶¶ 103-104; and (3) the allegedly deceptive mailing "created confusion among donors" who "mistakenly sent donations to Judicial Watch," *id.* ¶ 49. As a result, the Court shall deny Fitton and Judicial Watch's motion to dismiss as to Count Four of the Second Amended Complaint. Furthermore, the Court's conclusion applies equally to Defendants Orfanedes and Farrell, insofar as they have joined in Fitton and Judicial Watch's motion to dismiss Count Four. The Court notes, however, that what Klayman must prove in order to succeed on a claim for false endorsement is far removed from what he must allege in order to survive a motion to dismiss. The Court does not opine at this time on whether Klayman will ultimately be required to prove that he has an economic interest in his name and likeness in order to prevail on a claim for false endorsement under Section 43(a) of the Lanham Act.

b.    *Count Five - Violation of Florida Statute § 540.08*

Count Five relates to the same mailing that forms the basis of Count Four, and alleges that the fund-raising mailing constituted an unauthorized use of Klayman's name and likeness without his "express written or oral consent." SAC ¶ 108. Klayman further alleges that these acts "were perpetrated and occurred both nationally and internationally" and that the "misuse of

23

Klayman's name and likeness were calculated to confuse donors into believing that Klayman was soliciting their donations." *Id.* at 108-109. Klayman alleges that Defendants' conduct constitutes a violation of Florida Statute § 540.08, which provides, "[n]o person shall publish, print, display or otherwise publicly use for purposes of trade or for any commercial or advertising purpose the name, portrait, photograph, or other likeness of any natural person without the express written or oral consent to such use given by (a) such person . . . ." Fla. Stat. § 540.08.

Fitton and Judicial Watch argue that Count Five must be dismissed because, as the alleged unauthorized mailing was sent in October 2003, Klayman's claim is barred by the District of Columbia's one-year statute of limitations for actions involving libel and slander. Fitton/JW Mot. to Dismiss at 14-16. Fitton and Judicial Watch initially argue that District of Columbia law applies to Count Five because "the parties executed a Severance Agreement on September 19, 2003 that contains a choice of law provision designating the laws of the District of Columbia as governing the relationship of the parties." *Id.* at 15. As Fitton and Judicial Watch admit, however, that choice of law provision provides that the "Agreement shall be governed by and construed in accordance with the laws of the District of Columbia, without regard to its conflict of laws principles." *Id.* While Fitton and Judicial Watch argue that "determination of [Klayman's claims under Florida Statute § 540.08] will necessarily involve the rights of the parties as set forth in the Severance Agreement," *id.*, that is not actually the case. Klayman does not claim that the alleged unauthorized mailing was a breach of the Severance Agreement, but rather alleges that it constituted an entirely separate statutory violation which is actionable under Florida law. The fact that the Severance Agreement is governed by District of Columbia law is therefore irrelevant to determining whether Klayman's claim for a violation of Florida Statute

24

§ 540.08 is barred by a District of Columbia statute of limitations.

Fitton and Judicial Watch next assert that application of the District of Columbia choice of law principles demonstrates that District of Columbia law applies because the "conduct alleged in Count Five of the Second Amended Complaint is analogous to a claim of libel and slander in the District of Columbia," which is governed by a one-year statute of limitations. *Id.* A federal court sitting in diversity must apply state law to the substantive issues before it. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 2d 1188 (1938). As the statute of limitations is considered substantive for this purpose, the Court looks to state law to determine whether Klayman's cause of action based on state law has expired, and applies the District of Columbia choice of law rules to determine which state's statute of limitations applies. *A.I. Trade Finance, Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1458 (D.C. Cir. 1995) (citing *Guaranty Trust Co. v. York*, 326 U.S. 99, 65 S. Ct. 1464, 89 L. Ed. 2079 (1945); *Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941); and *Lee v. Flintkote Co.*, 593 F.2d 1275, 1278-80 (D.C. Cir. 1979)). Furthermore, the District of Columbia choice of law rules "treat statutes of limitations as procedural, and therefore almost always mandate application of the District's own statute of limitations." *Id.* (citations omitted).

However, Fitton and Judicial Watch's argument that Klayman's claim under Florida Statute § 540.08 is barred by a District of Columbia statute of limitations posits a false conflict between the District of Columbia one-year statute of limitations for libel and slander and the four-year statute of limitations for actions brought under Florida Statute § 540.08. *See Epic Metals Corp. v. Condec, Inc.*, 867 F. Supp. 1009, 1015 (M.D. Fla. 1994) ("Because section 540.08 does not provide its own limitations period and the action does not fall within any of the

specific categories provided in Florida Statute § 95.11, the four year all inclusive statute of

limitations is applicable.") (citing Fla. Stat. § 95.11(3)(p)).  Under District of Columbia law,

appropriation of one's name or likeness is one theory on which a plaintiff may maintain a

common law tort cause of action for invasion of privacy, a tort which is governed by a one-year

statute of limitations.  *Grunseth v. Marriott Corp.*, 872 F. Supp. 1069, 1074 (D.C. Cir. 1995)

(citing *Vassiliades v. Garfinckel's, Brooks Bros.*, 492 A.2d 580, 586 (D.C. 1985) and *Doe v.

Southeastern University*, 732 F. Supp. 7, 8 (D.D.C. 1990), *appeal dismissed*, 927 F.2d 1257

(D.C. Cir. 1991)).

In contrast, Florida Statute § 540.08 specifically states, "[t]he remedies provided for in

this section shall be in addition to and not in limitation of the remedies and rights of any person

under the common law against the invasion of her or his privacy."  Fla. Stat. § 540.08(6).  The

District of Columbia one-year statute of limitations for common law claims of invasion of

privacy is therefore inapplicable to Klayman's claim under Florida Statute § 540.08 because that

statute is intended to create a cause of action above and beyond Klayman's rights under the

common law.  As a four-year statute of limitations therefore applies to Klayman's claim under

Florida Statute § 540.08, *see Epic Metals Corp.*, 867 F. Supp. at 1015, the Court shall deny

Fitton and Judicial Watch's motion to dismiss as to Count Five of the Second Amended

Complaint.[5]  Furthermore, insofar as Defendants Orfanedes and Farrell joined in Fitton and

---

[5]  The Court notes that, in proceeding with this action, it will require Klayman to provide
a satisfactory explanation as to why he should be allowed to invoke a Florida statute in this
action, when (1) the allegedly unauthorized mailing was sent from the District of Columbia; (2)
Klayman has opted to bring suit in the District of Columbia; and (3) his allegations of injury in
Florida flowing from the allegedly unauthorized mailing, while sufficient to withstand a motion
to dismiss for failure to state a claim, are sparse at best.  *Cf. Gritzke v. M.R.A. Holding, LLC*, No.
4:01CV496-RH, 2002 WL 32107540, *1 (N.D. Fla. Mar. 15, 2002) (denying motion to dismiss

Judicial Watch's motion to dismiss as to Count Five, the Court's conclusion applies equally to them.

> c.      *Count Six - Rescission for Breach of Contract*

In Count Six of the Second Amended Complaint, Klayman seeks rescission of the Severance Agreement, alleging various willful breaches of the Severance Agreement by Judicial Watch, and claiming that Judicial Watch's "deliberate misrepresentation" that an appropriate Chairman would be found to succeed Klayman "materially induced [him] to enter into the Severance Agreement." SAC ¶¶ 133-135. Klayman alleges that Fitton and Judicial Watch's breaches of the Severance Agreement are "so pervasive and widespread that monetary damages would be inadequate" and that as a result, the Severance Agreement must be rescinded, with Klayman restored to his position as Chairman of Judicial Watch. *Id.* ¶¶ 135-137. Fitton and Judicial Watch assert that Count Six must be dismissed for two reasons. First, they argue that Klayman cannot seek the equitable remedy of rescission because an adequate remedy at law is available to him. Fitton/JW Mot. to Dismiss at 26-27. Second, they argue that before seeking rescission, Klayman must restore Judicial Watch to its pre-contract position, a feat which Fitton and Judicial Watch maintain Klayman is not able to perform. The Court finds Fitton and Judicial Watch's arguments unavailing at the motion to dismiss stage.

Fitton and Judicial Watch correctly argue that it is a basic doctrine of equity jurisprudence that equitable relief will not be granted where the plaintiff has a complete and adequate remedy at law. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381, 112 S. Ct. 2031, 119 L. Ed. 2d

---

which argued that Florida Statute § 540.08 was inapplicable where videotape was made in Louisiana because plaintiff was a Florida resident who alleged that the videotape was advertised and sold in Florida).

27

157 (1992) (citing *O'Shea v. Littleton*, 414 U.S. 488, 499, 94 S. Ct. 669, 677-78, 38 L. Ed. 2d

674 (1974) and *Younger v. Harris*, 401 U.S. 37, 43-44, 91 S. Ct. 746, 750-51, 27 L. Ed. 2d 699

(1971)). However, while Klayman does seek damages for Judicial Watch's alleged breach of the

Severance Agreement in Count Seven of the Second Amended Complaint, in Count Six Klayman

alleges that monetary damages are inadequate and that rescission is necessary to prevent

continued harm to Klayman and Judicial Watch. SAC ¶¶ 135-36. The Court is bound to credit

Klayman's allegations on a motion to dismiss. While the equitable remedies of rescission and

specific performance may ultimately prove unnecessary or an inadvisable means of addressing

Judicial Watch's alleged breach of the Severance Agreement, the Court cannot conclude at this

stage of proceedings that they are entirely unavailable to Klayman.[6]

     Fitton and Judicial Watch are also correct that "inherent in the remedy of rescission is the

return of the parties to their pre-contract positions," such that, in order to seek rescission,

Klayman must restore Judicial Watch to its position at the time the Severance Agreement was

made. *Id.* at 915 (citing *Kent Homes, Inc. v. Frankel*, 128 A.2d 444, 446 (D.C. 1957). Fitton and

Judicial Watch argue that "[a]s a matter of law, Klayman is not able to restore Judicial Watch to

its pre-contract position" because Klayman received $600,000 pursuant to the Severance

---

[6] In allowing Klayman to pursue his claim for rescission, the Court notes that under the law of the District of Columbia, "[w]here a party to an executed contract discovers a material misrepresentation made in the execution of the contract, that party may elect one of two mutually exclusive remedies. He may either affirm the contract and sue for damages, or repudiate the contract and recover that with which he or she has parted." *Dean v. Garland*, 779 A.2d 911, 915 (D.C. 2001) (citing *Dresser*, 465 A.2d at 840). In the end, Klayman may not "rescind for breach of contract and at the same time recover damages for the breach." *Id.* (citations omitted). Although Klayman may set forth alternative claims for relief in his Second Amended Complaint, *see* Fed. R. Civ. P. 8(e)(2), and proceed on each claim past a motion to dismiss, he cannot ultimately receive double redress for a single wrong. *Id.* at 916 (citing *Giordano v. Interdonato*, 586 A.2d 714, 717 (D.C. 1991)).

Agreement, which he has not returned, and because, according to Fitton and Judicial Watch, the "many personnel, management and other" changes that have occurred in the three years since Klayman left Judicial Watch make it impossible for him to return to his former position as Chairman.  Fitton/JW Mot. to Dismiss at 28.  Fitton and Judicial Watch's second argument lacks merit because, while it may be uncomfortable at this point for Klayman to return to his position as Chairman of Judicial Watch, it is not "impossible" merely because the organization has changed in the past three years.  Their argument as to the monetary benefit that Klayman received under the Severance Agreement, however, has merit.  If Klayman ultimately opts to pursue a claim for rescission, he will be required to return to Judicial Watch the $600,000 he received under the Severance Agreement.  Nevertheless, Fitton and Judicial Watch do not cite the Court to authority – nor is the Court aware of such authority – indicating that Klayman is required to tender the monetary benefit he received at this juncture in order to maintain a cause of action for rescission.  As such, the Court shall deny Fitton and Judicial Watch's motion to dismiss as to Count Six of the Second Amended Complaint.[7]

### d.    Count Nine - Defamation

In Count Nine of the Second Amended Complaint, Klayman claims that "Judicial Watch, through Fitton, Orfanedes, Farrell and other agents and representatives . . . have defamed Klayman, by publishing false statements to various persons and entities . . .," SAC ¶ 149, and describes three allegedly defamatory publications, *id.* ¶¶ 148-162.  First, Klayman alleges that, in its 2003 and 2004 Form 990 tax returns, Judicial Watch knowingly published false claims that

---

[7] The Court shall leave further discussion of Count Six to its consideration of Defendants' not-yet-ripe Motion for Summary Judgment as to Counts Six, Seven, and Eight of the Second Amended Complaint, filed on December 26, 2006.

Klayman owed Judicial Watch money, and subsequently published the allegedly false and misleading tax returns on its website. *Id.* ¶¶ 66, 150-151. Second, Klayman alleges that Fitton and Judicial Watch knowingly sent a false statement to Judicial Watch employees claiming that Klayman filed this action because he owed Judicial Watch a significant sum of money. *Id.* ¶ 154. Third, Klayman alleges that Fitton and Judicial Watch published knowingly false statements in a number of media outlets, including *The Washington Post*, *The Washington Times*, *World NetDaily.com*, and *Slate.com*, because Defendants falsely told reporters that "Klayman filed his suit as a 'tactical maneuver designed to distract attention away from the fact that Klayman owes **more than a quarter of a million dollars to Judicial Watch**.'" *Id.* ¶¶ 156-157 (emphasis in original).

In addition, elsewhere in the Second Amended Complaint, Klayman alleges that Fitton has caused Judicial Watch to disparage and defame Klayman "in violation of the Severance Agreement" by allegedly doctoring press quotations originally made about Klayman so that they refer to Judicial Watch instead, and then posting these false statements on the Judicial Watch website. *Id.* ¶ 65. It is unclear whether these allegations provide support for Count Nine; however, Fitton and Judicial Watch address them in that context in their motion to dismiss. *See* Fitton/JW Mot. to Dismiss at 23-25. As such, in addition to discussing the three categories of allegedly defamatory statements described by Klayman in Count Nine, the Court shall consider whether Klayman's allegations that Judicial Watch doctored press quotations to remove references to Klayman state a claim for defamation.

"A statement is actionable in defamation under District of Columbia law if it is both false and defamatory." *Weyrich v. The New Republic, Inc.*, 235 F.3d 617, 627 (D.C. Cir. 2001) (citing

*Moldea v. New York Times Co.*, 15 F.3d 1137, 1142 (D.C. Cir. 1994), *rev'd in part on rhr'g*, 22

F.3d 310 (D.C. Cir. 1994).[8]  On a motion made pursuant to Federal Rule of Civil Procedure

12(b)(6), the Court must assume the falsity of any express or implied factual statements,

*Weyrich*, 235 F.3d at 623, and a statement is considered "defamatory 'if it tends to injure plaintiff

---

[8] The Court shall apply the District of Columbia law of defamation in assessing Klayman's Count Nine.  The Court notes that Defendants rely on District of Columbia law, *see* Fitton/JW Mot. to Dismiss at 16-26, and that Klayman does not actually argue that choice of law principles favor the application of Florida law, *see* Fitton/JW Reply at 6 n.3.  While Klayman does cite a single Florida case for the elements of defamation, he otherwise relies solely on District of Columbia law in opposing Fitton and Judicial Watch's motion to dismiss and states that "[a]ssuming the District of Columbia law applies to this intentional tort the required elements for the claim are the same as those required under Florida law."  Pls' Opp'n to Fitton/JW Mot. at 18 n.1.

Furthermore, although the parties have not briefed this issue, the Court concludes that applying the District of Columbia's governmental interest analysis test to determine the proper law of defamation to apply to this diversity action would likely lead as well to the application of District of Columbia law.  *See Weyrich*, 235 F.3d at 626 (citing *Klaxon*, 313 U.S. at 496, 61 S. Ct. 1020).  The governmental interest approach adheres to a two-step inquiry: 1) identifying the governmental policies underlying the applicable laws; and 2) determining which state's policy would be most advanced by having its law applied to the facts of this case.  *See Stutsman v. Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.*, 546 A.2d 367, 373 (D.C. 1988); *Williams v. Williams*, 390 A.2d 4, 6 (D.C. 1978).  To evaluate which state has the stronger interest, the four factors enumerated in the Restatement (Second) of Conflict of Laws § 145 are also considered: 1) the place where the injury occurred; 2) the place where the conduct causing the injury occurred; 3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and 4) the place where the relationship is centered.  *See Hercules*, 566 A.2d at 40-41.

Here, Klayman alleges various defamatory statements, including statements published by Judicial Watch on its website, presumably from its District of Columbia headquarters; statements made to members of the media, including *The Washington Post* and *The Washington Times*; and statements made to Judicial Watch employees, again presumably at the District of Columbia headquarters.  As a result, the majority of the alleged conduct causing Klayman's injury occurred in the District of Columbia.  In addition, Judicial Watch is headquartered in the District of Columbia, and the Klayman-Judicial Watch relationship is centered in the District of Columbia, where Klayman was employed by Judicial Watch.  While Klayman alleges that he is a resident of Florida and that, as such, harm to his reputation accrued in Florida, it appears that the District of Columbia's interest in this action is stronger.  The Court shall therefore apply the District of Columbia law of defamation in assessing Count Nine.  If the parties disagree with this conclusion, they are instructed to brief the issue completely in their next round of briefing.

31

in his trade, profession or community standing, or lower him in the estimation of the community," *id.* at 627 (quoting *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1293-94 (D.C. Cir. 1988)). "An allegedly defamatory remark must be more than unpleasant or offensive; the language must make the plaintiff appear odious, infamous, or ridiculous." *Weyrich*, 235 F.3d at 627 (citing *Howard Univ. v. Best*, 484 A.2d 958, 989 (D.C. 1989)).

Fitton and Judicial Watch assert, and Klayman does not contest, that the appropriate standard for defamation to apply in this case is that of a public person. *See* Fitton/JW Mot. to Dismiss at 16 n.6; Pls' Opp'n to Fitton/JW Mot. at 21. As the Supreme Court has explained,

> Those who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures . . . may recover for injury to reputation only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth.

*Gertz v. Welch*, 418 U.S. 323, 342, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974). However, as Klayman correctly notes, on a motion to dismiss made under Federal Rule of Civil Procedure 12(b)(6), the Court must assume that statements were made with knowledge of their falsity or disregard for their truth. *Weyrich*, 235 F.3d at 623. On this motion, the Court is therefore required only to decide whether the allegedly defamatory statements "(1) contain[] express or implied verifiably false statements of fact, which (2) are reasonably capable of defamatory meaning or otherwise place appellant in an offensive false light." *Id.* (citing *Moldea*, 15 F.3d at 1142-43; *Guilford Transp. Ind., Inc. v. Wilner*, 760 A.2d 580, 597 (D.C. 2000)).

### i.    Statements in Form 990 Tax Returns

Fitton and Judicial Watch argue that Klayman cannot state a claim for defamation based on the alleged false statements made in Judicial Watch's 2003 and 2004 Form 990 tax returns

32

because "[a]s a matter of law and of public policy, statements contained in mandatory governmental filings are absolutely privileged against claims for defamation, regardless of the existence or absence of actual malice." Fitton/JW Mot. to Dismiss at 17.[9]  In support of this assertion, Fitton and Judicial Watch point to the Restatement Second of Torts § 592A, which states that "[o]ne who is required by law to publish defamatory matter is absolutely privileged to publish it."  Restatement (Second) of Torts § 592A (1977).

As Fitton and Judicial Watch explain, IRS regulations provide that a 501(c)(3) non-profit organization like Judicial Watch "shall make its annual information returns . . . available for public inspection without charge in [its offices] during regular business hours."  Fitton/JW Mot. to Dismiss at 18; 26 C.F.R. § 301.6104(d)-1(a).  In addition, the regulations provide that Judicial Watch "shall provide a copy without charge . . . of all or any part of any application required to made available for public inspection under this paragraph to any individual who makes a request for such copy in person or in writing."  Id.  The regulations further provide that a 501(c)(3) organization is not required to comply with requests for copies of its annual information return if "the organization has made the requested document widely available," Fitton/JW Mot. to Dismiss at 18; 26 C.F.R. § 301.6104(d)-2(a), and specifically explain that a 501(c)(3)

---

[9] The Court notes that affirmative defenses, such as privilege, may be raised on a motion made pursuant to Federal Rule of Civil Procedure 12(b) "when the facts that give rise to the defense are clear from the face of the complaint."  Smith-Haynie v. District of Columbia, 155 F.3d 575, 578 (D.C. Cir. 1998).  Here, the Second Amended Complaint specifically alleges that Defendants published defamatory statements in their Form 990 tax returns, and made those returns available on the Judicial Watch website. SAC ¶¶ 66, 150-51.  As such, it is appropriate for Fitton and Judicial Watch to raise their affirmative defense on a motion to dismiss under Rule 12(b).  The Court further notes that Fitton and Judicial Watch's Seventeenth Affirmative Defense pled in their Answer to Plaintiffs' Second Amended Complaint is an affirmative defense of privilege as against Klayman's claim for defamation.  See Ans. of Defs. JW and Fitton to Pls' Second Am. Compl. at 11.

organization may make its annual information return "widely available" by posting it on the organization's webpage, Fitton/JW Mot. to Dismiss at 18; 26 C.F.R. § 301.6104(d)-2(b)(2). Fitton and Judicial Watch thus argue that "[w]hen Judicial Watch posted its Forms 990 on its website, it did so not on its own initiative, but in order to ensure compliance with the law" and that the "privilege for this type of compulsory publication is – and as a matter of public policy, must be – absolute." Fitton/JW Mot. to Dismiss at 18-19. Fitton and Judicial Watch further rely on *Goggins v. Hoddes*, 265 A.2d 302 (D.C. 1970), in which the District of Columbia Court of Appeals found that a report which an employer filed with the District Unemployment Compensation Board could not form the basis of an action for libel because the employer was required by law to file the report. *Id.* at 303.[10]

Klayman disputes Fitton and Judicial Watch's assertion that statements made in its Form 990 tax returns are absolutely privileged. Klayman concedes that Judicial Watch is required to make its annual information returns available for public inspection, but maintains that the decision to make a return widely available by posting it on the organization's website is elective rather than mandatory. Pls' Opp'n to Fitton/JW Mot. at 19-21 Klayman thus seeks to distinguish *Goggins* by arguing that in that case, the reports were required to be published and were to be kept confidential, whereas in the instant case, Klayman argues, the "publication was voluntary and broad." *Id.* at 19. However, the applicable regulations specifically provide that a

---

[10] Neither party has cited the Court to case law specifically addressing the issue of whether an absolute privilege applies to tax returns, nor did the Court locate such case law in its own research. The Court is aware that courts in other jurisdictions, in the context of other forms required by law to be submitted, have considered a qualified privilege appropriate. *See, e.g.*, *Dawson v. New York Life Ins. Co.*, 135 F.3d 1158 (7th Cir. 1998). However, the Court is aware of no precedent from this jurisdiction indicating that the privilege at issue is qualified rather than absolute.

34

501(c)(3) may, in lieu of complying with requests for copies of its annual information return, make the document "widely available," and that one permissible means of doing so is posting the document on the organization's webpage. 26 C.F.R. §§ 301.6104(d)-2(a), 2(b)(2). As such, in filing its Form 990 tax returns and posting them on the organization's website, Judicial Watch was performing a duty required by law in a means specifically permitted by the applicable regulations. Judicial Watch was therefore acting pursuant to its legal duty, and cannot be said to have "voluntarily" published allegedly defamatory material.

Moreover, Klayman's attempt to distinguish the instant case from *Goggins* on the grounds that the forms in *Goggins* were kept confidential and never published to outside parties is unavailing. To meet the element of publication in the context of defamation, "[i]t is not necessary that the defamatory matter be communicated to a large or even a substantial group of persons. It is enough that it is communicated to a single individual other than the one defamed." Restatement (Second) of Torts § 577 cmt. b (1977); *see also Steinbuch v. Cutler*, Civ. A. No. 05-0970 (PLF), 2006 WL 3060084 (D.D.C. Oct. 30, 2006) ("as used in connection with liability for defamation . . . '[p]ublication' can mean communication to a single person.") (citing Restatement (Second) of Torts § 652D cmt. a). As a result, the fact that Judicial Watch allegedly published defamatory material to anyone who visited the organization's website, while the defendant in *Goggins* published the allegedly defamatory form only to the District Unemployment Compensation Board, is a distinction of no legal consequence.

Finally, Klayman argues that there is "no privilege known to the common law of defamation protecting the intentional publication of false material," and as such, that Judicial Watch's Form 990 tax returns cannot be absolutely privileged because Klayman alleges that the

35

returns contain defamatory and ancillary information. Pls' Opp'n to Fitton/JW Mot. to Dismiss at 20-21. However, "the fact that the [returns were] defamatory (if [they were]) cannot determine the applicability of the privilege, since the very purpose of the privilege is to protect against liability for defamation." *Messina v. Krakower*, 439 F.3d 755, 760 (D.C. Cir. 2006) (addressing statements made in complaint in connection with applicability of litigation privilege). The Court shall therefore grant Fitton and Judicial Watch's motion to dismiss Count Nine insofar as it is based on allegedly defamatory statements made in Judicial Watch Form 990 tax returns.[11] Furthermore, the Court's conclusion applies equally to Defendants Orfanedes and Farrell, who joined in Fitton and Judicial Watch's motion to dismiss as to Count Nine.

### ii. Statement to Judicial Watch Employees

Fitton and Judicial Watch next argue that Klayman cannot maintain a claim for defamation based on an allegedly false statement sent by Defendants to Judicial Watch employees claiming that Klayman filed this action because he owed Judicial Watch a significant sum of money, SAC ¶ 154, because "such statements are mere expressions of opinion regarding a matter of public concern, namely the dispute between a well-known public watchdog group and

---

[11] Fitton and Judicial Watch filed their reply in further support of their motion to dismiss Counts One through Six and Nine of the Amended Complaint on September 1, 2006. Plaintiffs subsequently filed a motion for leave to file a sur-reply on September 14, 2006. Plaintiffs proposed sur-reply is limited to the issue of whether Judicial Watch's Form 990 tax returns were subject to an absolute privilege, and Defendants opposed Plaintiffs' motion for leave to file a sur-reply on September 22, 2006. The Court shall deny Plaintiffs' motion for leave to file a sur-reply. "A surreply may be filed only by leave of Court, and only to address new matters raised in a reply to which a party would otherwise be unable to respond." *United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*, 238 F. Supp. 2d 270, 276-77 (D.D.C. 2002). Here, Fitton and Judicial Watch's reply does not raise any new matters, and Plaintiffs' proposed sur-reply simply seeks to continue arguing a matter already addressed in his Opposition. As such, it is not appropriate to permit the sur-reply to be filed.

its former chairman." Fitton/JW Mot. to Dismiss at 21. Fitton and Judicial Watch are correct

that "[f]air comment or criticism on a matter of public interest is not actionable so long as the

comment is not motivated by malice." *Fisher v. Washington Post Co.*, 212 A.2d 335, 337 (D.C.

1965). Indeed, "a statement of opinion relating to matters of public concern which does not

contain a provably false factual connotation will receive full constitutional protection."

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990). This

"fair comment privilege" "provides assurance that public debate will not suffer for lack of

'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the

discourse of our nation." *Id.* (citing *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 53-55, 108

S. Ct. 876, 99 L. Ed. 2d 41 (1988).

However, it is equally true that the "fair comment defense goes only to opinions

expressed by the writer and does not extend to misstatements of fact." *Fisher*, 212 A.2d at 337

(citing *Washington Times Co. v. Bonner*, 86 F.2d 836 (D.C. Cir. 1936)). "Thus where a

statement of 'opinion' on a matter of public concern reasonably implies false and defamatory

facts regarding public figures or officials, those individuals must show that such statements were

made with knowledge of their false implications or with reckless disregard for the truth" and with

some level of fault. *Milkovich*, 497 U.S. at 20-21, 110 S. Ct. 2695. Here, while Fitton and

Judicial Watch claim that their "[s]tatements regarding the perceived motive for [Klayman's]

lawsuit . . are mere expressions of opinion regarding a matter of public concern," Fitton/JW Mot.

to Dismiss at 21, Klayman specifically alleges that Judicial Watch made false and defamatory

statements of fact. According to Klayman, "Fitton and Judicial Watch knowingly sent a false

statement to all Judicial Watch employees, which stated that Klayman filed his lawsuit because

he owed Judicial Watch a significant sum of money," and that all Defendants "knew that

Klayman did not, individually, owe Judicial Watch any money when they published the false and

misleading statement." SAC ¶¶ 154-155.[12]  Accepting Klayman's allegations as true, it is clear

that Fitton and Judicial Watch's allegedly defamatory statements are "not the sort of loose,

figurative, or hyperbolic language which would negate the impression that" Fitton and Judicial

---

[12] Klayman's allegations that Fitton and Judicial Watch knowingly misstated to Judicial Watch employees that Klayman owed Judicial Watch a significant sum of money, while admittedly sparse, are sufficient to meet the notice pleading requirement applicable to defamation actions. *See Croixland Props. Ltd. P'ship v. Corcoran*, 174 F.3d 213, 215 n.2 (D.C. Cir. 1999) ("the Federal Rules of Civil Procedure impose no special pleading requirements for defamation as they do for a specified list of other matters.").  However, in addition to the allegations discussed above, in his Opposition to Fitton and Judicial Watch's motion to dismiss, Klayman argues that two additional allegations – included in Plaintiffs' Second Amended Complaint but not under the heading "Count Nine" – describe further defamatory misstatements of fact by Fitton and Judicial Watch. Pls' Opp'n to Fitton/JW Mot. to Dismiss at 22.  Specifically, Klayman points to his allegations that Fitton and Judicial Watch (1) affirmatively told callers to Judicial Watch that "they could not discuss the 'reasons' why Klayman left Judicial Watch, contrary to the express provisions in the Severance Agreement, in order to create the erroneous impression that Klayman was forced to leave Judicial Watch," SAC ¶ 37; and (2) "[o]n information and belief . . . interfered with Klayman's relationships with . . . former clients who had offered to help Klayman in his Senate campaign, by disparaging, defaming, holding in a false light and providing false and misleading information to them to cause them to sever their relationships with Klayman." *Id.*; SAC ¶ 66J.  Klayman argues that these statements "contain verifiably false statements of fact which contain reasonable defamatory meaning" because the Severance Agreement states that "Klayman's separation shall be treated for all purposes as a voluntary resignation." Pls' Opp'n to Fitton/JW Mot. to Dismiss at 22.
    Neither of these allegations are sufficient to state a claim for defamation. Klayman's allegation that Fitton and Judicial Watch interfered with Klayman's relationships with former clients fails to meet even the notice pleading requirement of Federal Rule of Civil Procedure 8 because it does not actually allege a particular "false and defamatory statement" or even the general nature of any allegedly defamatory statements, and is therefore insufficient "to permit the opposing party to form responsive pleadings." *See Crowley v. N. Am. Telecomm. Ass'n.*, 691 A.2d 1169, 1172 (D.C. 1997).  Furthermore, Klayman's allegation that Fitton and Judicial Watch told callers that they "could not discuss the 'reasons' why Klayman left Judicial Watch" is not reasonably capable of having a defamatory meaning because it is not even "unpleasant or offensive," let alone "odious, infamous, or ridiculous." *Weyrich*, 235 F.3d at 627 (citing *Howard Univ.*, 484 A.2d at 989).

Watch were seriously maintaining that Klayman owed Judicial Watch a significant sum of money. *Milkovich*, 497 U.S. at 21, 110 S. Ct. 2695. Moreover, the "connotation" that Klayman owed Judicial Watch money "is sufficiently factual to be susceptible of being proved true or false," *id.*, and as such Judicial Watch's allegedly defamatory statement to Judicial Watch employees may properly form the basis for Klayman's action for defamation. The Court shall therefore deny Fitton and Judicial Watch's motion to dismiss the Second Amended Complaint insofar as it relates to allegations that they knowingly misrepresented to Judicial Watch employees that Klayman owed the organization significant sums of money. Furthermore, as Defendants Orfanedes and Farrell joined in Fitton and Judicial Watch's motion to dismiss as to Count Nine, the Court's conclusion applies equally to them.

### iii.    Statements to the Media

In their motion to dismiss, Fitton and Judicial Watch argue that Klayman's claim for defamation must be dismissed to the extent that it is based on alleged threats made by Defendants to the media "that Judicial Watch could and would take legal action against the media outlets if they permitted Klayman to appear and truthfully state he was the founder and former Chairman of Judicial Watch." Fitton/JW Mot. to Dismiss at 25-26. However, as Klayman points out in his Opposition to Fitton and Judicial Watch's motion to dismiss, Count Nine does not specifically refer to the allegations challenged by Fitton and Judicial Watch, but instead includes allegations that Fitton and Judicial Watch published knowingly false statements in media outlets, including *The Washington Post, The Washington Times*, World NetDaily.com, and Slate.com, that "Klayman filed his suit as a 'tactical maneuver designed to distract attention away from the fact that Klayman owes **more than a quarter of a million dollars to Judicial Watch**." Pls' Opp'n

39

to Fitton/JW Mot. to Dismiss at 25; SAC ¶¶ 156-157 (emphasis in original).  Fitton and Judicial

Watch appear to accept this clarification, as they do not respond to Klayman's allegations

regarding threats to media outlets in their Reply in further support of their motion to dismiss.

With respect to Klayman's allegations that Fitton and Judicial Watch misrepresented to

the media that Klayman owed Judicial Watch more than a quarter of a million dollars, Fitton and

Judicial Watch assert that such statements were nothing more than expressions of opinion

regarding a matter of public concern.  Fitton/JW Mot. to Dismiss at 21.  However, as discussed

above, this argument is unavailing because Klayman clearly alleges misstatements of verifiable

facts.  Indeed, Klayman sufficiently alleges (1) that Defendants made false and defamatory

statements concerning Klayman; (2) published the statements without privilege to various media

outlets; (3) with knowledge of the falsity of their statements; and (4) that Defendants' false

statements caused damage to Klayman.  *See Crowley*, 691 A.2d at 1172 n.2 (stating elements of

defamation under District of Columbia common law).  The Court shall therefore deny Fitton and

Judicial Watch's motion to dismiss Count Nine of the Second Amended Complaint to the extent

that it is based on allegedly false statements to the media.  Furthermore, insofar as Defendants

Orfanedes and Farrell joined in Fitton and Judicial Watch's motion to dismiss as to Count Nine,

the Court's conclusion applies equally to them.

> iv.    *Removal of Klayman's Name from Statements on Judicial
>        Watch Website*

Finally, Fitton and Judicial Watch argue that Count Nine of the Second Amended

Complaint must be dismissed insofar as it is based on Klayman's allegations that Fitton and

Judicial Watch doctored press quotations originally made about Klayman so that they refer to

Judicial Watch instead, and then posted these false statements on the Judicial Watch website. Fitton/JW Mot. to Dismiss at 23-25; SAC ¶ 65. Although these allegations are not included under the heading "Count Nine" in the Second Amended Complaint, Fitton and Judicial Watch address them in that context in their motion to dismiss, and Klayman challenges Fitton and Judicial Watch's arguments in his Opposition to their motion to dismiss. Pls' Opp'n to Fitton/JW Mot. to Dismiss at 23-24. As a result, the Court considers whether such allegations can support Klayman's claim for defamation, and concludes that they cannot.

Fitton and Judicial Watch argue that Klayman's allegations regarding doctored press quotations cannot support a claim for defamation because on their face they are not defamatory and do not concern Klayman. Fitton/JW Mot. to Dismiss at 23. In response, Klayman unpersuasively argues that "the statements . . . are defamatory when considered in context and taken as a whole [because the] effect of these statements on Judicial Watch's intended audience is to undermine Klayman's ability to advocate as an attorney, represent and fundraise as a public figure." Pls' Opp'n to Fitton/JW Mot. to Dismiss at 24. "[T]o satisfy the 'of and concerning' element [of a claim for defamation], it suffices that the statements at issue lead the listener to conclude that the speaker is referring to the plaintiff by description, even if the plaintiff is never named or is misnamed." *Croixland*, 174 F.3d at 216. However, the Court cannot conclude that Klayman has satisfied this element, based on a plain reading of the Second Amended Complaint.

The Second Amended Complaint posits as examples of Fitton and Judicial Watch's alleged doctoring of press quotations two purportedly altered quotations. Klayman first seeks to compare an allegedly doctored quotation reading, "Judicial Watch appears to be the main public interest litigator at this time, no small feat," (attributed to the *National Journal*, June 24, 2002),

41

with the purportedly original quotation, which reads "He (Klayman) appears to be the major public litigator at this time." SAC ¶ 65. Further, Klayman alleges that a quotation from Judicial Watch's website reading "Thanks, in part to aggressive litigation, Judicial Watch was recently named on of the top ten most effective government watchdog organizations by *The Hill* newspaper and a force in Washington by the *National Journal*" is based on a "real quote" from the *National Journal* of June 24, 2002 that reads ". . . through his challenge of secrecy rules, Klayman has become a major force in Washington." However, on their faces, the quotations as they now read do not refer to Klayman at all, and thus cannot be said to lead anyone to conclude that they refer to Klayman by description. As such, the quotations cannot form the basis for a defamation action because they are not "of and concerning" Klayman. What Klayman actually alleges is that Fitton and Judicial Watch have failed to give him credit where credit is due; while Klayman make take issue with Fitton and Judicial Watch's alleged doctoring of quotations, the quotations in question, as they now read, cannot reasonably be read as defaming Klayman. As a result, the Court shall grant Fitton and Judicial Watch's motion to dismiss Count Nine of the Second Amended Complaint insofar as it is based on the allegedly doctored quotations. Furthermore, as Defendants Orfanedes and Farrell joined in Fitton and Judicial Watch's motion to dismiss Count Nine, the Court's conclusion applies equally to them.

> B. *Defendants Orfanedes and Farrell's Motion to Dismiss*

Defendants Orfanedes and Farrell are named as individual defendants in Counts Four (Lanham Act), Five (Florida Statute 540.08), and Nine (Defamation) of the Second Amended Complaint. Orfanedes and Farrell have filed a separate Motion to Dismiss the Second Amended Complaint, in which they join Fitton and Judicial Watch's motion to dismiss as to the substance

42

of Counts Four, Five, and Nine.  The Court will not repeat its conclusions with respect to Fitton

and Judicial Watch's motion to dismiss Counts Four, Five, and Nine; however, as Orfanedes and

Farrell have joined in the substance of that motion, as noted above, the Court's conclusion with

respect to each Count applies equally to them.

In their separate motion to dismiss, Orfanedes and Farrell further argue that Klayman's

claims against them must be dismissed because Klayman's allegations fail to support individual

liability on their parts.  Orfanedes/Farrell Mot. to Dismiss at 2.  Klayman opposes Orfanedes and

Farrell's motion to dismiss by arguing that Orfanedes and Farrell are named throughout the

allegations of the Second Amended Complaint, and that this is sufficient to give Orfanedes and

Farrell notice "that they are alleged to have committed, participated in, or inspired the

complained of acts."  *Id.* at 7.  Moreover, Klayman argues, "the issue of whether Orfanedes and

Farrell individually participated and are responsible for the alleged wrongdoing is a question of

fact and, therefore, not disposable" on a motion to dismiss.  *Id.*

"Under the law of the District of Columbia, corporate officers are not shielded by the

limited liability of the corporation for [sic] liability for their own tortious acts."  *Camacho v.

1440 Rhode Island Ave. Corp.*, 620 A.2d 242, 246 (D.C. 1993).  Rather, "[i]ndividual liability

attaches when a corporate officer either physically commits the tortious conduct, or participates

in 'some meaningful sense' in the tortious conduct."  *Id.* at 427 (citing *Vuitch v. Furr*, 482 A.2d

811, 823 (D.C. 1984).  Orfanedes and Farrell argue that Klayman has failed to allege that they

participated in "some meaningful sense" in Judicial Watch's purportedly tortious conduct, and

that as a result he has failed to demonstrate that individual liability is appropriate.  In support of

this argument, Orfanedes and Farrell claim that Klayman has simply inserted their names into the

43

relevant paragraphs of his Amended Complaint, rather than actually alleging culpable conduct on their parts. Orfanedes and Farrell may be correct that Klayman has simply inserted their names into the relevant paragraphs of the Amended Complaint. However, as the Second Amended Complaint now reads, it sufficiently alleges that Orfanedes and Farrell individually participated in "some meaningful sense" in Judicial Watch's purportedly tortious behavior. The Court agrees that these allegations are somewhat sparse, but they are nevertheless sufficient to withstand a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b).

Specifically, in Count Four, Klayman alleges that Orfanedes and Farrell, along with the other defendants, "deliberately used Klayman's image and name to confuse donors into thinking that Klayman was still affiliated with Judicial Watch" in order to "entice donors to continue giving donations to Judicial Watch." SAC ¶¶ 103-104. Klayman thus sufficiently alleges that Orfanedes and Farrell participated in Judicial Watch's decision to send the allegedly misleading fund-raising mailing to Judicial Watch donors in order to elicit contributions. Likewise, in Count Five, Klayman alleges that Orfanedes and Farrell, along with the other defendants, "deliberately misrepresented and falsely advertised that Klayman was Chairman and General Counsel of Judicial Watch after he left Judicial Watch to run for the Senate," *Id.* ¶ 109; that the "misuse of Klayman's name and likeness were calculated to confuse donors into believing that Klayman was soliciting their donations," *id.* ¶ 110; and that Orfanedes and Farrell "knew that donors that received the misleading fundraising publications would be confused by the publication and use of Klayman's name and likeness." These allegations are sufficient to plead Orfanedes and Farrell's meaningful participation in Judicial Watch's purportedly unauthorized use of Klayman's name and likeness. Finally, in Count Nine, Klayman alleges that despite knowing that Klayman did

44

not, individually, owe Judicial Watch any money, Fitton and Orfanedes falsely told reporters that

Klayman owed Judicial Watch more than a quarter of a million dollars. SAC ¶¶ 149-150, 157-

159, 161. These allegations sufficiently plead that Orfanedes and Farrell meaningfully

participated in Judicial Watch's alleged defamation of Klayman. The Court shall therefore deny

Orfanedes and Farrell's separate motion to dismiss the Second Amended Complaint to the extent

that it raises an argument not addressed in the motion to dismiss brought by Defendants Fitton

and Judicial Watch.

C.   *Defendants' Motion to Strike Portions of the Second Amended Complaint*

In addition to moving to dismiss the entire Second Amended Complaint, Defendants

Fitton and Judicial Watch have moved, pursuant to Federal Rule of Civil Procedure 12(f) to

strike various allegations contained in the Second Amended Complaint on the grounds that they

are "immaterial, impertinent, and scandalous," as well as to strike "Plaintiff Klayman's request to

be reinstated to his former positions of Chairman and General Counsel of Judicial Watch, Inc."

Mot. to Strike at 1. Klayman opposes this request, arguing that the challenged allegations are not

"scandalous" and bear directly on the claims of the Second Amended Complaint. Pls' Opp'n to

Mot. to Strike.

Federal Rule of Civil Procedure 12(f) provides that "the court may order stricken from

any pleading . . . any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P.

12(f). Motions to strike pleadings are generally considered a drastic remedy disfavored by

courts, and the decision to deny or grant such motions is in the sound discretion of the Court.

*Canady v. Erbe Elektromedizin GmbH*, 307 F. Supp. 2d 2, 7–8 (D.D.C. 2004). In the context of

Rule 12(f), the word "scandalous" "generally refers to any allegation that unnecessarily reflects

45

on the moral character of an individual or states anything in repulsive language that detracts from the dignity of the court." *Pigford v. Veneman*, 215 F.R.D. 2, 4 (D.D.C. 2003) (citations omitted). Matter in pleadings is immaterial and impertinent where it "is not materially relevant to any pleaded claim for relief or defense." *Makuch v. Fed. Bureau of Investigation*, Civ. A. No. 99-1094 (RMU), 2000 WL 914767 (D.D.C. Jan. 7, 2000) (citations omitted).

As an initial matter, the Court notes that, insofar as Fitton and Judicial Watch challenge allegations raised in connection with Benson's claims, such allegations are no longer operative in light of the Court's dismissal of Benson's claims for lack of subject matter jurisdiction. Furthermore, the Court finds that none of the allegations relating to Klayman's claims that Fitton and Judicial Watch seek to challenge are, in fact, "scandalous," as that term is used in the context of motions to strike. Moreover, the Court is unable at this stage of proceedings to determine whether any of the challenged allegations will ultimately prove relevant to Klayman's legal claims. As this matter progresses, the issues and claims may become more narrow and certain allegations may prove superfluous, but the Court cannot, at this point in time, determine that the allegations challenged by Fitton and Judicial Watch are either immaterial or impertinent.

Finally, as Klayman correctly argues, a motion to strike made pursuant to Rule 12(f) is not the proper vehicle for seeking the dismissal of Klayman's demand for reinstatement as Chairman and General Counsel of Judicial Watch, nor do Fitton and Judicial Watch cite any legal authority for striking a claim for relief on a Rule 12(f) motion. *See* Pls' Opp'n to Mot. to Strike at 11 (citing Wright & Miller, *Federal Practice and Procedure: Civil 3d* § 1379). In the context of their motion to dismiss, Fitton and Judicial Watch raise a number of challenges to Klayman's claim for rescission, which they repeat in their motion to strike. However, as

46

discussed above, Klayman's claim for rescission is sufficient to survive a motion to dismiss, and

the Court will not reconsider Fitton and Judicial Watch's arguments in the improper context of a

motion to strike made pursuant to Federal Rule of Civil Procedure 12(f).

      D.     *Defendants Fitton and Judicial Watch's Motion to Sever is Moot*

      Fitton and Judicial Watch have further moved, pursuant to Federal Rule of Civil

Procedure 20(a) and Local Civil Rule 7.1,  to sever the claims of Plaintiff Benson from those of

Plaintiff Klayman.  However, in light of the Court's dismissal of Plaintiff Benson's claims for

lack of subject matter jurisdiction, Fitton and Judicial Watch's motion to sever is now moot.  As

such, the Court shall deny the motion to sever.

## IV: CONCLUSION

      For the reasons set forth above, with respect to the motion to dismiss Plaintiffs' Second

Amended Complaint brought by Defendants Judicial Watch and Fitton, the Court shall (1)

dismiss without prejudice Counts One, Two, and Three of Plaintiffs' Second Amended

Complaint for lack of subject matter jurisdiction; (2) deny the motion to dismiss as to Counts

Four, Five, and Six; (3) as to Count Nine of Plaintiffs' Second Amended Complaint, grant-in-

part the motion to dismiss brought by Defendants Judicial Watch and Fitton insofar as it relates

to allegedly defamatory statements made in Judicial Watch Form 990 tax returns and allegedly

doctored press quotations posted on the Judicial Watch website; and (4) as to Count Nine of

Plaintiffs' Second Amended Complaint, deny-in-part the motion to dismiss brought by

Defendants Judicial Watch and Fitton insofar as it is based on allegedly false statements to

Judicial Watch employees and the media.  To the extent that Defendants Orfanedes and Farrell

have joined in Fitton and Judicial Watch's motion to dismiss as to Counts Four, Five, and Nine,

the Court's conclusions with respect to those Counts apply equally to them. Furthermore, the

Court shall (5) deny Plaintiffs' motion for leave to file a sur-reply; (6) deny the motion to dismiss

Plaintiffs' Second Amended Complaint brought by Defendants Orfanedes and Farrell (insofar as

it raises an additional argument not addressed in Fitton and Judicial Watch's motion to dismiss);

(7) deny the motion to strike brought by Defendants Fitton and Judicial Watch; and (8) deny as

moot the motion to sever brought by Defendants Judicial Watch and Fitton.

An appropriate Order accompanies this Memorandum Opinion.


Date:   January 17, 2007


                                        _____/s/_____
                                        COLLEEN KOLLAR-KOTELLY
                                        United States District Judge

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LARRY KLAYMAN,

    Plaintiff,

     v.

JUDICIAL WATCH, INC., *et al.*,

    Defendants.

Civil Action No. 06-670 (CKK)

**MEMORANDUM OPINION**
(December 3, 2007)

Currently pending before the Court is the Motion for Leave to Amend Counterclaim filed by Defendants/Counter-Claimants Judicial Watch, Inc., and Thomas J. Fitton (collectively, "Judicial Watch"). Plaintiff opposes Judicial Watch's Motion for Leave to Amend on the grounds that it was brought in bad faith and that the only new claim Judicial Watch seeks to add via its Amended Counterclaim is futile. Plaintiff has also filed a Cross-Motion for Sanctions. Upon a searching review of the filings currently before the Court in connection with Judicial Watch's Motion for Leave to Amend and Plaintiff's Cross-Motion for Sanctions, the relevant statutes and case law, and the entire record herein, the Court shall GRANT Judicial Watch's Motion for Leave to Amend and shall DENY Plaintiff's Cross-Motion for Sanctions.

**I: BACKGROUND**

The Court shall assume familiarity with the Court's January 17, 2007 and April 3, 2007 Memorandum Opinions, which set forth in detail the factual background of this case, and shall therefore only briefly address such facts as are necessary for resolution of the motions currently before the Court. *See Klayman v. Judicial Watch, Inc.*, Civil Action No. 06-670, 2007 WL

140978 (D.D.C. Jan. 17, 2007) (hereinafter "MTD Slip Op."); *Klayman v. Judicial Watch, Inc.*, Civil Action No. 06-670, 2007 WL 1034936 (Apr. 3, 2007) (hereinafter "Reconsid. Slip Op."; and *Klayman v. Judicial Watch, Inc.*, Civil Action No. 06-670, 2007 WL 1034937 (Apr. 3, 2007) (hereinafter "PSJ Slip Op."). Defendant Judicial Watch, Inc. is a 501(c)(3) organization formed under the laws of the District of Columbia and headquartered in the District of Columbia. PSJ Slip Op. at 3-4. Defendant Fitton is President of Judicial Watch, Defendant Orfanedes is the Secretary and a Director of Judicial Watch, and Defendant Farrell is a Director of Judicial Watch. *Id.* at 4. Plaintiff Larry Klayman ("Klayman") is the self-described founder and former Chairman, General Counsel and Treasurer of Judicial Watch, who resides in and practices law in the State of Florida. *Id.*

In his Second Amended Complaint, Klayman brought six claims against various combinations of Defendants, relating to events that occurred after Klayman left Judicial Watch in September 2003. *Id.* In connection with Klayman's separation from Judicial Watch, on September 19, 2003, the parties executed a detailed Severance Agreement, signed by Klayman and Fitton, on behalf of Judicial Watch, and attested to by Orfanedes, as Corporate Secretary of Judicial Watch. *Id.* Plaintiff's claims have been narrowed somewhat by the Court's January 17, 2007 and April 3, 2007 Memorandum Opinions. Specifically, the Court has dismissed Count Five of Plaintiff's Second Amended Complaint, dismissed-in-part Count Nine of Plaintiff's Second Amended Complaint, and granted-in-part Defendant's motion for summary judgment as to Counts Six, Seven, and Eight of Plaintiff's Second Amended Complaint. *See generally* MTD Slip Op., Reconsid. Slip Op., PSJ Slip Op.

On June 28, 2006, Judicial Watch filed its Answer to Plaintiff's Second Amended

Complaint, and also filed its Counterclaim against Klayman, which includes nine Counts: Count I (Breach of Contract) alleges that Klayman has not paid Judicial Watch, Inc. amounts due under the Severance Agreement, Counterclaim ¶¶ 19-24; Count II (Breach of Contract) alleges that Klayman has not repaid a debt owed to Judicial Watch, Inc. by Klayman's former law firm, Klayman & Associates ("K&A"), which was re-affirmed in the Severance Agreement, *id.* ¶¶ 25-30; Count III (Indemnification) alleges that Klayman is obligated to indemnify Judicial Watch, Inc. for damages arising out of K&A's purported breach of the Severance Agreement, *id.* ¶¶ 31-34; Counts IV and V (Trademark Infringement) allege that Klayman knowingly used Judicial Watch, Inc.'s registered trademarks without consent, in violation of the Lanham Act, 15 U.S.C. §§ 1114(1)(a) and 1125(a), *id.* ¶¶ 35-48; Counts VI and VII (Breach of Contract) allege that Klayman has disparaged Judicial Watch, Inc. and Fitton in violation of the Severance Agreement, *id.* ¶¶ 49-63; Count VIII (Breach of Contract) alleges that Klayman has used Confidential Information in violation of the Severance Agreement, *id.* ¶¶ 64-70; and Count IX (Breach of Contract) alleges that Klayman has violated the Severance Agreement's covenant not to compete or solicit, *id.* ¶¶ 71-77.  Klayman filed his Answer to Judicial Watch's Counterclaim on August 7, 2006.

Judicial Watch filed its Motion for Leave to Amend Counterclaim on May 25, 2007, asserting that "[s]ince filing the Counterclaim, Judicial Watch has had an opportunity to learn additional information . . . [and] Klayman has pursued a course of action that requires expanded allegations concerning claims under the Lanham Act."  JW Mot. for Leave to Amend Counterclaim (hereinafter "JW Mot. to Amend") ¶ 1.  Judicial Watch therefore seeks to expand Count IV of the Counterclaim, split Count V into two claims (one for false advertising and one

for false association), and add a claim for cybersquatting.

      In addition–and at the heart of Plaintiff's Opposition and Motion for Sanctions–Judicial Watch seeks to add a number of allegations to its Counterclaim regarding the circumstances under which Klayman separated from Judicial Watch in September 2003.  Specifically, Judicial Watch alleges that in May 2003, Klayman informed Fitton and Orfanedes that "his wife, a former Judicial Watch employee, had commenced divorce proceedings against him" and that she "alleged that Klayman had had an inappropriate relationship with a Judicial Watch employee with whom he had been in love" and that "Klayman had assaulted her physically."  JW Am. Count. ¶ 10.  According to Judicial Watch, "Klayman denied having a sexual relationship with the employee" but acknowledged that he "had been in love with the employee," "that he had purchased gifts for the employee and had kissed her," and also acknowledged "an incident with his wife that clearly provided the basis for his wife's allegation of physical assault."  *Id.* ¶ 11. Judicial Watch alleges that Fitton and Orfanedes considered Klayman's "acknowledged behavior [] entirely inconsistent with that of a leader of a conservative, pro-family organization," as well as "Klayman's fiduciary duties to the organization," and that they were concerned about Klayman's possible misuse of Judicial Watch resources.  *Id.* ¶¶ 12.  Judicial Watch further alleges that, as a result of these revelations, "Fitton requested that Klayman resign," and "Fitton and Orfanedes also insisted that Judicial Watch undertake an internal investigation into Klayman's conduct, including an audit. . . ."  *Id.* ¶ 13.  According to Judicial Watch, "Klayman offered to resign rather than face such an inquiry," and the parties began negotiating for his separation from Judicial Watch, which eventually culminated in the September 19, 2003 Severance Agreement.  *Id.* ¶¶ 14-18.

Plaintiff filed his Opposition and Cross-Motion for Sanctions on June 11, 2007, and

Judicial Watch filed its Reply in support of its motion to amend and Opposition to Plaintiff's

Cross-Motion on June 21, 2007.  On July 5, 2007, Plaintiff filed a motion to file out of time his

Reply in support of his Cross-Motion, which was granted on October 1, 2007.  Thereafter, as

permitted by the Court in its October 1, 2007 Minute Order, Judicial Watch filed a Sur-Reply

regarding Plaintiff's Cross-Motion for Sanctions.

## II: LEGAL STANDARDS

Under Federal Rule of Civil Procedure 15(a), a party may amend its pleading once as a

matter of course at any time before a responsive pleading is served.  *See* Fed. R. Civ. P. 15(a).

Once a responsive pleading is served, however, a party may amend its complaint only by leave of

the court or by written consent of the adverse party.  *Id.*; *Foman v. Davis*, 371 U.S. 178, 182

(1962).  The grant or denial of leave to amend is committed to the sound discretion of the district

court.  *See Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996).  The court must,

however, heed Rule 15's mandate that leave is to be "freely given when justice so requires."  *Id.*;

*Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1083 (D.C. Cir. 1998).

Indeed, "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper

subject of relief, he ought to be afforded an opportunity to test his claim on the merits."  *Foman*,

371 U.S. at 182.  As such, "[a]lthough the grant or denial of leave to amend is committed to a

district court's discretion, it is an abuse of discretion to deny leave to amend unless there is

sufficient reason, such as 'undue delay, bad faith or dilatory motive . . . repeated failure to cure

deficiencies by [previous] amendments . . . [or] futility of amendment.'"  *Firestone*, 76 F.3d at

1208 (quoting *Foman*, 371 U.S. at 182); *see also Caribbean Broad. Sys.*, 148 F.3d at 1084 (a

5

district court's discretion to grant leave to amend is "severely restricted" by Rule 15's command

that such leave "be freely given"). Nevertheless, the Court may deny as futile a motion to amend

a complaint when the proposed complaint would not survive a motion to dismiss. *James*

*Madison*, *Ltd. v. Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996); *see also* 3 Moore's Federal

Practice § 15.15[3] (3d ed. 2000) ("An amendment is futile if it merely restates the same facts as

the original complaint in different terms, reasserts a claim on which the court previously ruled,

fails to state a legal theory, or could not withstand a motion to dismiss.").

### III: DISCUSSION

Klayman opposes Judicial Watch's Motion for Leave to Amend on the grounds that it

was filed in bad faith for improper purposes and, with respect to Judicial Watch's proposed

cybersquatting claim, also argues that amendment is futile because the claim would not survive a

motion to dismiss. The Court addresses each of these arguments in turn, before considering

Plaintiff's Cross-Motion for Sanctions.

 *A.* *The Court Cannot Conclude That Judicial Watch's Proposed Amendment Was*
   *Made in Bad Faith or For an Improper Purpose*

As an initial matter, the Court notes that Klayman does not oppose Judicial Watch's

proposed amendment insofar as it seeks to expand Count IV for trademark infringement and

divide Count V of its original Counterclaim into two unfair competition claims under the

Lanham Act, one for false advertising (Count V) and one for false association (Count VI).

Nevertheless, Klayman argues that Judicial Watch's proposed amendment "is brought in bad

faith and for the improper purpose of defaming, harassing and injuring Klayman, his family and

other innocent third parties." Pl.'s Opp'n at 5. In particular, Klayman opposes Judicial Watch's

proposed addition of Paragraphs 10-20 of its Amended Counterclaim–the allegations described

above concerning the circumstances of Klayman's departure from Judicial Watch.  *Id.* at 6-7.

      Klayman first argues that the allegations contained in Paragraphs 10-20 have no bearing

on Judicial Watch's current or proposed legal claims.  *Id.*  However, Klayman proffers no legal

challenge to Judicial Watch's proposed Count V, which alleges that "Klayman has made false

and/or misleading statements that have actually deceived and/or had the tendency to deceive a

substantial segment of the receiving audience."  Am. Count. ¶ 93.  The Court is unaware of any

reason for denying Judicial Watch leave to amend its Counterclaim to add its proposed Count V,

and it follows that Judicial Watch may also amend its Counterclaim to add the factual allegations

necessary to support that claim.  To that end, Judicial Watch asserts that the allegations in

Paragraphs 10-20 are directly relevant, and in fact "critical" to Judicial Watch's claims for unfair

competition and breach of contract.  JW Reply at 3-6.  According to Judicial Watch, Klayman

has made a number of false or misleading statements concerning himself and his reasons for

leaving Judicial Watch via his direct mail and advertising campaign, which have resulted in harm

to Judicial Watch that is actionable under the Lanham Act.  *Id.* at 5.[1]  The Court finds this

explanation sufficient to demonstrate the relevance of Judicial Watch's proposed Paragraphs 10-

20 to its legal claims.[2]

---

[1] Judicial Watch also argues that in order to succeed on its claim that Klayman has
disparaged Judicial Watch officers by falsely characterizing them as liars (Counts VIII and IX of
Judicial Watch's proposed Amended Counterclaim), Judicial Watch will need to show that its
officers did not falsely represent that the reasons for Klayman's departure were confidential.  *Id.*
at 5-6.

[2] Klayman's filings emphasize that Judicial Watch was aware of the allegations contained
in Paragraphs 10-20 when it filed its original Counterclaim but did not include those allegations
in that filing.  According to Klayman, Judicial Watch threatened to do so, but chose not to after

Klayman next argues that Judicial Watch's proposed allegations regarding the
circumstances of Klayman's departure from Judicial Watch are made in bad faith because they
contradict the Severance Agreement's statement that Klayman's separation "shall be treated for
all purposes as a voluntary resignation," and actually violate the Severance Agreement's non-
disparagement provision.  Pl.'s Opp'n at 6-8 (citing Severance Agreement ¶¶ 1, 17).  While
Klayman is correct as to the language of the Severance Agreement, denying Judicial Watch leave
to amend its Counterclaim on the ground that the amendment violates the non-disparagement
provision of the Severance Agreement puts the cart before the horse.  The proper interpretation of
the Severance Agreement's non-disparagement provision is directly at issue in Counts Six,
Seven, and Eight of Plaintiff's Second Amended Complaint.  Thus, to the extent that Klayman
alleges Judicial Watch's proposed amendments constitute a violation of the non-disparagement

---

counsel exchanged letters on the subject.  *See* Pl.'s Opp'n at 1-2; Pl.'s Reply at 1.  The Court
need not resolve the parties' dispute over past events because Judicial Watch explains that, since
it filed its original Counterclaim, "Klayman has pursued a course of action that requires
expanded allegations concerning claims under the Lanham Act."  JW Mot. to Amend. ¶ 1.
According to Judicial Watch, the allegations in Paragraphs 10-20 are included in the proposed
Amended Counterclaim because they are primarily relevant to Judicial Watch's expanded
Lanham Act claims.  It therefore follows that the allegations were not included in Judicial
Watch's original Counterclaim because they were not relevant to the legal claims therein.

Klayman also notes that Judicial Watch was aware of Klayman's website,
www.savingjudicialwatch.org, when it filed its original Counterclaim, and therefore could have
brought its proposed cybersquatting claim (Count VII of Judicial Watch's proposed Amended
Counterclaim) at that time.  However, insofar as that Count alleges that "Klayman's actions have
harmed . . . the good will represented by Judicial Watch's JUDICIAL WATCH mark" and "have
caused Judicial Watch to suffer . . . damage and injury to its reputation and goodwill, as well as a
loss of fund raising revenues," it appears that Judicial Watch's proposed cybersquatting claim
relies upon events subsequent to the filing of its original Counterclaim.  *See* Am. Count. ¶¶ 106-
16.  Significantly, Klayman does not assert that Judicial Watch unduly delayed bringing either its
expanded Lanham Act or cybersquatting claim, or that he would be prejudiced by Judicial
Watch's addition of claims at this time.  Furthermore, the Court notes that the parties are still
engaged in fact discovery, the deadline for which will be extended through January 31, 2008 by
separate order.

provision, he can argue as much in proving his breach of contract claims.  The Court therefore

declines to deny Judicial Watch leave to amend based solely on Klayman's unproven allegation

that Judicial Watch's amendment violates the Severance Agreement, because doing so would

require the Court to interpret the language of the non-disparagement provision in a vacuum.

Finally, Klayman asserts that Judicial Watch need not amend its Counterclaim in order to

add documents that Judicial Watch identifies as examples of allegedly false and misleading

statements made by Klayman in his direct mail and advertising campaign (Exhibits C through Q

to the proposed Amended Counterclaim).  *Id.* at 8-9.  Klayman notes that  "[u]nder the Federal

rules, pleading standards are minimal" and the "applicable rules of procedure do not mandate the

filing of exhibits or attachments to a complaint."  *Id.* at 9 (citations omitted).  Klayman appears

to suggest that because Judicial Watch is not required to attach exhibits to its Counterclaim,

Judicial Watch's attempt to do so somehow demonstrates bad faith.  As, Judicial Watch correctly

notes, however, "Rule 8(a)(2) [of the Federal Rules of Civil Procedure] represents a floor, not a

ceiling."  JW Reply at 8.  The Court therefore does not accept Klayman's suggestion that Judicial

Watch acted in bad faith by opting to go beyond the minimal pleading requirements of the

Federal Rules.

B.      *Judicial Watch's Proposed Cybersquatting Claim is Not Clearly Futile*

Klayman also argues that Judicial Watch should be denied leave to amend its

Counterclaim to add a claim for cybersquatting because Judicial Watch's proposed claim would

not survive a motion to dismiss.  While futility of amendment is certainly grounds for denying

leave to amend, the Court cannot agree with Klayman that Judicial Watch's proposed

cybersquatting claim is not actionable.  The Federal Rules of Civil Procedure require that a

complaint contain "'a short and plain statement of the claim showing that the pleader is entitled

to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon

which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. ___, 127 S. Ct. 1955, 1964 (2007)

(quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)); *accord Erickson v. Pardus*, 551 U.S. ___,

127 S. Ct. 2197, 2200 (2007) (per curiam).  Although "detailed factual allegations" are not

necessary to withstand a motion to dismiss for failure to state a claim, to provide the "grounds"

of "entitle[ment] to relief," a plaintiff must furnish "more than labels and conclusions" or "a

formulaic recitation of the elements of a cause of action."  *Id.* at 1964-65; *see also Papasan v.

Allain*, 478 U.S. 265, 286 (1986).  In evaluating a motion to dismiss for failure to state a claim,

the court must construe the complaint in a light most favorable to the plaintiff and accept as true

all reasonable factual inferences drawn from well-pleaded factual allegations, but "need not

accept inferences drawn by the plaintiff[] if such inferences are unsupported by the facts set out

in the complaint."  *Kowal v. MCI Comm'cns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

       Judicial Watch's proposed cybersquatting claim is brought under the Anti-Cybersquatting

Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d).  Am. Count. ¶¶ 106-16.  To state a

cybersquatting claim under the ACPA, Judicial Watch must allege that (1) JUDICIAL WATCH

is a distinctive or famous mark entitled to protection; (2) Klayman's

www.savingjudicialwatch.org domain name is identical or confusingly similar to Judicial

Watch's mark; and (3) that Klayman registered his domain name with the bad faith intent to

profit from it.  15 U.S.C. § 1125(d)(1)(A); *Shields v. Zuccarini*, 254 F.3d 476, 482 (3d Cir.

2001).  Klayman does not contest whether Judicial Watch's federally registered trademark,

JUDICIAL WATCH, is distinctive or famous, and the Court therefore assumes as much

10

*arguendo*. *See* Pl.'s Opp'n at 11; Am. Count. ¶ 54.

Instead, Klayman argues that Judicial Watch's proposed cybersquatting claim does not sufficiently allege confusion or a bad faith intent to profit. Klayman argues that his website, www.savingjudicialwatch.org is not confusingly similar to Judicial Watch's website, www.judicialwatch.org because the "word 'saving' precedes the name, so that any search for Judicial Watch on the world wide web would not track to Klayman's website." Pl.'s Opp'n at 11. Judicial Watch's proposed cybersquatting claim alleges the opposite–that the two marks are "confusingly similar"–and further alleges that Klayman's website has "harmed, and will continue to harm, the goodwill represented by Judicial Watch's [] mark . . .by creating a likelihood of confusion as to the source, sponsorship, affiliation and endorsement of [Klayman's] site." Am. Count. ¶¶ 108, 113. The Court agrees with Judicial Watch that whether Klayman's website is actually confusingly similar to Judicial Watch's website is an issue of fact that cannot be resolved on the limited record before the Court at this time, and would be unlikely to be resolved at all on a motion to dismiss for failure to state a claim.

Klayman further argues that Judicial Watch's cybersquatting claim would not survive a motion to dismiss because Judicial Watch "did not, and can not, allege that Klayman was motivated by profit, let alone bad faith intent to profit." Pl.'s Opp'n at 12. Klayman posits that the instant case is "a far cry from the 'squatting' activity made illegal by the ACPA," and cites to cases in which courts have found insufficient evidence of the bad faith required under the ACPA where defendants registered websites that they used to complain about experiences with, or criticize, the defendants' companies. *Id.* at 11-12. To the contrary, Judicial Watch's proposed Amended Counterclaim specifically alleges that "Klayman registered, used and continues to use

11

the savingjudicialwatch.org domain name with bad faith intent to divert supporters and donors from Judicial Watch's websites to the websites previously and currently accessible at savingjudicialwatch.org for Klayman's commercial gain and for purposes of promoting Klayman d/b/a Saving Judicial [W]atch." Am. Count. ¶ 111.  On its face, then, Judicial Watch's proposed cybersquatting claim asserts that Klayman registered his website with an intent to profit by diverting funds from Judicial Watch to his own coffers.

Finally, as to allegations of bad faith, Judicial Watch's proposed cybersquatting claim charges that Klayman does not have prior trademark or intellectual property rights in the JUDICIAL WATCH mark and made no prior use of the name, that he intended to divert Judicial Watch supporters to his website, and that he purposefully concealed his identity in registering his website. *Id.* ¶¶ 106-16.  Each of these allegations is relevant to one of the nine factors that the ACPA specifically provides courts may consider in determining whether a person has the requisite bad faith.  *See* 15 U.S.C. § 1125(d)(1)(B)(i).  In light of these nine, non-exhaustive factors, the Court cannot determine on the current record whether Klayman actually had the requisite bad faith, but can determine that Judicial Watch's cybersquatting claim might survive a motion to dismiss for failure to state a claim.  The Court therefore rejects Klayman's argument that Judicial Watch's proposed cybersquatting claim is futile.  Moreover, for the reasons set forth above, Klayman fails to demonstrate a sufficient reason for denying Judicial Watch leave to amend its Counterclaim.  Rather, because "the underlying facts or circumstances relied upon by [Judicial Watch] may be a proper subject of relief, [it] ought to be afforded an opportunity to test his claim on the merits." *Foman*, 371 U.S. at 182.  The Court shall therefore grant Judicial Watch's Motion for Leave to Amend.

C.    *Plaintiff's Cross-Motion for Sanctions Shall Be Denied*

The Court turns now to Klayman's cross-motion, in which he asks the Court to impose

sanctions upon Judicial Watch–including attorneys fees, additional fines, the striking of Judicial

Watch's proposed Amended Counterclaim, and a contempt order–under the Court's "inherent

power to impose sanctions for abusive litigation practices undertaken in bad faith." Pl.'s Opp'n

at 13, 16. The Court's inherent power to sanction is "'governed not by rule or statute but by the

control necessarily vested in courts to manage their own affairs so as to achieve the orderly and

expeditious disposition of cases.'" *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (quoting

*Link v. Wabash R.R. Co.*, 370 U.S. 626, 630-31 (1962)). However, "[b]ecause of their very

potency, inherent powers must be exercised with restraint and discretion." *Id.* at 44 (citing

*Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980)).

Klayman's motion for sanctions focuses on the allegations contained in Paragraphs 10-20

of Judicial Watch's proposed Amended Counterclaim regarding the circumstances in which

Klayman separated from Judicial Watch. As an initial matter, to the extent that Klayman's

motion for sanctions relies upon his argument that those allegations are irrelevant to any issue in

the case, and "unnecessary and violative of the pleading requirements of Fed.R.Civ.P. 8," *id.* at

13, the Court rejects Klayman's argument for the reasons discussed above. In further support of

his motion for sanctions, Klayman asserts that Judicial Watch filed its proposed Amended

Counterclaim with the knowledge that the allegations contained in Paragraphs 10-20 were "made

by Klayman's ex-wife during divorce proceedings, were false, and were later withdrawn," and

were "sealed by Order of the Circuit Court, Fairfax County, where the divorce was proceeding."

*Id.* at 13-14. Based on these claims, Klayman asks this Court to hold Judicial Watch and its

attorneys in civil contempt for filing the proposed Amended Counterclaim in derogation of the June 19, 2003 Order of the Circuit Court of Fairfax County, Virginia, sealing the record of Klayman's divorce proceeding.  *See* Pl.'s Reply, Ex. 1.  However, Judicial Watch explicitly asserts that the "basis for the Amended Counterclaim is not the court file for Klayman's divorce."  JW Sur-Reply at 3.  Rather, Judicial Watch maintains that its proposed Amended Counterclaim is based on a conversation during which Klayman informed Fitton and Orfanedes about his wife's allegations, "acknowledged to Fitton and Orfanedes that he had been in love with the employee," "had purchased gifts for the employee and had kissed her," and also "acknowledged an incident with his wife that clearly provided the basis for his wife's allegation of physical assault."  *Id.*; Am. Count. ¶¶ 10-11.

The Court notes that the relevant paragraphs of the proposed Amended Counterclaim explicitly refer to a conversation that occurred on or about May 6, 2003 (notably before the seal order was entered), and thus support Judicial Watch's claim as to the provenance of the allegations contained therein. *Id.*  For his part, Klayman admits that he "voluntarily revealed the accusations" during a conversation "well prior to any discussion of his possible resignation." Pl.'s Opp'n at 6.  As it thus appears uncontested that Judicial Watch's allegations may be based on the conversation rather than Klayman's sealed divorce record, the Court cannot conclude that Judicial Watch has acted in a manner worthy of civil contempt.

Klayman also maintains that sanctions are appropriate because the disclosure of the allegations contained in Paragraphs 10-20 violates the attorney-client privilege as well as various Rules of Professional Conduct applicable to attorneys.  *Id.* at 13-16; Pl.'s Reply at 6-10.  Each of these arguments turns on Klayman's assertion that he disclosed the information underlying

14

Paragraphs 10-20 of Judicial Watch's proposed Amended Counterclaim "in confidence, as attorney-client communications, to Orfanedes and to Judicial Watch's outside counsel, David Barmak." Pl.'s Reply at 8. The parties appear to dispute the circumstances of those communications. Specifically, Judicial Watch claims that Klayman confessed "the admissions described in the Amended Counterclaim . . . directly to Fitton and Orfanedes in their capacity as officers and directors of Judicial Watch." JW Reply at 12. Judicial Watch asserts that in the context of the conversations at issue "Orfanedes' role as an attorney, if any, would have been on behalf of his fiduciary, Judicial Watch" and "the purpose of consulting with Barmak was for Judicial Watch to obtain legal advice and assistance." JW Reply at 12. If Judicial Watch is correct that both Orfanedes and Barmak represented Judicial Watch, rather than Klayman individually, during the conversations at issue, then the attorney-client privilege would belong to Judicial Watch and Judicial Watch would have the option of waiving the privilege.

Ultimately Klayman does not clearly explain the basis on which he asserts the attorney-client privilege applies, and this failing is fatal because the party seeking to invoke the attorney-client privilege bears the burden of presenting to the court sufficient facts to establish the privilege. *See In re Sealed Case*, 737 F.2d 95, 99 (D.C. Cir. 1984). However, even accepting Klayman's version of the facts (to the extent that the Court is able to discern it), it appears that the attorney-client privilege and attorney duty of confidentiality are not applicable. Klayman's argument is that during the conversations in question, Orfanedes and Barmak were jointly representing Klayman, as Chairman of Judicial Watch, along with Judicial Watch itself. Pl.'s Reply at 8. Klayman proffers no evidence to establish that Orfanedes was his personal attorney rather than Judicial Watch's attorney. In contrast, Klayman cites to a letter dated May 8, 2003, in

15

which he and Fitton acknowledged that Barmak had "represented or may be deemed to have represented, Larry Klayman personally." *Id.*, Ex. 3.  Nevertheless, even if Orfanedes or Barmak was engaged in a joint representation of Klayman individually and Judicial Watch, Klayman himself admits that "the prevailing rule is that, as between commonly represented clients, the [attorney-client privilege] does not attach." *Id.* at 9 (citing Comment 15 to D.C. R. of Prof. Cond. 1.7).

Finally, although the Court cannot discern whether Klayman in fact asserts as much, it does not appear that the attorney-client privilege would apply even if Orfanedes or Barmak represented Klayman individually during the conversations at issue.  Klayman does not dispute Judicial Watch's contention that Fitton was present during the conversations and it is clear that Fitton is not a lawyer.  *See* JW Reply at 12.  "Normally the attorney-client privilege is destroyed once information is shared with any person other than the attorney and the client because the presence of a third party is inconsistent with the client's intent that the communication remain confidential." *Blumenthal v. Drudge*, 186 F.R.D. 236, 243 (D.D.C. 1999) (citing *In re Lindsay*, 158 F.3d 1263, 1270 (D.C. Cir. 1998)).  It therefore appears that the attorney-client privilege would not apply if Klayman disclosed information to his attorneys in Fitton's presence. Moreover, as the party seeking to invoke the attorney-client privilege, Klayman bears the burden of presenting to the court sufficient facts to establish the privilege.  *In re Sealed Case*, 737 F.2d at 99.  Klayman has utterly failed to carry this burden, because he has not even clearly described the factual circumstances in which the conversations at issue are alleged to have taken place.  As such, the Court cannot conclude that the attorney-client privilege has been violated.

Klayman also argues that the allegations Judicial Watch seeks to add are the fruit of an

16

improper disclosure by Orfanedes and Barmak, in violation of their duty of confidentiality under Rule of Professional Conduct 1.6. That Rule prohibits a lawyer from knowingly revealing a confidence of a client, using a confidence of a client to the client's disadvantage, or using a confidence of a client for the advantage of a lawyer or of a third person. D.C. R. of Prof. Cond. 1.6. However, that Rule defines a "confidence" as "information protected by the attorney-client privilege under applicable law." *Id.* Thus, because Klayman has not established the application of the attorney-client privilege, he cannot demonstrate a violation of Rule 1.6. Furthermore, the Court notes again that Klayman does not dispute that Fitton was present during the conversations at issue and that Fitton is not a lawyer. As such, Fitton is not bound by any duty of confidentiality with respect to the matters discussed and Klayman has not proffered any evidence that the allegations at issue were disclosed by Orfanedes or Barmak, rather than Fitton.

Finally, in his Reply in support of his Cross-Motion for Sanctions, Klayman argues that Judicial Watch violates other Rules of Professional Conduct by seeking to add the allegations contained in Paragraphs 10-20 of its proposed Amended Counterclaim. Specifically, Klayman argues that the allegations violate Rule 3.6 because they are "utterly irrelevant" to the instant action and therefore constitute improper extra-judicial statements that will be disseminated and will have a substantial likelihood of materially prejudicing an adjudicative proceeding. Pl.'s Reply at 6-7; D.C. R. of Prof. Cond. 3.6. Klayman further asserts that the allegations "have no substantial purpose other than to embarrass third persons" and therefore violate Rule 4.4(a). Each of these assertions fails, however, because of the Court's conclusion above that the allegations contained in Judicial Watch's proposed Paragraphs 10-20 are directly related to

17

Judicial Watch's actionable Lanham Act claims.[3]

In sum, Klayman has failed to support his Cross-Motion for Sanctions with any evidence of sanctionable conduct on the part of Judicial Watch, its officers, or its counsel.  As such, the Court shall deny Klayman's Cross-Motion for Sanctions.

## IV: CONCLUSION

For the reasons set forth above, the Court shall GRANT Judicial Watch's Motion for Leave to Amend and shall DENY Plaintiff's Cross-Motion for Sanctions.  An appropriate Order accompanies this Memorandum Opinion.

Date:   December 3, 2007

_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge

---

[3] Klayman's Cross-Motion for sanctions also accuses Judicial Watch of alerting the media to its filing of its proposed Amended Counterclaim.  However, Klayman fails to proffer any factual support for this allegation, which Judicial Watch in turn denies.  *See* Pl.'s Opp'n at 15; JW Reply at 13, Ex. 4.  As such, the Court has not considered Klayman's unsupported assertion.